IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.  MICHELLE ERNST as Personal Representative of the Estate of DAVID MICHAEL ERNST, deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 14-CV-504-GKF-PJC |
| v. | ) ) ) | |
| 1.  CREEK COUNTY PUBLIC FACILITIES AUTHORITY, | ) ) | |
| 2.  ADVANCED CORRECTIONAL HEALTHCARE, INC., | ) ) ) | |
| Defendants. | ) | |

---

**DEFENDANT AUTHORITY'S MOTION AND BRIEF FOR SUMMARY JUDGMENT**

---

Ambre C. Gooch, OBA No. 16586
COLLINS, ZORN & WAGNER, P.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: gooch@czwglaw.com

ATTORNEY FOR DEFENDANT CREEK COUNTY PUBLIC FACILITIES AUTHORITY

April 15, 2016

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iv

LIST OF ATTACHMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v - vii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LOCAL RULE STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      STANDARD OF REVIEW FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . 12

II.     PLAINTIFF'S MUNICIPAL LIABILITY AGAINST THE
        AUTHORITY FAILS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.      There was no underlying violation of Ernst's
                Constitutional Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      The Jail's Reliance on ACH Medical Staff was Reasonable . . . . . . . . . . . . . 19

        C.      No policy, practice, or custom of the Defendant Authority
                caused a violation of Ernst's constitutional rights . . . . . . . . . . . . . . . . . . . . . 21

        D.      There was no failure to train . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        E.      There was no failure to supervise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## TABLE OF AUTHORITY

**CASES**                                                                                 **PAGE**

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Barney v. Pulsipher*, 143 F.3d 1299 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Barrie v. Grand County, Utah*, 119 F.3d 862 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . 16

*Board of County Commissioners of Bryant County, Oklahoma v. Brown*,
520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Celotext Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Cf Connick v. Thompson*, 131 S. Ct. 1350, 179 L.Ed.2d 417 (2011) . . . . . . . . . . . . . . . . . . 22, 24

*Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197,
103 L. Ed. 2d 412 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 24-26

*City of Los Angeles v. Heller*, 475 U.S. 796 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427,
85 L. Ed. 2d 791 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 21

*Estate of Hocker by Hocker v. Walsh*, CIV-92-855-H,
1993 WL 664646, *6 (W.D. Okla. Jan. 14, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Estate of Hocker v. Walsh*, 22 F.3d 995 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Estelle v. Gamble*, 429 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970,
128 L. Ed. 2d 811 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20, 26

*Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 21

*Jett v. Dallas Independent School District*, 491 U.S. 701,
109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Lankford v. City of Hobart*, 73 F.3d 283 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Livsey v. Salt Lake County*, 275 F.3d 952 (10th Circ. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Mitchell v. Maynard*, 80 F.3d 1433 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658,
98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 21

*Pembaur v. Cincinnati*, 475 U.S. 469, 106 S. Ct. 1291, 89 L. Ed. 2d 425 (1986) . . . . . . . . 13, 21

*Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rizzo v. Goode*, 423 U.S. 362, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976) . . . . . . . . . . . . . . . . . . 26

*Ruegsegger v. Jefferson County Bd. of County Com'rs*,
197 F. Supp. 2d 1247 (D. Colo. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Sample v. Diecks*, 885 F.2d 1099 (3rd Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Spruill v. Gillis*, 372 F.3d 218 (3rd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Taylor v. Barkes*, 135 S.Ct. 2042, 192 L.Ed2d 78 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATUTES**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15, 21, 22, 24

**RULES**

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

## ATTACHMENTS TO DEFENDANT AUTHORITY'S
<u>MOTION FOR SUMMARY JUDGMENT</u>

Exhibit 1          Ernst Inmate Detail

Exhibit 2          Declaration of Birch dated April 13, 2016

Exhibit 3          Ernst Inmate Medical Form - **UNDER SEAL**

Exhibit 4          Ernst Placement/Review of Detainee in Observation - **UNDER SEAL**

Exhibit 5          Suicide Observation Checklist for David Ernst - **UNDER SEAL**

Exhibit 6          Ernst Medical History Form dated August 26, 2013 - **UNDER SEAL**

Exhibit 7          Ernst Medical Progress Note dated August 26, 2013 - **UNDER SEAL**

Exhibit 8          Ernst Medical Progress Note dated September 2, 2013 - **UNDER SEAL**

Exhibit 9          NONE

Exhibit 10         Ernst Medical Request Form dated August 28, 2013 - **UNDER SEAL**

Exhibit 11         Ernst Medical Request Form dated August 30, 2013 - **UNDER SEAL**

Exhibit 12         Ernst Medical Request Form dated September 1, 2013 - **UNDER SEAL**

Exhibit 13         Ernst Medical Request Form dated September 5, 2013 - **UNDER SEAL**

Exhibit 14         Ernst Medical Request Form dated September 17, 2013 - **UNDER SEAL**

Exhibit 15         Ernst Medical Request Form dated October 1, 2013 - **UNDER SEAL**

Exhibit 16         Ernst Medical Request Form dated November 16, 2013 (Bates No. 45) - **UNDER SEAL**

Exhibit 17         Ernst Medical Request Form dated November 16, 2013 (Bates 2191) - **UNDER SEAL**

Exhibit 18         Ernst Medical Progress Note from November 16, 2013 - **UNDER SEAL**

Exhibit 19         Ernst Medical Request Form dated December 11, 2013 - **UNDER SEAL**

Exhibit 20      Ernst Medical Request Form dated January 10, 2014 - **UNDER SEAL**

Exhibit 21      Ernst Medical Request Form dated January 16, 2014 - **UNDER SEAL**

Exhibit 22      Ernst Medical Request Form dated January 23, 2014 - **UNDER SEAL**

Exhibit 23      Ernst Medical Request Form dated January 29, 2014 - **UNDER SEAL**

Exhibit 24      Mental Health Services Clinical Contact Form - **UNDER SEAL**

Exhibit 25      Audio recorded phone call on June 11, 2014 from Angela Holmes to Creek County Jail

Exhibit 26      Transcript of audio recorded phone call at the CCDC on June 12, 2014 between Angela and Jeremy Holmes, p. 129, ln. 17-23

Exhibit 27      Jury Verdict in Ernst's criminal case filed June 12, 2014

Exhibit 28      Ernst Medical Progress Note dated June 17, 2014 - **UNDER SEAL**

Exhibit 29      Excerpts of the deposition of Michelle Ernst taken on May 21, 2015

