IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. | MICHELLE ERNST as Personal Representative of the Estate of DAVID MICHAEL ERNST, deceased, | )<br>)<br>)<br>) |
| | Plaintiff, | )<br>)<br>) |
| v. | | ) Case No. 14-CV-504-GKF-PJC<br>)<br>) |
| 1.<br>2. | CREEK COUNTY PUBLIC FACILITIES AUTHORITY,<br>ADVANCED CORRECTIONAL HEALTHCARE, INC., | )<br>)<br>)<br>)<br>) |
| | Defendants. | ) |

## DECLARATION OF LELAND DENNIS, M.D.

I, Leland Dennis, M.D., being first duly sworn, depose and say:

1. I am familiar with the Plaintiff's claims in the above-styled case. I have prepared an expert report which sets forth my expert opinions relative to this case. My expert report is attached to this Declaration as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2016

Leland Dennis, M.D.

EXHIBIT 32

# Leland W. Dennis, M.D.
# 5201 NE Highway 33
# Guthrie, OK  73044

## Introduction

I am a general adult psychiatrist with more than twenty years clinical experience. I have inpatient and outpatient experience. In addition to clinical work I have participated in clinical research and trained psychiatry residents. Currently, my practice is at the Oklahoma County Detention Center, Oklahoma City, Oklahoma. I am the full time psychiatrist in the jail. My qualifications and publications are set forth in the attached CV.

I have been retained as an expert to review materials and provide expert opinion regarding the medical and mental health care provided to Mr. David Ernst between August 24, 2013 and June 17, 2014 at the Creek County Jail.

Based on my training, experience, and review of the material, in my opinion the medical and mental health care received by David Ernst at the Creek County Jail was adequate and within accepted standards of care.

## Materials Reviewed

See attached Appendix

## Overview Of Opinions

**ALL OPINIONS WITHIN THIS REPORT ARE TO A REASONABLE DEGREE OF MEDICAL PROBABILITY BASED ON THE INFORMATION CURRENTLY AVAILABLE.**

1) Mr. Ernst completed suicide on Tuesday, June 17, 2014. The suicide was not due to a breach of care by any employee of Advanced Correctional Healthcare.

2) Mr. Ernst received a verdict and was appropriately evaluated by Pam Hibbert, LPN.

3) Not renewing/discontinuing medications did not contribute to Mr. Ernst's completed suicide and did not breach the standard of care.

4) Neurontin®, (gabapentin) is FDA approved to treat post-herpetic neuralgia in adults and as adjunctive therapy in the treatment of partial onset seizures, with and without secondary generalization. Neurontin® is also commonly prescribed for off-label uses such as anxiety disorder and insomnia.

5) There are no FDA approved medication therapies for nightmares.

6) Therapeutic level checks not indicated.

7) Suicide assessment is not an exact science.

EXHIBIT A

1) **Mr. Ernst completed suicide on *Tuesday, June 17, 2014.* The suicide was not due to a breach of care by any employee of Advanced Correctional Healthcare.**

The last call Mr. Ernst made to his wife Regina was on *Sunday, June 15, 2014 at 7:16 PM.*

Mr. Ernst is angry and believes his wife is avoiding his calls, that she has become intimate with another man and that she will no longer help with his appeal.

During this call Mr. Ernst states "I had a feeling you wouldn't get that lawyer anyway. You don't even ask..."

The following exchange ends the their last conversation:

Mr. Ernst: "Man, Reg. Why don't you just let me know the truth? Why..."

Mrs. Ernst: "Just do whatever you want to do. Okay?"

Mr. Ernst: "Seriously?"

Mrs. Ernst: "Yeah. Seriously. I'm just (Inaudible 03:21) because I just can't handle it anymore."

Mr. Ernst: "Yeah. You and what's his name, huh?"

Mrs. Ernst: "No. I love you. I'm going to let you go. Bye."

Mr. Ernst: "You better not hang up on me..."

Mr. Ernst wrote a suicide letter on *Monday, June 16, 2014.* He timed the letter at 1:00 PM.

These statements are part of the suicide letter:

"I didn't want to do this but I can't spend each day thinking of someone else in my place."

"I pray God gives me the strength to do what I need to do to free you from my captivity."

"I hope you can forgive me for what I done to everyones lives, but you'll probably be happier without me."

