IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA


1) MICHELLE ERNST as Personal )
Representative of the Estate )
of DAVID MICHAEL ERNST, )
deceased, )
 )
              Plaintiff, )
 )
vs. ) No. 14-CV-504-GKF-PJC
 )
1) CREEK COUNTY PUBLIC )
FACILITIES AUTHORITY, )
2) ADVANCED CORRECTIONAL )
HEALTHCARE, INC., )
 )
            Defendants. )



\*   \*   \*   \*   \*

DEPOSITION OF KELLY BIRCH
TAKEN ON BEHALF OF THE PLAINTIFF
AT 404 E. DEWEY AVENUE, SAPULPA, OKLAHOMA
COMMENCING AT 8:55 A.M.
ON NOVEMBER 18, 2015
PURSUANT TO THE STIPULATIONS OF THE PARTIES
\*   \*   \*   \*   \*




ROBERTA JOHNSON REPORTING SERVICES
P.O. BOX 457
SALINA, OKLAHOMA 74365
(918) 520-1506
robertaljohnson@aol.com


REPORTED BY:  ROBERTA L. JOHNSON, CSR, RPR

EXHIBIT 33

1                          KELLY BIRCH

2    after first being duly sworn to tell the truth, the

3    whole truth, and nothing but the truth, testified as

4    follows:

5                      DIRECT EXAMINATION

6    BY MR. WALSH:

7        Q.   Would you state your full name, please?

8        A.   Kelly, K-E-L-L-Y, Gene, G-E-N-E, Birch,

9    B-I-R-C-H.

10       Q.   How are you employed?

11       A.   I'm employed with the Creek County Sheriff's

12   Office.

13       Q.   In what capacity?

14       A.   I'm the jail administrator.

15       Q.   How long have you served as the jail

16   administrator?

17       A.   Six years, I believe.

18       Q.   Tell me what your day-to-day job duties are

19   as jail administrator.

20       A.   Overseeing the daily operations of the jail

21   facility, the budget, the financials, things such as

22   that.

23       Q.   You say the -- the day-to-day activities,

24   what does that entail?

25       A.   The daily operations, the staffing,

Page 62

1      A.   It was in the May to June time frame.

2      Q.   How did you learn of ACH?

3      A.   I went on the Internet and just started

4  looking at different correctional health care

5  facilities.

6      Q.   Had you ever received any material from ACH

7  prior to you going online?

8      A.   Not that I remember.  No.

9      Q.   Okay.  What -- when you went online, there

10  were a lot of facilities that offer medical to

11  correctional facilities, aren't there?

12           MS. GOOCH:  Object to the form.

13           THE WITNESS:  Correct.

14      Q.   (BY MR. WALSH)  Excuse me?

15      A.   Correct.

16      Q.   How was it that you chose ACH?

17      A.   It went out in a bid process.

18      Q.   How many other companies bid?

19      A.   There was three to four total that I

20  remember.

21      Q.   How did you vett these different companies to

22  determine not only lowest price, but also just to make

23  sure that we want this company to go ahead and bid on

24  this job?

25      A.   We reviewed who they currently had contracts

Page 63

1    with and spoke with those facilities as well.

2         Q.    What facilities did you speak to about ACH?

3         A.    I honestly don't remember the exact ones.  I

4    believe I spoke with Payne County.  I don't -- I don't

5    remember the exact counties I spoke with.

6         Q.    Okay.  Were they all Oklahoma counties?

7         A.    No, they were not.

8         Q.    Do you have any type of file material that

9    would enable you to go back and determine who you made

10   contact with to vett ACH?

11        A.    No.

12        Q.    Did Payne County have good things to say

13   about ACH?

14        A.    From what they knew, yes.  They had just

15   started with them.  That's the only county I

16   specifically remember talking to.

17        Q.    Are you aware that Payne County no longer

18   uses ACH?

19        A.    I was not.

20             MS. GOOCH:  Object to the form.

21             THE WITNESS:  I know they have just switched

22   over.

23        Q.    (BY MR. WALSH)  Yes.  Did you talk to that

24   person at Payne County about why they made the switch?

25        A.    No, I did not.

ROBERTA JOHNSON REPORTING SERVICES - (918) 520-1506

1     A.   Not that I recall.

2     Q.   Did you discuss with them how they provided

3  medical care to inmates?

4     A.   It was in the contract and things such as

5  that that -- the hours and how they would see and how

6  they would refer.

7     Q.   Did you give each of these facilities that

8  were going to bid on this contract a copy of the

9  jail's policies and procedures?

10    A.   I do not believe so.

11    Q.   Okay.  At the time that you retained ACH, you

12  did give them a copy of the policies and procedures of

13  your facility, didn't you?

