IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

1) MICHELLE ERNST as Personal )
Representative of the Estate )
of DAVID MICHAEL ERNST, )
deceased, )
                         )
            Plaintiff, )
                         )
vs. ) No. 14-CV-504-GKF-PJC
                         )
1) CREEK COUNTY PUBLIC )
FACILITIES AUTHORITY, )
2) ADVANCED CORRECTIONAL )
HEALTHCARE, INC., )
                         )
            Defendants. )


                  *   *   *   *   *
           DEPOSITION OF GARY MCINTOSH
        TAKEN ON BEHALF OF THE PLAINTIFF
     AT 4026 S. ARIZONA, JOPLIN, MISSOURI
          COMMENCING AT 9:29 A.M.
            ON DECEMBER 4, 2015
    PURSUANT TO THE STIPULATIONS OF THE PARTIES
                *   *   *   *   *


       ROBERTA JOHNSON REPORTING SERVICES
                 P.O. BOX 457
          SALINA, OKLAHOMA 74365
             (918) 520-1506
        robertaljohnson@aol.com


   REPORTED BY:  ROBERTA L. JOHNSON, CSR, RPR

EXHIBIT 35

Page 5

```
 1                    GARY MCINTOSH

 2   after first being duly sworn to tell the truth, the

 3   whole truth, and nothing but the truth, testified as

 4   follows:

 5                    DIRECT EXAMINATION

 6   BY MR. WALSH:

 7       Q.   Would you state your full name, please?

 8       A.   Gary Edward McIntosh.

 9       Q.   How are you employed?

10       A.   Through Advanced Correctional Healthcare.

11       Q.   How long have you been working for ACH?

12       A.   I believe over seven years.

13       Q.   Where are you presently working?

14       A.   With Advanced Correctional Healthcare and

15   I've been in an internal medicine, emergency medicine,

16   family practice, rural Kansas for, oh, 10 years.

17       Q.   What is the name of the practice in Kansas?

18       A.   Horton Community Hospital.

19       Q.   Excuse me?

20       A.   Horton.  H-O-R-T-O-N.  Horton Community

21   Hospital.

22       Q.   And what facility are you working with ACH

23   in?

24       A.   In Oklahoma?

25       Q.   Anyplace.
```

```
 1    the doctor coming to the jail --

 2              MR. WALSH:  Okay.

 3              MR. MCMILLIN:  -- on a regular basis.

 4         Q.   (BY MR. WALSH)  Do you recall Mr. Ernst?

 5         A.   Not really.  I saw him once that I recall.

 6         Q.   Okay.  And let me show you the document that

 7    I have here.  I think this is -- was prepared pursuant

 8    to that visit; correct?

 9         A.   Yes.

10         Q.   And as you sit here right now, do you have

11    any independent recollection of what Mr. Ernst --

12         A.   No.

13         Q.   -- looked like?

14         A.   No.

15         Q.   In going through your education to become a

16    PA, you talked about you have these modules in the

17    training.  We talked about mental health training for

18    an LPN.  And as a PA, do you receive more training in

19    mental health than what a PA --

20         A.   Yes.

21         Q.   -- an LPN is going to?

22         A.   Yes.

23         Q.   How much time in the PA school is spent or

24    devoted to how to treat people with mental health

25    issues?
```

Page 29

1      A.   It's a module that would have been broken

2  down for weeks, at least, if not longer.

3      Q.   Do you feel competent to diagnose individuals

4  with mental health issues?

5      A.   I do.

6      Q.   Okay.  And is that something as a PA that you

7  would do, is diagnose people with mental health

8  issues?

9      A.   Yes.

10      Q.   And as a PA, are you competent to administer

11  medications necessary to treat people with depression

12  issues?

13      A.   Yes.

14      Q.   Are you competent to administer medications

15  for people with anxiety issues?

16      A.   Yes.

17      Q.   The document that I handed you and I've got

18  it Bates stamp ACH 113, this is the -- the visit --

19      A.   Uh-huh.

20      Q.   -- that Mr. Ernst made to you; correct?

21      A.   Right.

22      Q.   What was the problem that Mr. Ernst was

23  having at this time?

24      A.   Bilateral ear pain.

25      Q.   And what did you do for Mr. Ernst?

Page 35

1      A.    No, it is not.  It is another -- the

2   classification it's in is seizure control or other

3   neurologics.

4      Q.    Did Mr. Ernst suffer from seizures?

5      A.    No, he did not.

6      Q.    Okay.

7      A.    Not that I'm aware of.

8      Q.    Was Mr. Ernst clinically depressed?

9      A.    I saw nothing to indicate he was clinically

10   depressed.

11      Q.    Well, you saw him on one occasion, didn't

12   you?