Exhibit 30      Jail Incident Report

Exhibit 31      Transcript of June 15, 2014 phone call between David and Regina Ernst, 156:2-157:12

Exhibit 32      Declaration of Dr. Dennis dated April 13, 2016 (with attached expert report)

Exhibit 33      Excerpts of the deposition of Kelly Birch taken on November 18, 2015

Exhibit 34      Excerpts of the deposition of Amanda Spriggs taken on July 31, 2015

Exhibit 35      Excerpts of the deposition of Gary McIntosh taken on December 4, 2015

Exhibit 36      Excerpts of the deposition of Pam Hibbert taken on July 30, 2015

Exhibit 37      Excerpts of the deposition of Adam Marshall taken on November 9, 2015

Exhibit 38      Excerpts of the deposition of David Johnsen, Ph.D. taken on March 16, 2016

Exhibit 39      Excerpts of the deposition of Gary Vilke, M.D. taken on January 13, 2016

Exhibit 40      Excerpts of the deposition of Regena Ernst taken on May 18, 2015

Exhibit 41      *Estate of Hocker by Hocker v. Walsh*, CIV-92-855-H, 1993 WL 664646, *6
                (W.D. Okla. Jan. 14, 1993)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. MICHELLE ERNST as Personal Representative of the Estate of DAVID MICHAEL ERNST, deceased, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14-CV-504-GKF-PJC |
| v. | ) | |
| | ) | |
| | ) | |
| 1. CREEK COUNTY PUBLIC FACILITIES AUTHORITY, | ) ) | |
| 2. ADVANCED CORRECTIONAL HEALTHCARE, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT AUTHORITY'S MOTION AND BRIEF FOR SUMMARY JUDGMENT

Defendant Creek County Public Facilities Authority ("Authority") requests that the Court grant summary judgment in its favor pursuant to Fed. R. Civ. P. 56(a), for the reasons set forth in the following Brief.

## STATEMENT OF THE CASE

Plaintiff is personal representative of the estate of David Ernst. Ernst was incarcerated in the Creek County Criminal Justice Center ("CCCJC" or "Jail") from August 24, 2013 until he committed suicide by hanging on June 17, 2014. Plaintiff has sued the Authority for alleged failure to provide medical care[1] to Ernst during his incarceration, in violation of the United States Constitution[2]. The Authority denies that it failed to provide appropriate medical care for Ernst.

---

[1]Throughout this Motion and Brief, the term medical care is intended to include mental health care.

[2]On March 30, 2016, the Plaintiff dismissed her alleged state law claims against the Authority. See Dismissal filed at Doc. 63.

During Ernst's incarceration (and on other dates as well), the Authority contracted with Advanced Correctional Healthcare (ACH) for ACH to provide medical care to CCCJC inmates. ACH trained and employed its licensed medical staff. Ernst's suicide was the first in the CCCJC. Prior to Ernst's suicide, the Authority had no issues with ACH providing or not providing care or medication to inmates.  The Authority's reliance on ACH's trained, licensed medical staff to make medical decisions regarding CCCJC inmates, specifically Ernst in this case, was reasonable and does not reflect deliberate indifference toward Ernst's alleged serious medical needs.

## LOCAL RULE STATEMENT OF FACTS

1.     On August 24, 2013, at 6:50 a.m., Ernst was booked into the Creek County Criminal Justice Center (CCCJC) on four counts of first degree manslaughter and one count of unsafe lane use. (Exhibit 1, Ernst Inmate Detail; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

2.     Shortly after being booked in, Ernst was asked questions by a jailer and his responses were recorded on the Inmate Medical Form. Ernst denied he was suicidal and reported he was not currently receiving mental health treatment (Exhibit 3, Ernst Inmate Medical Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

3.     It is the Jail's policy to provide access to care for serious medical, dental, and mental health care needs. (Exhibit 2, Deposition of Birch, 76:22-77:4).

4.     The Jail did this during Ernst's incarceration by contracting with Advanced Correctional Healthcare (ACH) to provide medical and mental health care services to CCCJC inmates. (Exhibit 33, Deposition of Birch, 69:2-6; Exhibit 2, Declaration of Birch at ¶¶ 2-3, 7).

5.     During Ernst's incarceration, the Jail's policy and practice regarding inmate medical/mental health care was for ACH staff to make inmate medical/mental health care decisions.

2

If an inmate had a medical/mental health complaint, the complaint was provided to ACH staff who decided how to address the complaint.  Jail staff followed ACH  staff's direction or advice as to inmate medical/mental health care.  (Exhibit 2, Declaration of Birch at ¶ 9; Exhibit 33, Deposition of Birch, 117:19-118:11).

6.      During Ernst's incarceration, the staff ACH hired to work in the Jail's medical department consisted of nurses, a mental health professional, and a physician and/or physician's assistant. These staff were employed by ACH; they were not Jail employees. (Exhibit 2, Declaration of Birch at ¶ 7).

7.      During Ernst's incarceration, ACH was required to provide 108 hours of on-site nursing services/week, 10 hours/week of on-site services from a Qualified Mental Health Professional, a weekly visit by the ACH physician or physician assistant, and 24/7 on call service by the physician or physician's assistant.  (Exhibit 2, Declaration of Birch at ¶ 8).

8.      A few hours after Ernst was booked into Jail, Ernst was placed on suicide watch because he would not eat.  (Exhibit 34, Deposition of Spriggs, 47:8-12; Exhibit 5, Suicide Observation Checklist for Ernst; Exhibit 4, Ernst Placement/Review of Detainee in Observation; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

9.      On August 26, 2013 at 9:50 a.m., Ernst was removed from suicide watch by Amanda Spriggs, ACH's Licensed Professional Counselor, because Ernst denied being suicidal, acknowledged his reasons to live, and committed to a safety plan.  (Exhibit 34, Deposition of Spriggs, 48:-13-49:13, 49:24-51:5, 52:19-53:8; Exhibit 4, Ernst Placement/Review of Detainee in Observation; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

10.      When Spriggs removed Ernst from suicide watch on August 26, 2013, Ernst denied

3

being suicidal, denied previous suicide attempts, and denied mental health medication management. (Exhibit 34, Deposition of Spriggs, 48:-13-49:13, 49:24-51:5, 52:19-53:8; Exhibit 4, Ernst Placement/Review of Detainee in Observation; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

11.     Only medical or mental health staff can remove an inmate from suicide watch. (Exhibit 33, Deposition of Birch, 104:23-105:1; Exhibit 34, Deposition of Spriggs, 8:23-9:3; Exhibit 35, Deposition of McIntosh, 48:6-11).