"I loved you the best that I could, goodbye my beautiful wife. I miss you"

A surveillance video shows Mr. Ernst leaving his cell at *3:53 AM on June 17, 2014.* He concealed a blanket under his shirt. He secured this blanket to his neck and a shower rod. Approximately 40 minutes after he exited his cell he was found. Resuscitative efforts were initiated. He was pronounced dead at 5:05 AM.

Less than 24 hours after his wife hung up on him Mr. Ernst wrote a suicide letter to her.

Less than 24 hours after Mr. Ernst mailed the suicide letter he killed himself.

Mr. Ernst had a prohibition to suicide, his wife of 30 years. His dependence on her is evident in phone call after phone call. She motivated him to kill himself with her statement "Just do whatever you want to do. Okay?" He questioned her back, "Seriously?" She reconfirmed that she could no longer handle his situation. She ended the call by hanging up on him.

Mr. Ernst no longer believed Mrs. Ernst would work to advance his appeal. He did not believe her when she said she traveled to Arkansas alone. He could no longer bear the thought of her with another man. He developed suicidal intent and settled on a plan. He wrote a suicide letter to Mrs. Ernst. In the suicide letter he prays to God for strength to kill himself. He rigged his cell door and hid a blanket under his shirt. In the early morning, moving quietly so as not to be discovered, he went to a shower stall where he could reach the shower rod. He was in the shadows, protected from the eye of the camera. His plan proved to be lethal.

There is no evidence that Mr. Ernst asked for help from any employee of Advanced Correctional Healthcare after his last call with his wife.

### 2) Mr. Ernst received a verdict and was appropriately evaluated by Pam Hibbert LPN.

On Thursday, June 12, 2014, a Jury found Mr. Ernst guilty of four counts of manslaughter in the first degree. A 36-year sentence was recommended. The concern about a negative reaction to the verdict is well documented. At the request of jail staff, Ms. Pam Hibbert, LPN, evaluated Mr. Ernst and concluded that he did not need a more restrictive level of care. When he did return to his pod, Deputy Lance Prout states "Nurse Pam ( cooperate Nurse) who had been helping cover shifts at the Justice Center because we were short-handed talked with inmate Ernst for a while and decided to let him return to his housing unit to be with the other inmates he had spent the last several months with. It was three to four hours before we let inmate Ernst return to his housing unit and he at that time was in good spirits."

Later that day, in a telephone call with his wife Regina, Mr. Ernst states "...they were going to put me on suicide watch, but I talked them out of it."

Placing a person on a more restrictive level of care, such as constant observation, restricts them from interacting with others. Isolating him from his peers on his pod and restricting his access to phone calls could easily have increased Mr. Ernst's distress. This may have increased his risk for attempting or completing suicide. The decision was to allow him to return to general population. Consequently, a mental health professional evaluation was not indicated, as it would have been had he been placed at a higher level of care. The evaluation and assessments performed by Pam Hibbert, LPN on June 12 and 13, 2014 were reasonable based upon the information revealed to Nurse Hibbert.

### 3) Not renewing/discontinuing medications did not contribute to Mr. Ernst's completed suicide and did not breach the standard of care.

The medication mirtazapine was stopped by Gary McIntosh, P.A. on January 14, 2014. Mirtazapine is a drug abused by inmates to alter their consciousness. It is, as a result, not a preferred antidepressant in the detention setting. There is a significant time between the discontinuation of mirtazapine and Mr. Ernst's successful suicide. Following the discontinuation of the mirtazapine Mr. Ernst was evaluated and had no suicidal ideation. He was also functioning while awake without apparent problems.

Suicide is a side-effect of special interest for the Food and Drug Administration (FDA). Each antidepressant, including mirtazapine, has a boxed warning about increased suicide thoughts when initiating therapy.

Suicidal thoughts and antidepressant therapies are linked. The highest risk is during the initiation of antidepressant therapy. The next highest period is during dose titration, either up or down. The lowest associated risk is with discontinuation. This is no surprise and is fortunate.

Getting people to stay on antidepressant therapy is an ongoing problem. People stop taking antidepressant medications every day. Fortunately we don't see suicide each time someone stops their antidepressant.

Mr. Ernst did not take his mirtazapine routinely. Poor treatment adherence is the equivalent of titrating doses up and down. Without the ability to monitor someone closely, initiating therapy with the known risks would be more risky than simply stopping the treatment. Not starting another antidepressant was also within the standard of care.

Simply thinking that mirtazapine was helpful for nightmares is, in fact, simple thinking. Polysomnography studies with mirtazapine show that it does not affect sleep architecture. There are no FDA approved therapies for nightmares.