14    A.   I believe I did.  I'm not a hundred percent

15  on it, but I'm pretty confident I did.

16    Q.   I mean, they have to abide by the policies

17  and procedures as well, don't they?

18    A.   Correct.  By the state jail standards.

19    Q.   Okay.  Do you have regularly scheduled

20  medical administrative meetings that occur at your

21  facility?

22    A.   Not regularly scheduled, no.

23    Q.   What are medical administrative meetings?

24    A.   With ACH, we would have -- I want to say that

25  we had quarterly reviews where we would check the

Page 77

1    A.   Yes.

2    Q.   Detainees could not be refused health care

3  due to inability to pay assessed copayments?

4    A.   Correct.

5    Q.   Was there a list of any medications that the

6  jail had, not -- not any formularies from ACH or any

7  other third party vendor of medications, that would

8  not be given to inmates?

9    A.   Narcotics would not be given in general,

10  unless there was a specific --

11         (Reporter asked for clarification.)

12         THE WITNESS:  -- a specific --

13         MS. GOOCH:  I'm sorry.

14         THE WITNESS:  I'm sorry.  Could you review

15  the question so I can --

16    Q.   (BY MR. WALSH)  Was there any document that

17  the jail had as to any medications that would not be

18  given to an inmate?

19    A.   Narcotics would not be given unless a

20  non-narcotic could be substituted.

21    Q.   What if it had been ordered by a physician?

22    A.   A physician previous to incarceration?

23    Q.   Or a physician at the jail.

24    A.   If a jail physician ordered it, yes.  Or if

25  they could obtain the inmate's medical records, they

1    would find a non-narcotic that they could be put on.

2         Q.   Okay.  Was deference given if an inmate had

3    been prescribed medications by a physician prior to

4    coming to the facility that these medications would be

5    continued?

6              MR. MCMILLIN:  Object to the form.

7              THE WITNESS:  If it met the formulary, they

8    would be given it.  If it did not meet the formulary,

9    they would find a substitute to substitute that

10   previous prescription and that prescription had to

11   been verified by their medical records.

12        Q.   (BY MR. WALSH)  What if there was not a

13   substitute that was available?

14        A.   If there was not a substitute need -- or

15   found and it was a needed medication, then they would

16   be given it.

17        Q.   I'm looking at a policy that is JD02C

18   medication services controlled drug policy.  When you

19   talk about controlled drug policy, that's referring to

20   narcotic medications, isn't it?

21        A.   I'm sorry.  Could you repeat that?

22        Q.   Yes.  Let me just show it to you; okay?  This

23   policy and it's Bates stamped 1793.  This is the

24   policy that is dealing with controlled drugs, which

25   would be narcotics; correct?

1    can be made.  You were aware that that was the policy

2    that was ultimately adopted by the jail based on ACH

3    policies and procedures; correct?

4         A.   Correct.

5         Q.   And yet as you sit here right now, we've

6    talked about that one man that went out for three to

7    five months, as we sit here now, is that still the

8    only person you can think of that has been transferred

9    outside of the facility for mental health treatment?

10        A.   Yes.

11        Q.   During the time that you have been the jail

12   administrator, are you saying that from that point

13   until now that you have never seen an inmate that you

14   thought was in need of inpatient mental health

15   services?

16             MS. GOOCH:  Object to the form.

17             THE WITNESS:  There have been others.  Yes.

18        Q.   (BY MR. WALSH)  But they did not receive that

19   treatment?

20             MS. GOOCH:  Object to the form.

21             THE WITNESS:  No.  Well -- no.

22        Q.   (BY MR. WALSH)  That would be in violation of

23   this policy, wouldn't it?

24             MS. GOOCH:  Object to the form.

25             THE WITNESS:  That would be correct.  That

1    would be my understanding that the medical company

2    would make the appropriate appointments or

3    arrangements for their treatment --

4         Q.   (BY MR. WALSH)   Okay.

5         A.   -- as per the contract.

6         Q.   Are you aware that ACH did not have any

7    contract with any psychologist or psychiatrist in the

8    area?

9         A.   No, I was not.

10        Q.   Did you ever see any psychiatrist or

11   psychologist ever come to your facility during the

12   time that ACH had this contract?

13             MR. MCMILLIN:   Object to the form.

14             THE WITNESS:   Not that I'm aware of.   No.

15        Q.   (BY MR. WALSH)   Were you ever told that a

16   psychiatrist or psychologist had came to your facility

17   during the time that ACH had this contract?

18        A.   No.   The only -- no.

19        Q.   In the same policy, the J-E-05, it says that

20   medical staff shall attempt to obtain past and current

21   medical and mental health history of a detainee to

22   assist in the treatment of detainee while

23   incarcerated.   This, once again, was something that

24   you expected the medical to do in fulfillment of their

25   responsibilities under the contract they had with the

Page 84

1    jail?