13      A.    That's true.

14      Q.    Okay.  And at that time, did you review his

15   chart before you saw him on that day?  I think it was

16   December 13th of 2013.

17      A.    I can't say that I reviewed his chart --

18   entire chart that day.

19      Q.    Okay.  Why wouldn't you have reviewed his

20   chart?

21      A.    He was in for ear wax.

22      Q.    But did you ask him any questions?  I see

23   here that you had been on some antidepressants,

24   antianxiety medication.  How have you been doing?

25      A.    His affect would have been normal.

Page 36

1      Q.    No.   I'm asking, did you -- did you ask him

2   those questions specifically?

3      A.    You're asking from two years ago.   I can't

4   tell you what I asked him.   I know what I documented.

5      Q.    Okay.   And what did you document?

6      A.    You got the sheet?

7      Q.    I stuck it back in there.

8      A.    Okay.

9      Q.    Let's see if we can find it again.   113.

10   Yeah.   Here it is right here.

11      A.    Okay.   I would have examined his ears.   He

12   had wax.   He was wanting his pain medication for

13   Crohn's Disease.

14      Q.    He was doing what?

15      A.    He was requesting Lortabs.   Wants Lortabs.

16      Q.    And were Lortabs prescribed for him?

17      A.    No.

18      Q.    What was prescribed for him?

19      A.    Medical records were requested regarding the

20   colonoscopy and the diagnosis.

21      Q.    Are you the one that requested the medical

22   records then?

23      A.    Uh-huh.

24      Q.    And these are the medical records from Creek

25   Medical Center?

1   suicidal, officers would put them in suicide watch.

2   The nurse would put them in suicide watch.  The mental

3   health worker would put them in suicide watch and

4   routinely they would call one of us providers to tell

5   us that somebody was in watch.

6       Q.   Who could then take them off of suicide

7   watch?

8       A.   The provider.

9       Q.   That would be you?

10      A.   Myself or one of the other three that's on

11  call.

12      Q.   Who are the other three that would be on

13  call?

14      A.   I don't know.  It was a revolving list.  I

15  think Dr. Earls was one of the -- maybe Dr. Hutchins,

16  Dr. Rigstraw.  The call list would vary depending on

17  somebody was on vacation.

18      Q.   Okay.  So it's your understanding that the

19  LPN could not take someone off of suicide watch?

20      A.   No.

21      Q.   And the mental health professional, the

22  master's in social work, could not take someone off of

23  suicide watch?

24      A.   They routinely didn't.

25      Q.   Okay.  So they would always --

Page 67

1    had a prior history of depression and anxiety;

2    correct?

3        A.    Have you had a good prior history, yes.

4        Q.    Well, Mr. Ernst had a prior history of those.

5        A.    There is no record of him having ever seen

6    mental health that I'm aware of prior to his

7    incarceration.

8        Q.    So you don't know --

9        A.    He was placed on an antidepressant.  Why?

10   I've reviewed his records back here.  I never did see

11   anything that discussed chronic depression.  Maybe you

12   have something, but I didn't see it.  I know he was on

13   Mirtazapine.  It looked like it was more for sleep.

14   At one time, he was on Trazodone, so they switched it

15   from Trazodone to Mirtazapine.

16       Q.    Who switched it up?

17       A.    Looked like a Brent Gray.

18       Q.    Okay.  Well, you saw that on 8-21 of 2013,

19   three days before his arrest, the medications that he

20   was on?

21       A.    I guess.

22       Q.    In Creek County?

23       A.    Sure.  Yeah, on his intake.

24       Q.    And you know that when he first went to this

25   facility, they continued him on these medications once

Page 68

1    they got them from the family, didn't they?

2        A.   Uh-huh.   They did.

3        Q.   And they continued them for -- until October

4    -- or excuse me, until November of 2013, didn't they?

5        A.   I believe they did.

6        Q.   And then they stopped giving the Remeron,

7    didn't they?

8        A.   On my order.

9             MR. MCMILLIN:   Object to the form.   I think

10   you got the dates wrong, Micky.

11       Q.   (BY MR. WALSH)  So it was on your order that

12   they stopped the Remeron?

13       A.   Yes.

14            MR. MCMILLIN:   Object.

15       Q.   (BY MR. WALSH)  Okay.   Then show me the order

16   that you gave to stop Remeron.   I still can't figure

17   out these -- I wrote it down once on these dates.

18            MR. MCMILLIN:   It's January.

19            MR. WALSH:   Okay.

20            THE WITNESS:   Right here, DC per McIntosh.

21            MR. MCMILLIN:   January 19th, 2014, protocol

22   medication revocation form.   There's his order.

23            MR. WALSH:   Discontinued what to property?

24            MR. MCMILLIN:   Meds?

25            THE WITNESS:   Meds to property.   If the