12.     While Ernst was on suicide watch, jailers checked on Ernst every fifteen minutes (Exhibit 5, Ernst Suicide Observation Checklist; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

13.     On August 26, 2013 at 1:50 p.m., a medical history was obtained by ACH staff from Ernst; this included a review of prescriptions Ernst reported having (Exhibit 7, Ernst Medical Progress Note; Exhibit 6, Ernst Medical History Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

14.     On August 28, 2013, Ernst submitted a medical request which he asked for Lortab (narcotics) for Crohn's disease. An ACH employee addressed this request on September 1, 2013. (Exhibit 10, Ernst's Medical Request Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

15.     On August 30, 2013, Ernst submitted a request to Stacy or Dana Fletcher in which he requested medication for abdominal pain from Crohn's disease. ACH nurse Stacy Jones responded to Ernst on September 3, 2013. She stated his family brought his medications on September 3, 2013 and they were started that day. (Exhibit 11, Ernst's Medical Request Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

16.     On September 1, 2013 Ernst submitted a medical request complaining that he was not getting his medicine for Crohn's disease. An ACH employee addressed the request on the same day, September 1, 2013.(Exhibit 12, Ernst's Medical Request Form; Exhibit 2, Declaration of Birch

4

at ¶¶ 2-3).

17.     On September 2, 2013, Ernst was seen by ACH medical staff for complaints of pain from Crohn's disease. He requested Lortab. Tylenol was prescribed, and ACH staff noted the physician would be contacted for orders. (Exhibit 8, Medical Progress Note from September 2, 2013; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

18.     On September 5, 2013, Ernst submitted a request to Medical/Stacy/Donna Fletcher in which he requested to receive pain medications for Crohn's disease.  ACH nurse K. Jones responded on the same day stating no narcotics are given at the facility. (Exhibit 13, Ernst's Medical Request Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

19.     On September 17, 2013, Ernst submitted a medical request in which he asked for narcotic pain medication (Lortabs) and other medications for abdominal pain from Crohn's disease. An ACH employee addressed the request September 20, 2013.  (Exhibit 14, Ernst's Medical Request Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

20.     On October 1, 2013 Ernst submitted a request to Mental Health to see a psychiatrist for counseling because he was having nightmares. On October 4, 2013, Spriggs responded to the request, and told Ernst the jail does not offer individual counseling to inmates. She advised him to contact CREOKS for counseling when he leaves the facility.  (Exhibit 15, Ernst's Medical Request Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

21.     However, it was Birch's understanding and expectation that ACH would make appropriate arrangements for mental health treatment, and that  counseling was available (Exhibit 33, Deposition of Birch, 82:11-83:5; 124:8-13).

22.     Birch was not aware ACH did not have a contract with psychologists or psychiatrists

5

in the area. (Exhibit 33, Deposition of Birch, 83:6-9).

23.     On an undated form, Ernst made a request to Hutchison or Birch to receive Gabapentin for depression in the amount prescribed by his doctor, and to receive pain medication for Crohn's disease. On November 6, 2013, Hutchison responded, telling Ernst he was getting the medication the doctor approved, and that medical put him on the list to see the doctor to discuss these issues. (Exhibit 16, Ernst's Request to Staff Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

24.     Then, on November 16, 2013 ACH saw Ernst and advised there were no new orders per the jail physician at that time.(Exhibit 17, Ernst's Medical Request Form; Exhibit 18, Medical Progress Note from November 16, 2013, Declaration of Birch at ¶¶ 2-3).

25.     On December 11, 2013, Ernst submitted a medical request in which he asked to see a doctor or nurse and he requested prescriptions for "personal issues" and Crohn's disease. An ACH employee addressed the request on December 13, 2013. (Exhibit 19, Ernst's Medical Request Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

26.     On December 13, 2013, Ernst was seen by ACH Physician's Assistant Gary McIntosh. Ernst complained only of ear wax and wanting medication for Crohn's disease. McIntosh saw nothing to indicate Ernst was clinically depressed, and Ernst's affect was normal. (Exhibit 35, Deposition of McIntosh, 28:5-29:5; 29:17-24; 35:8-36:15).

27.     On January 10, 2014 Ernst made a request to staff to see a counselor due to having nightmares. On January 18, 2014, ACH medical staff responded to the request by stating that counseling is not offered.  (Exhibit 20, Ernst's Medical Request; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

28.     On January 16, 2014, Ernst made a request to Lance Prout in which he requested to

see a psychiatrist due to having nightmares. An ACH employee addressed the requested on January 17, 2014 by stating counseling is not offered to inmates, and needs to be arranged outside the jail. (Exhibit 21, Ernst's Medical Request Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

29.     On January 23, 2014, Ernst made a medical request in which he complained he was having trouble sleeping due to nightmares and not receiving Remeron. On January 25, 2014 an ACH employee responded to the request by stating they cannot give Remeron at the jail anymore, and there is no substitute. (Exhibit 22, Ernst's Medical Request Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

30.     On January 29, 2014, Ernst made a medical request to go to CREOKS Mental Health for nightmares and related problems. On an unknown date, ACH staff responded to the requested, advising "No Remeron." (Exhibit 23, Ernst's Medical Request Form; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

31.     Regina Ernst claims that in May 2014, she told the 911 dispatcher at the Jail that Ernst needed mental health help. Regina claims that the dispatcher referred her to Sheriff's Office employee David Thompson, whom Regina claims she called the next day.  (Exhibit 40, Deposition of Regina Ernst, 54:9-56:14, 58:19-59:7).

32.     As a result, on May 19, 2014, Spriggs saw Ernst, in response to the family's contacting the Jail. Ernst advised Spriggs he was having nightmares and he requested individual counseling and sleep medication. Spriggs advised Ernst that neither individual counseling nor sleep medication were provided in jail and that his information would be given to a physician for review. (Exhibit 24, Mental Health Services Clinical Contact Form; Exhibit 34, Deposition of Spriggs, 90:9-21, 92:7-18; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

33.     On June 11, 2014, Angela Holmes, wife of inmate Jeremy Holmes, called the CCCJC and advised CCCJC staff that Ernst was threatening suicide. (Exhibit 25, Audio recorded phone call of June 11, 2014 from Angela Holmes to Creek County Jail; Exhibit 2, Declaration of Birch at ¶ 4).

34.     In response to this call, the Jail's policy and procedure required the supervisor to have Ernst checked on to see how he was doing and whether he needed to be seen by medical (Exhibit 2, Declaration of Birch at ¶ 5).