BusPar®, (buspirone) is FDA approved to treat Generalized Anxiety Disorder (GAD). It is not active in the benzodiazepine pathway. Mr. Ernst did not have a diagnosis of GAD. This places the use of this medication in the category of "Off-Label" use.

In clinical studies, patients exposed to benzodiazepines (like Mr. Ernst) such as valium are not able to distinguish buspirone from placebo. Most people with anxiety severe enough to seek treatment have been exposed to benzodiazepines. I have taught psychiatric residents that it is a safe medication looking for a reason to be prescribed. The fact that BusPar® was not continued in May and June, 2014, in no way contributed to Mr. Ernst's suicide.

The treatment of insomnia in the jail setting is widely discouraged. Insomnia is a pervasive complaint in jails. Sleep is complicated. The evaluation of sleep includes an assessment of function. The level of function expected to be achieved in a jail setting, at a minimum, is maintenance of the activities of daily living (ADLs). Mr. Ernst was able to make friends on his pod, talk with family and plan for the future. He was not, based on my review neglecting his ADLs. Although he complained of poor quality and/or inadequate sleep, the objective assessment was that his sleep was adequate for his level of activity. He was not neglecting basic life functions. No treatment for insomnia was indicated. Denial of his request for medication is appropriate based on this finding. It is also supported with the same medical decision making stated above, starting an antidepressant is associated with increased suicidal thought (increased suicidal risk).

Mr. Ernst was also appropriately denied his repeated requests for Lortab to treat his alleged Crohn's disease which, according to his medical records, he did not even have.

### 4) Neurontin®.

Neurontin®, (gabapentin) is FDA approved to treat post-herpetic neuralgia in adults and as adjunctive therapy in the treatment of partial onset seizures, with and without secondary generalization in children and pediatric patients 3 years and older.

The FDA recommended dose range for gabapentin is up to 1800 mg daily. Prior to his incarceration, Mr. Ernst was taking in excess of the recommended amount and this was appropriately reduced in jail to 600 mg twice daily. To continue an ineffective treatment exposes the person to the side effects of the treatment. Gabapentin is not a benign drug.

### 5) Nightmares.

Nightmares are extended and extremely frightening dreams. The content usually involves threats to survival or security. There are no FDA approved medication therapies for nightmares.

Nightmares are part of the re-experiencing symptoms subset for the diagnosis of Posttraumatic Stress Disorder (PTSD). This symptom is not pathognomonic, in and of itself. Even recurring nightmares do not make the diagnosis of PTSD.

### 6) Therapeutic level checks not indicated.

Few primary psychotropic medications currently in use require laboratory monitoring. There are no clinically relevant laboratory monitoring tests for gabapentin, mirtazapine or buspirone and laboratory monitoring was not indicated for any of the medications prescribed to David Ernst during his incarceration.

### 7) Suicide assessment is not an exact science.

Suicide assessment is not an exact science. If it was easy to predict suicide there would be fewer suicides. A person's suicide vulnerability results from the interaction between triggers or activating events and their threshold to action. It is clear that Mr. Ernst was motivated to act following the last conversation he had with Mrs. Ernst and he was actively hiding any suicidal thoughts or plans from the medical staff during his incarceration.

## Additional information

Mr. Ernst was placed on Suicide Observation by security staff in August, 2013. Amanda Spriggs, LPC, LADC evaluated Mr. Ernst on August 26, 2013. Quoting from that evaluation:

The Current Evaluation of Detainee/Mental Status: "Inmate reported he has medical problems and hasn't been able to eat. When he began giving his tray away officers became concerned and placed him on suicide watch. He denies suicidality, previous suicide attempts and mental health medication management."

Ms. Spriggs released Mr. Ernst from Suicide Observation. She stated in the Reason for Decision: "Inmate denies suicidality, states reasons to live and commits to a safety plan. Inmate will remain in booking and on medical observation and food intake will be documented.

Ms. Spriggs, LPC, LADC saw Mr. Ernst again on May 18, 2014. She saw him because "Inmate's family contacted CCJ stating the inmate needed mental health treatment." He complained to her of nightmares and sleeplessness. His mental status examination was essentially normal except for a hostile mood and blunted affect. No further referrals were made and follow-up care was planned. The assessments performed by Amanda Spriggs, LPC were reasonable and appropriate.