2        A.    That is correct.  We would have the inmate

3    sign a medical release and give that medical release

4    to them.

5        Q.    Have you ever seen the treatment protocols

6    that were utilized by ACH during the time that they

7    were under contract with your facility?

8        A.    I have seen them.  I haven't reviewed each

9    and every one of them but, yes, I have seen them.

10       Q.    Okay.  As the jail administrator responsible

11   ultimately for the well-being of the inmates at your

12   facility, should you have reviewed those medical

13   protocols?

14       A.    Yes.  I -- yes.

15       Q.    I mean, certainly both as in your role as the

16   jail administrator as well as just life in general, I

17   mean, you have encountered people that had anxiety

18   issues, haven't you?

19       A.    Yes, I have.

20       Q.    You have encountered people that have

21   depressive issues, haven't you?

22       A.    Yes.

23       Q.    You understand that those are conditions that

24   can be medically treated for individuals?

25       A.    Correct.

ROBERTA JOHNSON REPORTING SERVICES - (918) 520-1506

Page 89

1    Q.   Your policies and procedures require that

2  your guards be trained to recognize medical and mental

3  health issues?

4    A.   That is correct.

5    Q.   And, in fact, the policies and procedures

6  basically say that they are to work hand in hand with

7  medical to identify those issues; correct?

8    A.   Correct.

9    Q.   During the period of time that you have been

10  jail administrator, how many suicides have there been

11  at your facility?

12    A.   There has been two.

13    Q.   Mr. Ernst and Mr. Moss?

14    A.   That is correct.

15    Q.   Mr. Moss's suicide was one month after

16  Mr. Ernst, wasn't it?

17    A.   I believe it was a year and a month.  I don't

18  believe it was -- I don't recall.  It may have been.

19  I thought it was a year after but...

20    Q.   Well, Mr. Ernst died in June of 2014.  A year

21  and a month would mean that he died in July of 2015,

22  Mr. Moss, so that's been within the last three months?

23    A.   Maybe it was one month.  I don't recall the

24  exact date.

25    Q.   I know that there was an investigation that

Page 104

1    Q.    Is the booking area and medical the same?

2    A.    They're in the same area.  Yes.  It's -- the

3    medical office is in the intake area.

4    Q.    Okay.

5    A.    They have their own office just to the side

6    of the intake area.

7    Q.    Did you ever talk to Nurse Hibbert about her

8    conversation with Mr. Ernst?

9    A.    No, I did not.

10    Q.    If I told you that Pam Hibbert just simply

11    walked by and stood next to Mr. Ernst and talked to

12    him for a couple minutes, would that be the type of

13    assessment that you as the jail administrator would

14    have expected to take place?

15    A.    No.

16    Q.    Tell me the assessment that you would have

17    expected to take place based upon what Mr. Marshall

18    had reported.

19    A.    I would expect him to be placed on suicide

20    watch with the on duty medical staff talking to him

21    but not released from suicide watch until cleared by

22    mental health.

23    Q.    In fact, is it mental health that can release

24    a person from suicide watch or is it only the

25    physician that can do that?

Page 105

1    A.   The mental health and/or physician.

2    Q.   You think a master's in social work could

3  make a determination as to whether or not someone was

4  over any suicidal ideations?

5         MR. MCMILLIN:  Object to the form.

6         THE WITNESS:  I'm not sure what her

7  qualifications exactly were.

8    Q.   (BY MR. WALSH)  I'm telling you that that's

9  what it is.

10   A.   In social work I would not think so.

11   Q.   I mean, if you really want to provide help

12  for the inmates, the inmates need to be seen by people

13  that are competent and trained in mental health

14  issues; correct?

15   A.   I agree.

16        MS. GOOCH:  Object to the form.

17        MR. MCMILLIN:  Object to the form.

18   Q.   (BY MR. WALSH)  You understand a psychiatrist

19  would be that type of individual, wouldn't he?

20   A.   Yes.

21   Q.   A psychologist would be that type of

22  individual, wouldn't he?

23   A.   I would think so.

24   Q.   Other than those two, can you think of

25  anybody else that would be trained and competent to

Page 117

1    other two that he's got right there.

2            MR. WALSH:  Yeah.

3        Q.  (BY MR. WALSH)  Okay.  You've got the one

4    document -- mine is Bates stamped 124.  That is

5    medical history.  Do you see that document?

6        A.  Yes, sir.

7        Q.  Okay.  Who prepares this document?

8            MS. GOOCH:  I'm just looking to make sure

9    we're on the same page.

10           MR. WALSH:  You're fine.

11           THE WITNESS:  This is prepared by medical.

12       Q.  (BY MR. WALSH)  When a -- when a new inmate

13   comes in and medical would prepare this document, who

14   at the jail would review the document?