35.     In response to and after Holmes's call, Jail staff checked on Ernst, took him out of his cell, and asked him a few questions.  (Exhibit 26, Transcript of audio recorded phone call of June 12, 2014 between Angela and Jeremy Holmes, at the CCCJC; Exhibit 2, Declaration of Birch at ¶ 6).

36.     On June 12, 2014, Ernst was convicted by a jury on four counts of 1st Degree Manslaughter and sentenced to a total of 36 years in prison. (Exhibit 27, Case No. B-CF-2013-332 Jury Verdict)[3].

37.     On June 12, 2014, Deputy Adam Marshall transported Ernst from the Courthouse back to the CCCJC after his trial concluded, and he was concerned about Ernst. (Exhibit 37 Deposition of Marshall, 9:5-10:12; 28:22-29:1; 29:6-8).

38.     As a result, Marshall reported to shift supervisor Boomer Jones, Chief of Security Lance Prout, and Lieutenant Hutchison that Ernst needed to watched or put on suicide watch. (Exhibit 37, Deposition of Marshall, 35:4-36:12; 40:2-22).

39.     Prout then spoke with Ernst and told Ernst that he (Prout) would have the nurse check on him. (Exhibit 30, Jail Incident Report of Lance Prout at bates 89; Exhibit 2, Declaration of Birch

---

[3] Defendant requests the Court take judicial notice of this verdict. See Fed. R. Evid. 201

at ¶¶ 2-3).

40.     At this time, Ernst seemed to be in good spirits, said he wanted to be around other inmates, and stated he was okay with his situation. (Exhibit 30, Jail Incident Report of Lance Prout at bates 89; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

41.     Then, Ernst was seen by ACH Nurse Pam Hibbert.  (Exhibit 36, Deposition of Hibbert, 114:25-115:22; Exhibit 28, Ernst Medical Progress Note; Exhibit 30, Jail Incident Report of Lance Prout at bates 89; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

42.     At that time, ACH Nurse Hibbert evaluated Ernst, who repeatedly denied he was suicidal.(Exhibit 36, Deposition of Hibbert, 116:4-120:3, 37:8-39:3; Exhibit 28, Ernst Medical Progress Note; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

43.     At that time, Ernst showed no signs of suicidal ideation, according to ACH Nurse Hibbert. (Exhibit 36, Deposition of Hibbert, 116:4-120:3 37:8-39:3; Exhibit 28, Ernst Medical Progress Note; Exhibit 2, Declaration of Birch at  ¶¶ 2-3).

44.     Thus, ACH Nurse Hibbert determined Ernst could be returned to the general inmate population. (Exhibit 36, Deposition of Hibbert, 116:4-120:3).

45.     On June 13, 2014 during medication pass, Ernst told ACH Nurse Hibbert that he was alright. (Exhibit 36, Deposition of Hibbert, 120:25-121:19; Exhibit 28, Medical Progress Note; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

46.     On June 13, 2014 during medication pass, Ernst showed no signs of suicidal ideation, according to ACH Nurse Hibbert.(Exhibit 36, Deposition of Hibbert, 120:25-121:19; Exhibit 28, Medical Progress Note; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

47.     On June 15, 2014 at 1912 hours, Ernst called wife Regina from Jail. Ernst believed

9

she was with another man in Arkansas. Regina told Ernst to do whatever he wanted to do because she could not handle it anymore, and hung up on him. (Exhibit 31, Transcript of June 15, 2014 phone call between David and Regina Ernst, 156:2-157:12; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

48.    Ernst committed suicide by hanging himself in the early morning of June 17, 2014. (Exhibit 30, Jail Incident Report; Exhibit 2, Declaration of Birch at ¶¶ 2-3).

49.    Plaintiff's own, purported mental health expert, David Johnsen, Ph.D., is providing no opinions regarding the CCCJC's detention officers, deputies, employees, or policies.  (Exhibit 38, Deposition of Johnsen at p. 43, ln. 15-17; p. 76, ln. 7-13).

50.    Plaintiff's own purported correctional healthcare expert, Gary Vilke, M.D., agrees it is reasonable for CCCJC staff to rely on the medical decisions of ACH medical staff. (Exhibit 39, Deposition of Vilke, 127:13-17).

51.    Dr. Vilke also agrees that no action or inaction of CCCJC staff was deliberately indifferent.  (Exhibit 39, Deposition of Vilke, 127:18-128:10).

52.    The medical and mental health care Ernst received at the CCCJC was adequate and within accepted standards. (Exhibit 32, Expert Report of Dr. Dennis, page 1).

53.    Kelly Birch has been Jail Administrator since 2009.  Ernst's suicide is the first suicide in the Jail, since Birch has been Jail Administrator. (Exhibit 33, Deposition of Birch, 5:15-17; 89:9-24).

54.    Prior to contracting with ACH, Birch called other facilities to check ACH's references and received positive opinions of ACH. (Exhibit 33, Deposition of Birch, 62:21-63:16).

55.     ACH was required to provide its staff training on medical and mental health issues. (Exhibit 2, Declaration of Birch at ¶ 7).

56.     Jail policy required that all Creek County Jail detention staff receive a minimum of 12 hours of  annual training on the Jail's policies and procedures and the Oklahoma State Jail Standards.  Topics covered in this training include First Aid, CPR, security procedures, supervision of inmates, report writing and documentation, inmate rules and regulations, inmate grievance procedures, inmate disciplinary procedures, Facility emergency procedures, mental health issues and suicide recognition.  (Exhibit 2, Declaration of Birch at ¶ 10).

57.     Jail policy required that all newly hired detention staff receive a minimum of 24 hours of training, within their first year of employment, on the Jail's policies and procedures and the Oklahoma State Jail Standards.  Topics covered in this training are the same set forth above in ¶ 56. (Exhibit 2, Declaration of Birch at ¶ 11).

58.     ACH had criteria for suicide precautions, including a contract for inmates to sign promising they would not harm themselves.(Exhibit 34, Deposition of Spriggs, 11:24-16:7).

59.     Birch expected ACH to obtain past and current medical and mental health histories of inmates to aid in providing treatment to them. (Exhibit 33, Deposition of Birch, 83:19-84:4).

60.     Birch expected that, if a medication was prescribed by a physician prior to an inmate entering the Jail, the medication would be provided to that inmate if it met ACH's medication formulary, and if it did not meet that formulary, ACH would provide the inmate a substitute. (Exhibit 33, Deposition of Birch, 77:16-78:16).