Mr. Ernst asked to not be placed on Suicide Observation again in June, 2014 after his verdict. Jail staff appropriately considered placing Mr. Ernst on Suicide Observation. A suicide assessment was conducted wherein Mr. Ernst denied any suicidal ideation and reiterated that he expected the adverse verdict. A decision was made to allow Mr. Ernst to return to general population where he could be around his peers.

Even if Ms. Hibbert had recommended placement of Mr. Ernst on Suicide Observation after the verdict, he would have, in all probability, been stepped down to general population within 72 hours or less. There was no suicide attempt until June 17, 2014. Mr. Ernst had hope for an appeal. Mrs. Ernst was still connected, reinforcing in phone conversations that they would be together again and that she would help with the appeal.

Mr. Ernst told Mrs. Ernst that he was evaluated for Suicide Observation and that he "...talked them out of it." Mrs. Ernst made no call to the jail or medical service alerting them to his statement. No Advanced Correctional Healthcare staff had any knowledge in June, 2014 that Mr. Ernst was suicidal.

Mr. Ernst was appropriately assessed at different times during his detention. No judgment was made to place Mr. Ernst on Suicide Observation by an employee of Advanced Correctional Healthcare as Mr. Ernst did not endorse suicidal ideation during the evaluations.

It is known that inmates may try to manipulate the outcome of an evaluation that may result in placement in a more restrictive environment. This is a trait that is accounted for by clinicians that are experienced in the jail setting. Ms. Hibbert and Ms. Spriggs were both experienced providers who were capable of appropriately evaluating Mr. Ernst's suicide risks.

Mr. Ernst had a prohibition to suicide, his wife of 30 years. During their last conversation Mrs. Ernst essentially gave him permission to kill himself, removing his prohibition against suicide.

Mr. Ernst was appropriately assessed at different times during his detention. No diagnosis of depression was made. Mr. Ernst did not report symptoms consistent with the diagnosis of depression during these evaluations. Mr. Ernst admits, in a phone call to his wife after the May 18, 2014 mental health assessment by Amanda Spriggs, LPC, that when he was asked what his problem was, he only told her about nightmares and that he couldn't sleep. Mrs. Ernst also states, in the same phone call, that she told the jail, "that you wasn't suicidal."

Based on the available information, to a reasonable degree of medical probability, Mr. Ernst took his life for reasons unrelated to medication therapy or lack of. Nor did he kill himself due to limited access to mental health services or because he was having nightmares or sleep disturbances.

Mr. Ernst met his threshold for suicide behavior, as previously stated, when Mrs. Ernst convinced him that she would be better off without him.

## Summary

Suicide is an unpredictable outcome in any situation. In the jail setting there are countless contributors to the risk of acting on suicidal thoughts. Having a high risk for suicide, based on an assessment of commonly identified risk factors is not, in and of itself, a reason to place a person on suicide precautions. The prohibition to suicide needs to be considered. I have and will continue to *not* place people on suicide precautions based simply on a summation of risk factors. The individual is the patient. The individual makes the final determination and actions this determination. Future planning and a family based suicide prohibition are factors that serve to protect the individual, independent of the risks.

Mr. Ernst is an example of a man that had risk factors. He did not have all the risk factors that have been identified as suicide risk factors. When Mrs. Ernst hung up the phone, ending their last conversation, she removed his suicide prohibition. Taking away his prohibition permitted him to act. His planned actions were not disclosed and proved to be lethal.

## Background

My professional career has exposed me to many people with psychiatric problems. I have maintained an interest in high risk patients since my psychiatric residency training which concluded with a year as the Chief Resident of Emergency Psychiatry. I assess suicide risks routinely. I have saved many lives by placing people on suicide precautions. In addition to thousands of assessments, I have had the privilege of providing ongoing psychiatric care for thousands of people. Despite this wealth of experience, I have had patients that have killed themselves.

In addition to clinical assessments of suicide risk I have assessed the risk of suicide in psychiatric drug development research settings. Many of the clinical studies that I have been involved in required certification in suicide assessment to be an investigator in the study. Additionally, I have taught medical providers the importance and the "how to" of suicide assessment.

Currently, I am the psychiatrist at the Oklahoma County Sheriff's Office, also called the Oklahoma County Detention Center. This is the largest jail in the state. I train their new recruits in suicide awareness as well as the medical staff. A part of my daily routine involves assessing patients (inmates) for suicide risk.

The opinions in this document are mine. They are based on significant clinical experience, educational experiences, both as student and teacher. My opinions are true and correct within a reasonable degree of medical certainty.

Leland W. Dennis, M.D.
Psychiatrist