15       A.  Nobody from the jail would review it.

16       Q.  Why not?

17       A.  It's -- this is their medical evaluation.

18   This is what they would go off to treat them.

19       Q.  I understand, but you as the jail

20   administrator are charged with providing the

21   appropriate care for the inmates.  In order to do

22   that, you would have to know the condition they were

23   in at the time they came into the facility, wouldn't

24   you?

25           MS. GOOCH:  Object to the form.

Page 118

1          THE WITNESS:  I can't provide care.  That's

2     -- I'm not trained to provide medical care.  That's

3     why I have medical to provide professional medical

4     care.  I don't have the medical training to provide

5     the care.

6          Q.   (BY MR. WALSH)  And I understand you don't

7     have the medical care, but overall, the sheriff is

8     looking to you to make sure that inmates are treated

9     appropriately, isn't he?

10         A.   Correct.  And we defer that to the medical

11    company that's professionally trained to do it.

12         Q.   Well, do you think it would make sense that

13    when these intake sheets come in that someone from the

14    jail would review these sheets?

15         A.   No.

16         Q.   So you don't have any problem with these

17    being put in the medical file and no one in the

18    administration of Creek County ever seeing these

19    documents?

20         A.   No.  That's a medical form that medical would

21    provide care off of.

22         Q.   Okay.  This -- this is dated 8-26 of '13,

23    isn't it?

24         A.   Yes.

25         Q.   In here it asks him, down at line 23, mental

Page 124

1    appointment or figure out what we could do.

2         Q.   An off-site appointment was an option, wasn't

3    it?

4         A.   Yes, it is.

5         Q.   Giving the Remeron medication was an option,

6    wasn't it?

7         A.   Yes.

8         Q.   As early as October 1st of 2013, he had

9    requested to see a psychiatrist and once again the

10   disposition is Creek County does not provide

11   individual counseling to inmates.  Once again, that is

12   not a true statement, is it?

13        A.   No.

14             MS. GOOCH:  Object to the form.

15        Q.   (BY MR. WALSH)  We had talked about that

16   January 29th request to staff where he requested to go

17   to CREOKS Mental Health and the disposition didn't

18   address CREOKS, but it said no Remeron.  On January

19   23rd is when they made the comment that Remeron was

20   not available, was no longer given at this facility,

21   no substitute available.  So we now have two instances

22   where he's requested a specific medication.  Did you

23   ever get copies of these requests to staff?

24        A.   No.

25        Q.   There is a request form where he states they

Page 125

1    no longer will give me medicine for my Crohn's.  Were

2    you ever advised of that request?

3        A.    No.

4        Q.    There is a request made on September 5th of

5    2013.  I have requested my pain meds.  The disposition

6    is, no narcotics are given at this facility.  Once

7    again, the deposition that no narcotics are given at

8    this facility was not a correct statement, was it?

9        A.    Correct.

10       Q.    If you had at any time taken a look at these

11   requests to staff and there are numerous requests to

12   staff that we had just gone through; correct?

13       A.    Yes.

14       Q.    And you had seen these repeated requests,

15   would you have gone and talked to the doctor about

16   this?

17       A.    I probably would not talk to the doctor.  I

18   would have called the regional office -- or the main

19   off -- the corporate office.

20       Q.    What would you have told the corporate

21   office?

22       A.    I would have asked why he's not getting his

23   meds and why he's not getting his appointments.

24       Q.    If you had looked and seen that Remeron, in

25   fact, had been prescribed for a three-month period and

ROBERTA JOHNSON REPORTING SERVICES - (918) 520-1506

Page 126

1   now they're suddenly saying that we don't give

2   narcotics and we don't give Remeron, what would you

3   have wanted to know in your questioning of them about

4   that?

5       A.   Who changed it?  Why wasn't we notified and

6   why are we not trying to find a substitute?  Why can't

7   he have it if that's what he's prescribed and that's

8   been verified?

9       Q.   And would you have also wanted to know who is

10  your outside psychiatrist or psychologist that we're

11  going to use to help treat these patients?

12      A.   Yes.

13      Q.   And I take it, those issues never came up at

14  any time with any inmate during the time that ACH had

15  that contract?

16      A.   Correct.

17      Q.   Who is the contract with now?

18      A.   Turn Key Medical.

19      Q.   Is it the same coverage with Turn Key?

20      A.   The hours are the same with the exception of

21  with ACH, they didn't work holidays.  With Turn Key,

22  they do.

23      Q.   Do you know who the mental health

24  professional is that Turn Key uses?

25      A.   I do not know his name.  No.  I don't know.

ROBERTA JOHNSON REPORTING SERVICES - (918) 520-1506