61.     Prior to Ernst's suicide, Birch had no previous issues with ACH providing or not providing care or medication to inmates. (Exhibit 33, Deposition of Kelly Birch, 125:24-126:16).

62.     Medications were distributed to Ernst per the dosage instructions of the ACH physician or physician assistant. (Exhibit 34, Deposition of Spriggs, 37:4-8; Exhibit 36, Deposition of Hibbert, 71:20-72:4).

63.     Changes to Ernst's medications were determined by the ACH physician and Physician's Assistant. (Exhibit 35, Deposition of McIntosh, 67:8-68:20).

64.     PA McIntosh had training in mental health issues and felt competent to diagnose mental health issues and administer treatment. (Exhibit 35, Deposition of McIntosh, 28:15-29:13).

65.     During Ernst's incarceration, his daughter (and Plaintiff)  Michelle Ernst, believed he was having mental health problems, but she did not report this to anyone in the Jail. (Exhibit 29, Deposition of M. Ernst, 34:1-16, 51:5-52:1).

66.     Pam Hibbert is a licensed, practical nurse.  (Exhibit 36, Deposition of Hibbert, 17:24-18:2).

## I.     STANDARD OF REVIEW FOR SUMMARY JUDGMENT.

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any undisputed fact and the movant is entitled to judgment as a matter of law." Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotext Corp. v. Catrett*, 477 U.S. 317 (1986). The Supreme Court expressed support for the efficiency and expediency of summary judgment in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), stating that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Furthermore, the Court clarified, such evidence must be substantial enough, and "significantly probative" enough, that a jury could "reasonably find for the plaintiff";

12

"the mere existence of a scintilla of evidence" will not suffice. *Id*.  Summary judgment may be properly granted when the moving party references the lack of evidentiary support for plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, at 325).

## II.   PLAINTIFF'S MUNICIPAL LIABILITY AGAINST THE AUTHORITY FAILS.

In order to establish municipal liability against the Authority under 42 U.S.C. § 1983, Plaintiff must show that Ernst's constitutional right was violated AND that such violation was caused by a policy, practice or custom of the Authority, or that an official with final policy-making authority for the Authority personally participated in the alleged constitutional violation(s). *See Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) (municipality cannot be held liable under § 1983 unless the act complained of is that of a final policymaker or a custom or usage is shown).

The Authority cannot be held liable under § 1983 based upon the doctrine of *respondeat superior* or vicarious liability. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  In *Monell*, the Supreme Court held that a governmental entity is only liable under § 1983 when the constitutional injury can fairly be said to have been caused by that entity's own policies and customs. *Id*. at 694.  The actions of the governmental entity must be the moving force behind the constitutional violation. *Id*.  The Supreme Court has held that governmental liability for a constitutional violation "attaches where - and only where - the entity makes a deliberate choice to follow a course of action from among various alternatives." *Pembaur v. Cincinnati*, 475 U.S. 469, 483, 106 S. Ct. 1291, 89 L. Ed. 2d 425 (1986).

Additionally, the Authority may NOT be held liable simply because it "employs a tortfeasor." *Board of County Commissioners of Bryant County, Oklahoma v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997). "That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation." *Id.* at 406-07. Rather, *Monell* requires Plaintiff to establish that a policy or custom of the Authority exists and that it caused the alleged constitutional violations. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821-22, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985); *see also Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (plaintiff must show that there is a direct causal link between the policy or custom and the injury alleged).

Furthermore, it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality. *Brown*, 520 U.S. at 408. The plaintiff must also demonstrate that, through its *deliberate conduct*, the municipality was the "*moving force*" behind the injury alleged. *Id*. (emphasis added). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id*. at 405.

In sum, Plaintiff cannot show that Ernst's constitutional right was violated OR that a policy, practice, or custom of the Authority existed which caused any alleged violation of Ernst's constitutional rights.

### A.    There was no underlying violation of Ernst's Constitutional Rights.

The lack of a constitutional violation by the officers of a municipality negates a finding of liability against the municipality itself. *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).

14

This is so "regardless of whether the municipality's policies might have 'authorized' such harm." *Id*. (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). *See also Walker v. City of Orem*, 451 F.3d 1139, 1152 (10th Cir. 2006) (holding that a plaintiff suing a county under § 1983 must demonstrate that a municipal employee committed a constitutional violation); *Livsey v. Salt Lake County*, 275 F.3d 952, 958 (10th Circ. 2001) (county employees did not violate constitutional rights and thus could not have cause the county to be held liable based on their actions). In this case, not only do the Authority's policies and procedures refute Plaintiff's claims of deliberate indifference, Plaintiff cannot show any Authority jail staff acted with deliberate indifference toward Ernst's medical needs either.

In her Amended Complaint (Doc. 15), Plaintiff alleges the Authority was deliberately indifferent to Ernst's medical needs during his incarceration, particularly with regard to his suicide. Claims regarding inmate suicide under are "treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand County, Utah*, 119 F.3d 862, 866 (10th Cir. 1997). In *Estelle v. Gamble*, 429 U.S. 97 (1976), the U.S. Supreme Court held that deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment, and such a constitutional violation is actionable under § 1983. *Estelle* at 104. That ruling thereby established the "deliberate indifference" test against which all § 1983 inmate suicide claims are judged. *Estate of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994).

To state a claim that deliberate indifference to serious medical needs rises to the level of cruel and unusual punishment, a plaintiff must satisfy both the objective and subjective elements of the test for deliberate indifference. *Mata v. Saiz*, 427 F.3d 745, 752-753 (10th Cir. 2005) (quoting

*Farmer v. Brennan*, 511 U.S. 825, 834-37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Authority acknowledges that suicide constitutes substantial harm under the objective portion of the deliberate indifference test.

The second element that Plaintiff must prove to satisfy the deliberate indifference test is the subjective element. To prove the subjective element, Plaintiff must show the Authority or its employee(s) acted with a "sufficiently culpable state of mind," so egregious it amounts to "deliberate indifference" to a substantial risk of serious harm to an inmate. *Farmer* at 834. Mere negligence, even gross negligence is insufficient to meet this standard. *Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489, 1495 (10th Cir. 1990) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 and n. 7 (1989). In other words, to meet the subjective element, Plaintiff must demonstrate that the Authority's employee(s) disregarded a known or obvious risk that Ernst would commit suicide. *Barrie* at 869. Plaintiff cannot show this.

There is no evidence that, prior to Ernst's suicide on June 17, 2014, any Authority employee subjectively aware that Ernst was suicidal.  Each time Authority or ACH employees talked to Ernst before his death, he denied being suicidal. (See Undisputed Fact [UDF] 2, 9-10, 35, 40-46). The Court in *Estate of Hocker by Hocker v. Walsh*, CIV-92-855-H, 1993 WL 664646, *6 (W.D. Okla. Jan. 14, 1993) (unpublished opinion attached as Exhibit 41 ) *aff'd*, 22 F.3d 995 (10th Cir. 1994) noted that "knowledge that a detainee fits the profile of a high suicide risk is not enough to establish deliberate indifference. The knowledge must be specific to the particular detainee."  Plaintiff may argue that Ernst's conviction and lengthy sentence may have placed him at a higher risk for suicide, but nonetheless, the evidence does not support a claim that any jail employee was subjectively aware that Ernst was actually suicidal.

16

When Ernst was first booked into the jail on August 24, 2013, booking officers completed a medical questionnaire regarding Ernst, to which he provided the answers (UDF 2). He reported that he was not suicidal and was not under the care mental health professional at that time (UDF 2). Despite the fact that Ernst stated he was not suicidal, he was nonetheless placed on suicide watch anyway. (UDF8). Two days later, on August 26, 2013, Ernst was removed from suicide watch by Amanda Spriggs, ACH's Licensed Professional Counselor, because Ernst denied being suicidal, acknowledged his reasons to live, and committed to a safety plan.  (UDF 9).   At that time, Ernst denied being suicidal, denied previous suicide attempts, and denied mental health medication management. (UDF10).

Between August 26, 2013 and June 11, 2014, Ernst submitted more than a dozen requests for medical care of some kind, all but two of them were submitted to ACH medical staff (UDF 14-30).  Of the two that were submitted to Jail staff, one was submitted to Hutchison in November 2013, he requested medications for pain and depression, and on November 6, 2013, she referred his request to ACH who then addressed his request on November 16, 2013 (UDF 23-24).   Ernst was seen by ACH PA McIntosh on December 13, 2013, at which time Ernst only complained of ear wax and wanting medication for Crohn's disease, yet McIntosh saw nothing to indicate Ernst was clinically depressed, and Ernst's affect was normal. (UDF 25-26) . McIntosh did not place him on suicide watch.  This evidence does not support a claim that any jail employee was subjectively aware that Ernst was actually suicidal.

The other request received by ACH staff was on January 16, 2014 to Prout, where Ernst complained of nightmares, and on January 17, 2014, ACH staff responded to this (UDF 28). Additionally, Regina Ernst claims that in May 2014, she told the 911 dispatcher at the Jail that Ernst

needed mental health help, and that the dispatcher referred her to Sheriff's Office employee David Thompson, whom Regina claims she called the next day. (UDF 31). Clearly Regina's communication to the Jail was relayed to ACH because on May 19, 2014, Spriggs saw Ernst, in response to the family's contacting the Jail (UDF 32). This evidence does not support a claim that any jail employee was subjectively aware that Ernst was actually suicidal.

On June 11, 2014, Angela Holmes, wife of inmate Jeremy Holmes, called the CCCJC and advised CCCJC staff that Ernst was threatening suicide. (UDF 33). In response to this call, the Jail's policy and procedure required the supervisor to have Ernst checked on to see how he was doing and whether he needed to be seen by medical, and this is exactly what happened. (UDF 34). In response to and after Holmes's call, Jail staff checked on Ernst, took him out of his cell, and asked him a few questions. (UDF 35).

Then, on June 12, 2014, when Authority employee Adam Marshall returned to the Jail from Court, he was concerned for Ernst. (UDF 37). So what did Marshall do? Just what Jail policy required: he told Jail supervisors that Ernst needed to watched or put on suicide watch, and one of those supervisors told ACH Nurse Hibbert (UDF 38-40). In response to this report, ACH Nurse Pam Hibbert evaluated Ernst who repeatedly denied he was suicidal. (UDF 41-42). According to ACH Nurse Hibbert, at that time, Ernst showed no signs of suicidal ideation so she returned him to the general inmate population.(UDF 43-44). The next day, June 13, 2014 during medication pass, Ernst told ACH Nurse Hibbert that he was alright and according to ACH Nurse Hibbert, he showed no signs of suicidal ideation (UDF 45-46). The medical and mental health care Ernst received at the CCCJC was adequate and within accepted standards. (UDF 52)

Plaintiff simply has no evidence that any Jail employee was subjectively aware that Ernst was actually suicidal, prior to June 17, 2014 when he committed suicide.

### B.   The Jail's Reliance on ACH Medical Staff Was Reasonable.

It is the Jail's policy to provide access to care for serious medical, dental, and mental health care needs UDF 3. The Jail did this during Ernst's incarceration by contracting with ACH to provide medical and mental health care services to CCCJC inmates. (UDF 4). During Ernst's incarceration, the Jail's policy and practice regarding inmate medical/mental health care was for ACH staff to make inmate medical/mental health care decisions: if an inmate had a medical/mental health complaint, the complaint was provided to ACH staff who decided how to address the complaint. (UDF 5). Jail staff followed ACH  staff's direction or advice as to inmate medical/mental health care. (UDF 5).  During Ernst's incarceration, the staff ACH hired to work in the Jail's medical department consisted of nurses, a mental health professional, and a physician and/or physician's assistant. (UDF 6).

Jail staff's reliance on ACH's licensed  medical staff's opinions was reasonable and appropriate.   Jail officials may reasonably rely on a medical professional's judgment regarding inmate medical care unless it would be obvious to a layperson that the medical professional was providing inadequate or inappropriate treatment. *Johnson v. Doughty*, 433 F.3d 1001, 1010-11 (7th Cir. 2006); *see also Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004). Allegations of medical malpractice are not sufficient to establish a constitutional violation. <u>*Estelle*</u>, 429 U.S. at 106.

Plaintiff claims the amounts, types, and frequency of the medications given were not sufficient, but this does not establish deliberate indifference or a constitutional violation. A "mere difference of opinion between the [jail's] medical staff and the inmate as to the diagnosis or

19

treatment which the inmate receives does not support a claim of cruel and unusual punishment." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).Medications were distributed to Ernst per the dosage instructions of the ACH physician or physician assistant and changes to his medications were determined by the ACH physician and Physician's Assistant. (UDF 63).

The Authority's contract with ACH specified and required, in no uncertain terms that, ACH was to provide 10 hours/week of on-site services from a Qualified Mental Health Professional (UDF 7). It was Birch's understanding and expectation that ACH would make appropriate arrangements for mental health treatment, that counseling was available, and Birch was not aware that ACH did not have a contract with a psychologist or psychiatrist in the area (UDF 22).  Nonetheless, ACH did employ a Licensed Professional Counselor (Spriggs) (UDF 9), a licensed nurse (Hibbert) (UDF 66), and a Physician's Assistant McIntosh had training in mental health issues and felt competent to diagnose mental health issues and administer treatment (UDF 64).  Further, and prior to Ernst's suicide, there was no indication to the Authority that ACH was providing inadequate or inappropriate treatment. (UDF 61).  Therefore, it was entirely reasonable for Jail staff to rely on the ACH staff's treatment, evaluation and assessments of Ernst during the course of his incarceration.  Even Plaintiff's own expert witness, Dr. Gary Vilke, agrees it was reasonable for jail staff to rely on the medical decisions of ACH medical staff, and that Jail staff was not deliberately indifferent to Ernst. (UDF 50).

Plaintiff must show the Authority or its employee(s) acted with a "sufficiently culpable state of mind," so egregious it amounts to "deliberate indifference" to a substantial risk of serious harm to an inmate. *Farmer* at 834. Plaintiff cannot show that.  Jail staff's reliance on ACH for medical

care was reasonable and does not reflect deliberate indifference, and it is entitled to summary judgment in this case.

### C. No policy, practice, or custom of the Defendant Authority caused a violation of Ernst's constitutional rights.

Even assuming, *arguendo,* that Plaintiff could demonstrate an underlying violation of Ernst's constitutional rights (i.e,. that Jail staff were deliberately indifferent to Ernst), the Authority would nevertheless be entitled to summary judgment. The law is clear that municipal liability under § 1983 cannot be based on the doctrine of *respondeat superior* or vicarious liability. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694-695 (1978). In *Monell*, the Supreme Court held that a governmental entity such as the Authority is only liable under § 1983 when the constitutional injury can fairly be said to have been caused by that entity's own policies and customs. *Id.* at 694. The actions of the governmental entity must be the moving force behind the constitutional violation. *Id.* The Supreme Court has held that governmental liability for a constitutional violation "attaches where - and only where - the entity makes a deliberate choice to follow a course of action from among various alternatives." *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986).

In other words, Plaintiff must establish that a policy or custom of the Authority exists and that it caused the alleged constitutional violations. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821-22 (1985); *see also Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (plaintiff must show that there is a direct causal link between the policy or custom and the injury alleged). Here, Plaintiff cannot do that.  The Authority simply does not have any policy, practice, or custom of being deliberately indifferent to the medical needs of inmates, or being deliberately indifferent to the risk of suicide among inmates. To the contrary, it is the Jail's policy to provide access to care for serious medical, dental, and mental health care needs (UDF 3). The Jail did this during Ernst's

21

incarceration by contracting with ACH to provide medical and mental health care services to CCCJC inmates. (UDF 4).

The staff ACH hired to work in the Jail's medical department consisted of nurses, a mental health professional, and a physician and/or physician's assistant. (UDF 6). During Ernst's incarceration, ACH was required to provide 108 hours of on-site nursing services/week, 10 hours/week of on-site services from a Qualified Mental Health Professional, a weekly visit by the ACH physician or physician assistant, and 24/7 on call service by the physician or physician's assistant (UDF 7).

During Ernst's incarceration, the Jail's policy and practice regarding inmate medical/mental health care was for ACH staff to make inmate medical/mental health care decisions: if an inmate had a medical/mental health complaint, the complaint was provided to ACH staff who decided how to address the complaint.  (UDF 5). Jail staff followed ACH  staff's direction or advice as to inmate medical/mental health care.(UDF 5).

Furthermore, there is no evidence of a persistent pattern of previous constitutional violations that would support a claim of an informal unconstitutional custom or practice of the Authority.  *Cf Connick v. Thompson*, 131 S. Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (holding that a pattern of similar constitutional violations is typically necessary to prove deliberate indifference).  In order for a governmental entity to be held liable for an informal practice under § 1983, the practice must be "so permanent and well settled as to constitute a custom or usage with the force of law...In order to establish a custom, the actions must be persistent and widespread ... practices of [jail] officials." *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (internal citations and quotation marks omitted).  In determining what level of persistent and widespread conduct will be sufficient to

22

establish municipal liability, it is clear that "normally random acts" and "isolated incidents" fall short. *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994). *See also Carter v. Morris*, 164 F.3d 215, 220 (4th Cir. 1999) (a "meager history of isolated incidents" is insufficient). Furthermore, the court in *Lytle v. Doyle*, 326 F.3d 463, 473 (4th Cir. 2003), required evidence of "'numerous particular instances' of unconstitutional conduct."

Ernst's suicide is the first suicide in the Jail, since Birch has been Jail Administrator (UDF 53). Prior to contracting with ACH, Birch called other facilities to check ACH's references and received positive opinions of ACH (UDF 54). And, prior to Ernst's suicide, there was no indication to the Authority that ACH was providing inadequate or inappropriate treatment. ( UDF 61). As such, Plaintiff has no evidence to support her allegation that the Authority "created an environment that permitted refusal to provide treatment to inmates with suicidal thoughts."

Plaintiff has no evidence demonstrating that Authority has an informal practice of being deliberately indifferent to the medical and mental health needs of inmates, or that it is routinely deliberately indifferent to the risk of suicide among inmates. Nor is there any evidence of any past pattern of conduct which would have put Authority on notice that ACH medical staff were providing inadequate or inappropriate medical treatment to Jail inmates in general. As such, the jail's practice of relying upon ACH to provide inmate medical care was reasonable, and the Jail's policy and practice regarding inmate medical care was not enacted with deliberate indifference.

Finally, to the extent Plaintiff may claim that the Authority has failed to implement an adequate suicide prevention policy or protocol, such an argument fails. The United States Supreme Court stated in *Taylor v. Barkes*, 135 S.Ct. 2042, 2044, 192 L.Ed2d 78 (2015), that it has never issued an opinion that establishes an inmate has a right to "proper implementation of adequate

suicide prevention protocols." The court clarified that detention facility officials may not act with indifference to suicide risk, but stated no decision on record required jails to implement suicide prevention measures. *Id*. at 2015. In the present case, the Authority contracted with the jail to provide mental health services to inmates, and ACH had suicide recognition protocols in place. (UDF 58). Any alleged inadequacy of such policies would therefore only amount to negligence, but not support any allegation of deliberate indifference to medical needs.

Plaintiff cannot demonstrate any violation of his constitutional rights regarding medical care which was caused by any policy, practice, or custom enacted with deliberate indifference by the Authority, and it is entitled to summary judgment.

> **D.      There was no failure to train.**

Plaintiff cannot establish an alleged failure to train on behalf of the Authority.  There are limited circumstances where inadequacy in training can be a basis for § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (citation omitted). Inadequacy in training may serve as the basis for municipal liability under § 1983 "only where the failure to train amounts to deliberate indifference..." to inmate rights. *City of Canton*, 489 U.S. at 388.  "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality...can a city be liable for such a failure under § 1983." *Id*. at 389.  To establish deliberate indifference to a need for training, Plaintiff must show that the jail knew of and disregarded the substantial risk of inadequate training of its employees. *Canton*, 489 U.S. at 388.  It isn't enough to "show that there were general deficiencies in the county's training program for jailers." *Lopez v.*

*LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999).   Rather, a plaintiff must "identify a specific deficiency" that was obvious and "closely related" to the injury at the basis of this lawsuit. *Id*. In other words, Plaintiff must prove that the alleged lack of training actually caused staff to be deliberately indifferent to Ernst's medical needs. *See* <u>Canton</u>, 489 U.S. at 392 ("...respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs."). However, Plaintiff cannot show that occurred here.

Jail policy required that all Creek County Jail detention staff receive a minimum of12 hours of  annual training on the Jail's policies and procedures and the Oklahoma State Jail Standards. Topics covered in this training include First Aid, CPR, security procedures, supervision of inmates, report writing and documentation, inmate rules and regulations, inmate grievance procedures, inmate disciplinary procedures, Facility emergency procedures, mental health issues and suicide recognition.  (UDF 56).   Jail policy required that all newly hired detention staff receive a minimum of 24 hours of training, within their first year of employment, on the Jail's policies and procedures and the Oklahoma State Jail Standards.  Topics covered in this training are the same as for annual training (UDF 57).  ACH was required to provide its staff training on medical and mental health issues.  (UDF 55) In fact, PA McIntosh had training in mental health issues and felt competent to diagnose mental health issues and administer treatment (UDF 64), Spriggs was a Licensed Professional Counselor, and Hibbert was a licensed nurse (UDF 66).

Where Authority new hires receive 24 hours of training, and thereafter received 12 hours of annual training, on the Jail's policies and procedures, the Oklahoma State Jail Standards, First Aid, CPR, Facility emergency procedures, mental health issues and suicide recognition and other topics, Plaintiff cannot demonstrate that there was a deficiency in training, and she certainly cannot

demonstrate that any alleged lack of training actually caused Authority staff to be deliberately indifferent toward Ernst. Accordingly, Defendant is entitled to summary judgment on Plaintiff's alleged denial of medical care claim the extent it is premised upon alleged inadequate training.

### E. There was no failure to supervise.

Supervisory "status by itself is insufficient to support liability." *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) (citing *Rizzo v. Goode*, 423 U.S. 362, 376, 96 S. Ct. 598, 606-07, 46 L. Ed. 2d 561 (1976)).  In order to prevail on such a claim, Plaintiff must present evidence of an affirmative link between the alleged constitutional violations and the Authority's failure to supervise. *Meade v. Grubbs*, 841 F.2d 1512, 1527-28 (10th Cir. 1988).  *See also Ruegsegger v. Jefferson County Bd. of County Com'rs*, 197 F. Supp. 2d 1247 (D. Colo. 2001).

Additionally, "it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the supervisor had done more than he or she did." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3rd Cir. 1989).  Rather, Plaintiff must show that Defendant was deliberately indifferent to the deprivation of Ernst's rights.  *See City of Canton v. Harris*, 489 U.S. 378, 397, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). To establish deliberate indifference, Plaintiff must show that Defendant knew of and disregarded a substantial risk to Ernst's safety and well-being. *See Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm...In most instances, notice can be established by proving the existence of a pattern of tortious conduct...

*Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998) (citations omitted).

26

For the reasons discussed in Proposition II(A-D)  above, Plaintiff cannot establish any affirmative link between any failure to supervise on the part of the Authority and the alleged violation of Ernst's constitutional rights.  Moreover, Plaintiff has no evidence of a persistent pattern of previous constitutional violations in the Creek County Jail similar to the alleged denial of medical care herein which would have placed the Authority on notice that Authority staff required closer supervision.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's alleged denial of medical care claim the extent it is premised upon alleged inadequate supervision.

## CONCLUSION

It is the Jail's policy to provide access to care for serious medical, dental, and mental health care needs. The Jail did this during Ernst's incarceration by contracting with ACH to provide medical and mental health care services to CCCJC inmates.  ACH employed licensed, trained medical staff who made medical decisions regarding inmate care and Jail staff's reliance on ACH for this was reasonable and does not reflect deliberate indifference.

Plaintiff cannot show that Ernst's constitutional right was violated OR that a policy, practice, or custom of the Authority existed which caused any alleged violation of his constitutional rights. Plaintiff simply has no evidence that any Jail employee was subjectively aware that Ernst was actually suicidal, prior to June 17, 2014 when he committed suicide.  But even if the Court determines otherwise, such alleged violation was NOT caused by any policy, practice, or custom enacted with deliberate indifference by the Authority.

The Authority respectfully requests that the Court enter summary judgment in its favor on Plaintiff's claim against it in this case.

Respectfully submitted,


s/ Ambre C. Gooch
Ambre C. Gooch, OBA No. 16586
COLLINS, ZORN & WAGNER, P.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: gooch@czwglaw.com

ATTORNEY FOR DEFENDANT CREEK
COUNTY PUBLIC FACILITIES
AUTHORITY


## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Derek S. Franseen
Micky A. Walsh
Beeler, Walsh & Walsh, PLLC
4508 N. Classen Boulevard
Oklahoma City, OK 73118
dfranseen@beelerwalshwalsh.com
mwalsh@beelerwalshwalsh.com

Carla R. Stinnett
G. Gene Thompson
STINNETT LAW
404 East Dewey Avenue, Suite 202
Sapulpa, OK 74066
carla@stinnettlaw.com
gene@stinnettlaw.com
*Attorneys for Plaintiff*

28

Michael S. McMillin
Fenton, Fenton, Smith, Reneau & Moon
211 N. Robinson, Suite 800N
Oklahoma City, OK 73102
msmcmillin@fentonlaw.com
***Attorney for Defendant, Advanced***
***Correctional Healthcare, Inc.***

                                          s/ Ambre C. Gooch
                                          Ambre C. Gooch