```
                                                    1

          IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF OKLAHOMA

1) MICHELLE ERNST as Personal )
Representative of the Estate  )
of DAVID MICHAEL ERNST,       )
deceased,                     )
                              )
             Plaintiff,       )
                              )
vs.                           )  No. 14-CV-504-GKF-PJC
                              )
1) CREEK COUNTY PUBLIC        )
FACILITIES AUTHORITY,         )
2) ADVANCED CORRECTIONAL      )
HEALTHCARE, INC.,             )
                              )
             Defendants.      )


              *    *    *    *    *
            DEPOSITION OF KELLY BIRCH
         TAKEN ON BEHALF OF THE PLAINTIFF
        AT 404 E. DEWEY AVENUE, SAPULPA, OKLAHOMA
              COMMENCING AT 8:55 A.M.
                ON NOVEMBER 18, 2015
         PURSUANT TO THE STIPULATIONS OF THE PARTIES
              *    *    *    *    *




                ROBERTA JOHNSON REPORTING SERVICES
                       P.O. BOX 457
                   SALINA, OKLAHOMA 74365
                       (918) 520-1506
                  robertaljohnson@aol.com

REPORTED BY:  ROBERTA L. JOHNSON, CSR, RPR
```

```
                                                    2

                    A P P E A R A N C E S


FOR THE PLAINTIFF:

   MR. MICKY WALSH
   BEELER, WALSH & WALSH
   4508 North Classen
   Oklahoma City, Oklahoma 73118
   405-810-9339
   mwalsh@beelerwalshwalsh.com

   MS. CARLA STINNETT
   STINNETT LAW
   404 E. Dewey Avenue
   Sapulpa, Oklahoma 74066
   918-227-1177
   carla@stinnettlaw.com

FOR DEFENDANT CREEK COUNTY PUBLIC FACILITIES
AUTHORITY:

   MS. AMBRE C. GOOCH
   COLLINS, ZORN & WAGNER, P.C.
   429 N.E. 50th Street, Second Floor
   Oklahoma City, Oklahoma 73105-1815
   405-524-2070
   gooch@czwglaw.com

FOR DEFENDANT ADVANCED CORRECTIONAL HEALTHCARE, INC.:

   MR. MICHAEL S. MCMILLIN
   FENTON, FENTON, SMITH, RENEAU & MOON
   One Leadership Square, Suite 800
   211 N. Robinson
   Oklahoma City, Oklahoma 73102
   405-235-4671
   msmcmillin@fentonlaw.com
```

```
                                                    3

                    S T I P U L A T I O N S

     IT IS HEREBY STIPULATED AND AGREED by and between
the parties hereto that the notice for the taking of
the deposition is waived and that the same may be
taken at this time and place.
     IT IS FURTHER STIPULATED AND AGREED that all
objections, except as to the form of the question,
are reserved to the time of trial, with the same
force and effect as if made at the taking of
the deposition.
```

```
                                                    4

                          I N D E X

                                                  PAGE
WITNESS:

KELLY BIRCH
     Direct Examination by Mr. Walsh..............   5

SIGNATURE PAGE....................................  135

CORRECTIONS PAGE..................................  136

REPORTER'S CERTIFICATE............................  137
```

Exhibit 4

5

1           KELLY BIRCH
2 after first being duly sworn to tell the truth, the
3 whole truth, and nothing but the truth, testified as
4 follows:
5                DIRECT EXAMINATION
6 BY MR. WALSH:
7    Q.   Would you state your full name, please?
8    A.   Kelly, K-E-L-L-Y, Gene, G-E-N-E, Birch,
9 B-I-R-C-H.
10   Q.   How are you employed?
11   A.   I'm employed with the Creek County Sheriff's
12 Office.
13   Q.   In what capacity?
14   A.   I'm the jail administrator.
15   Q.   How long have you served as the jail
16 administrator?
17   A.   Six years, I believe.
18   Q.   Tell me what your day-to-day job duties are
19 as jail administrator.
20   A.   Overseeing the daily operations of the jail
21 facility, the budget, the financials, things such as
22 that.
23   Q.   You say the -- the day-to-day activities,
24 what does that entail?
25   A.   The daily operations, the staffing,

6

1 overseeing, making sure that -- that things are being
2 done properly, that there is proper staff there,
3 training, different vendor services, such as the
4 contracts with phone companies, medical services.
5    Q.   Who is your immediate supervisor?
6    A.   The sheriff, John Davis.
7    Q.   How long has John Davis been the sheriff?
8    A.   This is his third year.
9    Q.   Prior to that, who was the sheriff?
10   A.   Prior to that was Sheriff Steve Toliver.
11   Q.   Spell the last name.
12   A.   T-O-L-I-V-E-R.
13   Q.   How many years did Sheriff Toliver serve?
14   A.   I believe he served 12.
15   Q.   You said one of the things that you do is
16 also the budget for the jail?
17   A.   We don't necessarily per se have a budget,
18 but all of the -- the financial reports, making sure
19 that the spending is in the correct ways.
20   Q.   Do you have to make a yearly report to the
21 Court?
22   A.   Yes, I do.
23   Q.   Tell me what is involved in making this
24 yearly report to the Court.
25   A.   It determines the yearly jail -- per day jail

7

1 cost for the individual inmates.
2    Q.   And has the jail cost gone up for Creek
3 County?
4    A.   It has.  Over the last few years, it's gone
5 up, not substantially.  I mean, it's been within -- it
6 hadn't gone up more than a dollar over the -- I mean,
7 each year.  It's going to be less than a dollar that
8 it goes up.
9    Q.   And what is the price per inmate at this
10 point?
11   A.   Currently it's 28.37 per day.
12   Q.   And who is paying the 28.37 per day?
13   A.   That is the inmate's responsibility.  That's
14 on their fines and costs.  The Court assesses that.
15   Q.   You also house inmates for other police
16 organizations.  You have federal inmates?
17   A.   We have federal inmates and DOC inmates as
18 well.
19   Q.   Who pays for the DOC inmates?
20   A.   The Department of Corrections does.
21   Q.   And for the federal inmates?
22   A.   The U.S. Marshal Service does.
23   Q.   What is the charge for the DOC inmates?
24   A.   It is 27 -- I believe it's a flat rate of 27
25 per day.

8

1    Q.   How about for the federal inmates?
2    A.   It is $52 per day.
3    Q.   And did Judge Golden have the latest hearing
4 that you attended?
5    A.   Yes, he did.  It was, I believe, the second
6 week of December last year.
7    Q.   Okay.  Do you recall you were asked some
8 questions about how you were able to hold your costs
9 down?
10   A.   Yes, sir.
11   Q.   What was the explanation you gave to the
12 Judge?
13   A.   Well, we -- we keep a tight budget.  I mean,
14 I do everything I can to --
15   Q.   Uh-huh.
16   A.   -- to keep costs down and reduce costs.
17   Q.   Do you recall telling him that you were able
18 to keep the food costs down for the inmates?
19   A.   Yes, sir.
20   Q.   Do you also recall telling him that you were
21 cutting back on the medical for the inmates?
22   A.   The medical did decrease.  Yes, sir.
23   Q.   When you say it decreased, how did it
24 decrease?
25   A.   The hours -- the nursing hours decreased from

21

1 consider that a turnover rate.
2    Q.   So they've gone to other positions in the
3 sheriff's office?
4    A.   Correct.
5    Q.   I think we talked to Officer Marshall.
6    A.   Yes, sir.
7    Q.   And he is one of these people that has gone
8 up?
9    A.   Correct. He started in the jail, moved to
10 the transport division and now is on patrol division.
11   Q.   Is that a path you see a lot of these men and
12 women taking, that they start in the jail wanting to
13 go to other areas in the sheriff's office?
14   A.   That is correct.
15   Q.   Is it your experience that working in the
16 jail is the least desirable of the positions with the
17 sheriff's office?
18   A.   I wouldn't consider that. No.
19   Q.   Who is the most longstanding employee that
20 you have there?
21   A.   Myself.
22   Q.   After you?
23   A.   That would be Gina Hutchison.
24   Q.   And she is the assistant to you; correct?
25   A.   That is correct.

22

1    Q.   How long has she been there?
2    A.   10 years yesterday.
3    Q.   And you've been there six?
4    A.   I've been at the jail 11 years this January
5 total.
6    Q.   Okay.
7    A.   The jail administrator for six years.
8    Q.   After you and Gina, who would be your next
9 longstanding employee?
10   A.   As far as the jail staff?
11   Q.   Yes.
12   A.   That would be Cindy Thompson. I believe
13 she's been there four years.
14   Q.   What is Cindy Thompson's position?
15   A.   She's currently a shift supervisor.
16   Q.   How long has she held that position?
17   A.   I believe she's been a supervisor two years.
18 Maybe two and a half years.
19   Q.   So all of your other guards have been there
20 for four years or less?
21   A.   Correct.
22   Q.   Would you say the majority of your guards
23 have been there for two years or less?
24   A.   Yes.
25   Q.   And with the 12-hour shifts, I mean, you have

23

1 at least 10 jailers; correct?
2    A.   I have 20 detention staff.
3    Q.   Twenty detention staff?
4    A.   They're broke up into four separate shifts
5 with five -- five each shift. That's -- that's line
6 staff.
7    Q.   Okay. And when they're working the 12-hour
8 shifts, how many shifts do they work before they get
9 time off?
10   A.   They're on a rotating shift. They work --
11 for example, this week, shift A and C would work
12 Monday, Tuesday. Be off Wednesday, Thursday and work
13 Friday, Saturday, Sunday. The following week they
14 would be off Monday, Tuesday, work Wednesday, Thursday
15 and be off that Friday, Saturday, Sunday. Every other
16 weekend they get a three-day weekend.
17   Q.   Okay. So the -- the shifts are the A, B, C
18 and D shifts?
19   A.   Yes, sir.
20   Q.   Okay.
21   A.   A and C is -- A shift is the 7 a.m. to 7 p.m.
22 C is 7 p.m. to 7 a.m. And then B and D are the same
23 for the next set of days.
24   Q.   When you first started at the jail 11 years
25 ago, what was your position?

24

1    A.   I started out as a basic detention officer.
2    Q.   Had you worked at any other facilities before
3 going to work at the Creek County facility?
4    A.   I worked at the Tulsa Juvenile Bureau.
5    Q.   What did you do at the Tulsa Juvenile Bureau?
6    A.   I was a detention officer. I forget. It
7 wasn't -- detention officer wasn't the exact title,
8 but...
9    Q.   What does the Tulsa Juvenile Bureau do?
10   A.   They house juveniles in a correctional
11 detention type setting.
12   Q.   How many years did you work at that Tulsa
13 facility?
14   A.   Roughly a year before I came here.
15   Q.   Prior to that, where had you worked?
16   A.   Prior to Tulsa County Juvenile, I worked for
17 Brink's Armored Car Service.
18   Q.   What did you do for Brink's?
19   A.   I was a driver and a currier.
20   Q.   How long did you work for them?
21   A.   Two years.
22   Q.   Was that in Tulsa?
23   A.   Yes, sir.
24   Q.   Prior to that, how were you employed?
25   A.   I was employed with the United States Marine

Page 37

```
 1  medical.  When we hired a medical vendor, they have
 2  their policies that they go by.
 3      Q.   But it is the jail facility that owes the
 4  constitutional responsibility to the inmates to
 5  provide for medical and mental health care, isn't it?
 6           MS. GOOCH:  Object to the form.
 7           THE WITNESS:  That is correct.  That's why we
 8  hire a medical company to provide those medical
 9  services.
10      Q.   (BY MR. WALSH)  But who oversees what that
11  medical service is doing to determine that it is
12  adequate?
13      A.   I don't know how to answer that.  If -- if
14  there is a medical problem that I become aware of,
15  then I'd address medical.
16      Q.   Well --
17      A.   If --
18      Q.   -- ultimately, it is your responsibility to
19  ensure that the inmates receive appropriate medical
20  care, isn't it?
21           MS. GOOCH:  Object to the form.
22           THE WITNESS:  We hire a medical -- that's why
23  we hire a medical company to provide medical services
24  to the inmates.
25      Q.   (BY MR. WALSH)  I understand you hire the
```

Page 38

```
 1  company, but ultimately, that is your responsibility,
 2  isn't it?
 3           MS. GOOCH:  Object to the form.
 4           THE WITNESS:  It's my responsibility.  That's
 5  why we hired the medical company to provide medical
 6  services.
 7      Q.   (BY MR. WALSH)  Uh-huh.  And so tell me then
 8  what you do to determine that the medical company is
 9  providing those adequate services that are
10  constitutionally mandated.
11           MS. GOOCH:  Object to the form.
12           THE WITNESS:  The jail inspector comes in and
13  reviews medical.  When they do their yearly
14  inspection, they review files.  If an inmate comes to
15  me and says, hey, I'm having a problem, I'm not
16  getting my medications or they're not treating me,
17  then I follow up with medical and make sure that that
18  inmate gets the care that is needed.
19      Q.   (BY MR. WALSH)  And how often are you out
20  there talking to inmates?
21      A.   I see the inmates daily.
22      Q.   Okay.  You --
23      A.   And they have a request that they can write
24  me as well.
25      Q.   So request to staff, is that something that
```

Page 39

```
 1  you get a copy of?
 2      A.   Not all of them.  No.  It depends who they're
 3  addressed to.
 4      Q.   What if it's on a medical issue?  Do you get
 5  a copy of that request to staff?
 6      A.   If it's addressed to me, yes.  If it's not
 7  address -- if it's addressed to Boomer Jones, which is
 8  my chief of security, or Gina Hutchison, then they'll
 9  answer and forward it to medical.
10      Q.   On requests to staff, is there generally a
11  person that is always listed on requests to staff?
12      A.   I don't understand the question, is there a
13  person.
14      Q.   And that was a bad question.  On requests to
15  staff, it starts out with to --
16      A.   Correct.
17      Q.   -- and the inmate puts something in.
18      A.   Correct.
19      Q.   And the ones that I've seen, at least in this
20  case, appear primarily to be going to medical.
21      A.   Okay.
22      Q.   Have you looked at the requests to staff
23  concerning this issue, the case we're here today on,
24  Mr. Ernst?
25      A.   I have seen some of them.  Yes.
```

Page 40

```
 1      Q.   Okay.  Prior to you reviewing those in
 2  preparation of your deposition, had you ever looked at
 3  those requests to staff before?
 4      A.   If they had came to me, yes.  If they had not
 5  come to me, no.
 6      Q.   Did you see one in your review that was
 7  addressed directly to you?
 8      A.   I believe there was one or some that may have
 9  had my name on them.  Yes.
10      Q.   What was Mr. Ernst asking you to do?
11      A.   I don't specifically remember his.  I get 25
12  to 30 requests to staff a day.  I don't remember
13  exactly what his spoke of.
14      Q.   When is the last time you looked at any of
15  these requests to staff concerning Mr. Ernst?
16      A.   It's been a little while.
17      Q.   You've known that your deposition was going
18  to be taken and that we would be covering this subject
19  matter.  Did you look at those within the last week?
20      A.   No, I have not.
21      Q.   Okay.  So has it been more than a month ago
22  that you looked at them?
23      A.   Roughly a month.  Yes.
24      Q.   At the time of Mr. Ernst's suicide, did you
25  sit down and review his inmate file and medical file?
```

**Page 53**

1  recommendation that he needed to be transported?
2  A. I don't know exactly when she told me, but
3  she has told me.
4  Q. He was not transported because of what the
5  nurse told you, was he?
6  A. Correct.
7  Q. Do you know whether that nurse had ever
8  talked -- strike that. Did the nurse tell you that
9  she had talked to the doctor, the PA or the mental
10 health professional about getting this man
11 transported?
12 A. That I don't know. I know I had called the
13 district attorney to let them know the recommendation
14 and that's when they were waiting for the court order
15 to come down to transport him.
16 Q. Okay. So until the court ordered that this
17 took place, no action was taken other than for
18 whatever was done in-house for this inmate?
19 A. He was not transported anywhere. No.
20 Q. Okay. Other than this inmate, can you think
21 of any other inmates that had been sent to Vinita, not
22 for competency hearings, but for mental health
23 treatment?
24 A. I don't think just for mental health
25 treatment. No. I think it was all competency.

**Page 54**

1  Q. Okay. So during --
2  A. And that may have been why they sent -- I
3  mean, that may have been why they sent him, but I did
4  make a recommendation to the DA or addressed a
5  concern. I said that they were waiting to get him a
6  bed space in Vinita.
7  Q. So during the five to six years that you have
8  been the jail administrator, would it be a fair
9  statement that this is the only inmate that has been
10 transported to any facility to receive mental health
11 treatment?
12      MR. MCMILLIN: Object to the form.
13      THE WITNESS: No. That is incorrect. We
14 have transported -- for instance, if I have an inmate
15 that is on suicide watch that has made some sort of
16 gesture that they're suicidal, and if they get
17 released from jail, whether it's by the Court or
18 whether it's by bonding out, we transport them to
19 CREOKS so CREOKS can do a mental evaluation. Once --
20 once they are released from our custody, we will
21 transport them to CREOKS to make sure that CREOKS says
22 that they're safe to return to the community.
23 Q. (BY MR. WALSH) And when you say released by
24 your facility, they don't -- they're not going to
25 report to DOC, there is no other federal facility?

**Page 55**

1  These are people that are on their way out to go back
2  into the general population?
3  A. Correct.
4  Q. Okay. So during the time that you have been
5  jail administrator, has there ever been an instance,
6  other than this one we've talked about by court order,
7  where you have sent an inmate to receive mental health
8  treatment who was then going to be returned to your
9  facility?
10      MR. MCMILLIN: Object to the form.
11      MS. GOOCH: Same objection. Excuse me.
12      THE WITNESS: Not that I recall. I mean,
13 everybody that we transfer to Vinita is by court
14 order.
15 Q. (BY MR. WALSH) And other than this
16 incidence, they were all for competency
17 determinations?
18 A. Correct. And this one may have been
19 competency too. I don't know what the exact order
20 was.
21 Q. Have you ever contracted with a psychiatrist
22 or psychologist to provide mental health services to
23 any inmates at the Creek County facility?
24 A. Not that was not through the medical company
25 or CREOKS. We haven't contracted with CREOKS, but...

**Page 56**

1  Q. Other than Dr. Bumgardner, do you know -- do
2  you know what her qualifications were?
3  A. I do not. No.
4  Q. Okay. Other than this person, Dr.
5  Bumgardner, any other doctors to your knowledge been
6  in this facility since the time that you have been the
7  administrator that specifically dealt with mental
8  health issues?
9       MR. MCMILLIN: Object to the form.
10      THE WITNESS: We have had different mental
11 health people -- I don't know their exact
12 qualifications -- that have come in that have been by,
13 I would say, order of the Court, but maybe an attorney
14 would have -- wants a mental health professional to
15 come in and speak with their client --
16 Q. (BY MR. WALSH) Okay.
17 A. -- but nothing that -- nothing that the jail
18 has ordered. No.
19 Q. And a person who has a master's in social
20 work, do you know what that entails?
21 A. I do not.
22 Q. Do you know whether that person can prescribe
23 medication?
24 A. I do not.
25 Q. Do you know whether that person is competent

Page 57

```
 1  to diagnose mental illnesses?
 2     A.  I do not.  I don't know what their
 3  qualifications are.
 4     Q.  Let's go back to ACH.  You had ConMed for one
 5  year.  Why did you not renew the contract with ConMed?
 6     A.  They did not wish to renew.  We were their
 7  only site in Oklahoma and it was not beneficial to
 8  them.
 9     Q.  Were you satisfied with what ConMed had
10  provided to the facility?
11     A.  I would say yes.
12     Q.  Did you ever write any letters to ConMed
13  being critical of the work that they were doing in
14  your facility?
15     A.  Not that I recall.  No.
16     Q.  Did anyone on behalf of the facility, the
17  sheriff, undersheriff, anyone write letters to ConMed
18  saying you're not providing adequate services?
19     A.  Not to ConMed.  No.
20     Q.  To whom did they write those letters?
21     A.  There was a letter written to ACH.
22     Q.  Okay.  Let's get to ACH then.  ACH began
23  their contract in July of 2013?
24     A.  I believe that is correct.  Yes.  That's what
25  I had stated.  I'm pretty confident of that date.
```

Page 58

```
 1        MS. GOOCH:  I'm sorry.  I'm sorry, Micky.  I
 2  know you're shifting gears.  I need to use the
 3  restroom.  We've been going over an hour.
 4        MR. MCMILLIN:  Let's take a break.
 5        MS. GOOCH:  Can we take a real quick break?
 6        MR. WALSH:  That's fine.  Any time you need a
 7  break.
 8        MS. GOOCH:  Okay.  Thanks.
 9        (Break taken from 10:06 a.m. to 10:11 a.m.)
10     Q.  (BY MR. WALSH)  Earlier when we were talking
11  about those classes, you had -- you mentioned a -- a
12  woman by the name of Pam.
13     A.  Yes.
14     Q.  We've been talking off the record.  Pam
15  Hibbert?
16     A.  I believe -- I believe that was her last
17  name.  The other one that you had spoke of off the
18  record was Melissa Caldwell.
19     Q.  Melissa Caldwell?
20        MR. MCMILLIN:  That's right.
21     Q.  (BY MR. WALSH)  Okay.  Pam Hibbert, was she a
22  nurse there at the facility?
23     A.  She was not assigned to our facility.  No.
24  She was an ACH employee.  She would come down if they
25  were short staffed or needed help or get things caught
```

Page 59

```
 1  up.
 2     Q.  Okay.  But would she work in the nursing
 3  area?
 4     A.  Yes, she would.
 5     Q.  And she is the one that gave this class on
 6  suicide prevention and how to determine whether
 7  someone was depressed?
 8     A.  I believe it was Pam.  I'm not -- like I
 9  said, I'm not a hundred percent sure it was her.  It
10  was -- I know it was an ACH employee.
11     Q.  Do you know what her qualifications were to
12  teach that course?
13     A.  I do not.
14     Q.  You are familiar with the name Melissa
15  Caldwell.  How are you familiar with that name?
16     A.  She would call at times and just check in and
17  she had visited the site occasionally.
18     Q.  How often would she visit Creek County?
19     A.  I remember seeing her three times.  It could
20  have been more than that, but I remember physically
21  seeing her three times.
22     Q.  And do you know what her specialty was with
23  ACH?
24     A.  She was in the mental health field.  I don't
25  know her qualifications, but...
```

Page 60

```
 1     Q.  Did she ever send you any written materials
 2  that you were to disburse to your officers to help
 3  them deal with mental health issues?
 4     A.  No.  Not that I recall.
 5     Q.  Did you ever attend or did you require any of
 6  your officers to attend any video conferencing where
 7  Melissa Caldwell addressed mental health issues in a
 8  correctional facility?
 9     A.  No.  If -- can I make one clarification?
10     Q.  Sure.
11     A.  I think this is where my dates were messed up
12  earlier.  The contract with ACH started in 2011.
13     Q.  Okay.
14     A.  And then ConMed was the year before them.
15     Q.  2010?
16     A.  Correct.
17     Q.  Okay.
18     A.  And that's --
19     Q.  And that would have been around the time that
20  you were beginning your position?
21     A.  That was my transition.  Yeah.  I'm sorry.
22  That's --
23     Q.  Okay.  Do you recall a person named Amanda
24  Spriggs?
25     A.  Yes, sir.
```

## Page 61

1  Q.  What was Amanda Spriggs' position?
2  A.  She was the mental health -- I don't know if
3 you call her nurse, but the mental health professional
4 that would come in.
5  Q.  And do you know what her qualifications were?
6  A.  I -- not off the top of my head.  I know she
7 has given me her -- her title at one time.
8      MS. GOOCH:  Excuse me.
9      THE WITNESS:  It was abbreviated.  I don't
10 remember what it stood for.
11  Q.  (BY MR. WALSH)  Okay.  Could Amanda Spriggs
12 prescribe medication?
13  A.  Not that I'm aware of.  I don't think she
14 could, but, again, I'm not specific on her -- her
15 history or background of what she could or could not
16 do.
17  Q.  Okay.  We're going to pick her back up here
18 in just a second.  So 2010, you had the contract with
19 ConMed.  Did that run from July 2010 through July of
20 2011?
21  A.  I know it expired in July of 2011 because ACH
22 took over in August.
23  Q.  Okay.  When had ConMed given you notice that
24 we are no longer going to provide medical services to
25 your facility?

## Page 62

1  A.  It was in the May to June time frame.
2  Q.  How did you learn of ACH?
3  A.  I went on the Internet and just started
4 looking at different correctional health care
5 facilities.
6  Q.  Had you ever received any material from ACH
7 prior to you going online?
8  A.  Not that I remember.  No.
9  Q.  Okay.  What -- when you went online, there
10 were a lot of facilities that offer medical to
11 correctional facilities, aren't there?
12      MS. GOOCH:  Object to the form.
13      THE WITNESS:  Correct.
14  Q.  (BY MR. WALSH)  Excuse me?
15  A.  Correct.
16  Q.  How was it that you chose ACH?
17  A.  It went out in a bid process.
18  Q.  How many other companies bid?
19  A.  There was three to four total that I
20 remember.
21  Q.  How did you vett these different companies to
22 determine not only lowest price, but also just to make
23 sure that we want this company to go ahead and bid on
24 this job?
25  A.  We reviewed who they currently had contracts

## Page 63

1 with and spoke with those facilities as well.
2  Q.  What facilities did you speak to about ACH?
3  A.  I honestly don't remember the exact ones.  I
4 believe I spoke with Payne County.  I don't -- I don't
5 remember the exact counties I spoke with.
6  Q.  Okay.  Were they all Oklahoma counties?
7  A.  No, they were not.
8  Q.  Do you have any type of file material that
9 would enable you to go back and determine who you made
10 contact with to vett ACH?
11  A.  No.
12  Q.  Did Payne County have good things to say
13 about ACH?
14  A.  From what they knew, yes.  They had just
15 started with them.  That's the only county I
16 specifically remember talking to.
17  Q.  Are you aware that Payne County no longer
18 uses ACH?
19  A.  I was not.
20      MS. GOOCH:  Object to the form.
21      THE WITNESS:  I know they have just switched
22 over.
23  Q.  (BY MR. WALSH)  Yes.  Did you talk to that
24 person at Payne County about why they made the switch?
25  A.  No, I did not.

## Page 64

1  Q.  Did they make the switch after you had made
2 the switch?
3  A.  I don't recall if -- I believe it was roughly
4 right around the same time.
5  Q.  Okay.  When you went online and you -- you
6 went to the web site of ACH, what impressed you about
7 that web site for ACH?
8  A.  Nothing per se impressed me.  I was looking
9 for a source.
10  Q.  Were you part of the -- of the decision to go
11 ahead and use a third party vendor to provide medical
12 services to the Creek County facility?
13  A.  Is this when we first started using a vendor?
14  Q.  Yes.
15  A.  Somewhat, yes.  That was right during -- at
16 the transition when I was coming into the jail
17 administrator position.
18  Q.  Sheriff Toliver would have been the sheriff
19 at that time; correct?
20  A.  Correct.
21  Q.  Who was his undersheriff?
22  A.  Rick Ishmael.
23  Q.  Where is Rick Ishmael today?
24  A.  He still lives just outside of town here.
25  Q.  What does he do?

Page 65

```
 1   A.   I don't know what he's doing.
 2   Q.   Okay.  Tell me why the decision was made to
 3 go from in-house to a third party vendor for medical.
 4        MS. GOOCH:  Object to the form.
 5        THE WITNESS:  A lot of it was to help reduce
 6 liability.
 7   Q.   (BY MR. WALSH)  Okay.  Liability in what
 8 respect?
 9   A.   To have actual trained medical staff in there
10 that was trained and employed by a medical company.
11   Q.   Okay.  Well, you had trained medical staff,
12 didn't you --
13   A.   Correct.
14   Q.   -- when you did it in-house; correct?
15   A.   Correct.
16   Q.   Did you have any problems with the services
17 that were being rendered by the doctor that had been
18 at the facility since 2005?
19   A.   The doctor was relieved of his services
20 before I took over the jail administrator.
21   Q.   Why was he relieved of his services?
22   A.   There was a -- was an inmate medical lawsuit.
23   Q.   Was the jail dissatisfied with the number of
24 times that the doctor actually came to the facility?
25   A.   That I don't know.
```

Page 66

```
 1   Q.   Well, has it been your experience that while
 2 you have a medical doctor that is on call 24 hours a
 3 day, seven days a week, that generally they send their
 4 PA?
 5   A.   I don't even know if we had a PA at that
 6 time.
 7   Q.   Okay.  When you went with ACH, you said that
 8 there were, I think, three companies that actually bid
 9 on the job?
10   A.   There was three to four.  Yes.
11   Q.   And what were the parameters of the work that
12 you wanted done by these third party vendors to supply
13 medical and mental health services to inmates at Creek
14 County?
15   A.   It was 24-hour medical coverage, providing
16 medical care.  I don't remember the exact wording, but
17 it was medical care, X amount of nursing hours, X
18 amount of doctor hours, X amount of mental health
19 hours.
20   Q.   Is there a higher percentage of the
21 population in a jail setting that have mental health
22 issues than what we find out -- find in the general
23 population?
24   A.   I believe so.  Yes.
25   Q.   That's a real concern in a jail setting,
```

Page 67

```
 1 mental health issues, isn't it?
 2   A.   Yes.
 3        MS. GOOCH:  Object to the form.
 4   Q.   (BY MR. WALSH)  And you recognized that at
 5 the time that you became an administrator, didn't you?
 6        MS. GOOCH:  Object to form.
 7        THE WITNESS:  I didn't initially recognize it
 8 at that time.  I recognized it later on.  Yes.
 9   Q.   (BY MR. WALSH)  Well, you had worked in this
10 facility from 2005 to 2009 to 2010 as a guard, hadn't
11 you?
12   A.   Correct.
13   Q.   And you had seen mental health issues arise
14 during that period of your employment, hadn't you?
15   A.   Correct.
16        MS. GOOCH:  Object to the form.
17   Q.   (BY MR. WALSH)  So you were aware of the --
18 of the crucial need for inmates to receive appropriate
19 medications for mental health issues, weren't you?
20        MS. GOOCH:  Object to the form.
21        THE WITNESS:  There is a need for mental
22 health and medications.  Yes.
23   Q.   (BY MR. WALSH)  When you became the
24 administrator, did you make that one of your primary
25 goals to ensure that inmates were going to receive
```

Page 68

```
 1 appropriate medications that were prescribed by
 2 physicians to help address mental health needs?
 3   A.   It was my goal to make sure that the inmates
 4 had medical and mental health treatment and medical
 5 care that they needed.
 6   Q.   You're familiar with the term "deliberate
 7 indifference," aren't you?
 8        MS. GOOCH:  Object to the form.
 9        THE WITNESS:  Yes, sir.
10   Q.   (BY MR. WALSH)  Define that term for me.
11        MS. GOOCH:  Object to the form.
12        THE WITNESS:  It's basically when -- doing
13 wrong when you know what's right.
14   Q.   (BY MR. WALSH)  Okay.  As it applies to a
15 medical or mental health issue, could you give me an
16 example of something that you think would amount to
17 deliberate indifference towards an inmate in violation
18 of their constitutional rights?
19        MS. GOOCH:  Object to the form.
20        MR. MCMILLIN:  Object to the form.
21        THE WITNESS:  Knowing that they needed
22 medical care and not providing it.
23   Q.   (BY MR. WALSH)  Okay.  When you hired ACH,
24 did you specifically talk to anyone at ACH about how
25 they addressed mental health issues with the inmates?
```

## Page 69

1  A.  Not that I recall.
2  Q.  Did you discuss with them how they provided
3  medical care to inmates?
4  A.  It was in the contract and things such as
5  that that -- the hours and how they would see and how
6  they would refer.
7  Q.  Did you give each of these facilities that
8  were going to bid on this contract a copy of the
9  jail's policies and procedures?
10 A.  I do not believe so.
11 Q.  Okay. At the time that you retained ACH, you
12 did give them a copy of the policies and procedures of
13 your facility, didn't you?
14 A.  I believe I did. I'm not a hundred percent
15 on it, but I'm pretty confident I did.
16 Q.  I mean, they have to abide by the policies
17 and procedures as well, don't they?
18 A.  Correct. By the state jail standards.
19 Q.  Okay. Do you have regularly scheduled
20 medical administrative meetings that occur at your
21 facility?
22 A.  Not regularly scheduled, no.
23 Q.  What are medical administrative meetings?
24 A.  With ACH, we would have -- I want to say that
25 we had quarterly reviews where we would check the

## Page 70

1  charts, number of patients that were treated, number
2  of patients that went off site or emergency type care.
3  Q.  Who would be a part of these meetings?
4  A.  Normally myself, the nurse that was on staff
5  and one of the -- I believe they were called regional
6  managers, regional directors.
7  Q.  Would the regional directors appear in person
8  or by phone?
9  A.  In person.
10 Q.  Who was the regional director over your
11 facility?
12 A.  We had a couple of different ones. I can see
13 their faces, but can't think of a name. There was one
14 male and then there was two females.
15 Q.  You said that you had reviewed the medical
16 charts of inmates.
17 A.  We would -- we would spot -- we would pick a
18 -- you know, certain different charts and pull them
19 and spot check them.
20 Q.  So you would not review all of the inmate
21 medical files?
22 A.  Correct.
23 Q.  How many would you spot check?
24 A.  I'd say we would pull 10.
25 Q.  If you had any specific issues, like you had

## Page 71

1  gotten a request to staff on a medical issue, would
2  you ask them to pull that file as well?
3  A.  No. If I had gotten a request, I would have
4  addressed that request at the time of the request.
5  Q.  And in these spot checks, if you found
6  deficiencies, how would those be addressed?
7  A.  We would find out what happened and address
8  them as needed with that staff and/or all of the
9  staff.
10 Q.  After Mr. Ernst's suicide, was his file and
11 medical chart specifically ever pulled at one of these
12 medical administration meetings?
13 A.  No. After his death, his file was pulled for
14 keeping.
15 Q.  And this is policy J-A-04. It says that the
16 health care team will compile a report of the overall
17 medical staff activities each month and will be given
18 to administration. Was that done?
19 A.  No, it was not.
20 Q.  And it will review -- be reviewed at the
21 continuous quality improvement meetings. What are the
22 continuous quality improvement meetings?
23 A.  We don't do those. That's -- the medical
24 policy overrides what -- the medical policy is what we
25 go by.

## Page 72

1  Q.  So are you telling me that ACH had a separate
2  medical policy besides the policies of your facility?
3  A.  They had a policy and protocol book. Yes.
4  Q.  And were you given a copy of that policy and
5  protocol book?
6  A.  Yes.
7  Q.  Why didn't you go back then and revise policy
8  J-A-04 that dealt with the administrative meetings and
9  reports?
10 A.  I have no answer for that.
11 Q.  Policy J-A-06 states it is the policy of the
12 Creek County Jail to maintain written policies and
13 procedures for quality assurance assessments of health
14 care services. Did you follow that policy?
15 A.  Not on that. That's where we have the
16 vendor's policy or protocols in place.
17 Q.  So what were the vendor's protocols as far as
18 notifying you so that you could determine that quality
19 assurance had been met in the providing of health care
20 to inmates?
21 A.  I would have to review that policy. I don't
22 recall it off the top of my head.
23 Q.  Well, what did you get during the time that
24 ACH was there? What did you get that you could look
25 through and at the end of when you looked at it you

### Page 73

1  said to yourself they're doing their job?
2     A.   I could go in and pull any chart at any time
3  and review it.
4     Q.   But did you go pull charts and review them?
5     A.   Yes.  If there was a request or an issue that
6  an inmate had addressed to me, I would go review their
7  chart and normally would bring them to medical and
8  make sure that they were seen at that time.
9     Q.   But those were only on requests to staff
10 addressed to you; correct?
11    A.   Addressed to me.
12    Q.   So if there were requests to staff that were
13 being given, but was going to medical instead, you
14 would not see those requests to staff, would you?
15    A.   Not always.  Sometimes they would -- if it
16 was -- depending upon the circumstances they would --
17 I mean, they would bring me different ones at times.
18    Q.   Tell me -- tell me the -- what the policy was
19 as to whether you would get a request to staff not
20 specifically addressed to you.
21    A.   If I would get a request -- I don't
22 understand your question.
23    Q.   You told me that there would be times that
24 someone would bring a request to staff to you and I
25 want to know what was the policy that was in place as

### Page 74

1  to when you would be given a request to staff that was
2  not specifically addressed to you.
3     A.   Just -- just in concern to medical or
4  overall?
5     Q.   Concern to medical.
6     A.   If it was -- medical would bring me one.  For
7  instance, if medical was crushing meds and the inmate
8  didn't want their meds crushed or if it was
9  continually saying, you know, I'm not getting care.
10    Q.   When you say continually, how many times
11 would an inmate have to say that before you would be
12 advised of that?
13         MS. GOOCH:  Object to the form.
14         THE WITNESS:  Normally no more than twice.
15 Normally the second request, I would -- they would
16 bring it to me.
17    Q.   (BY MR. WALSH)  So if an inmate was saying he
18 was not getting his medications and has said that on
19 more than one occasion, you would expect that that
20 would be brought to your attention?
21    A.   Correct.
22    Q.   In the Ernst matter, was it ever brought to
23 your attention that he was not getting his
24 medications?
25    A.   I want to say at one time I got one from him

### Page 75

1  specifically saying he wasn't getting his medications
2  and it was found out that he was refusing his
3  medications.
4     Q.   What medications was he refusing to take?
5     A.   I don't recall which medication it was.
6     Q.   And I'm assuming that in his inmate file
7  there would be something in there that would say
8  inmate is being given his medications but has refused
9  them?
10    A.   Correct.
11         MS. GOOCH:  Object to the form.
12    Q.   (BY MR. WALSH)  Sir, I'm going to tell you in
13 looking at this inmate file, I've never seen such a
14 document.  If that document isn't in there, would that
15 make you question whether or not that, in fact,
16 occurred?
17         MS. GOOCH:  Object to the form.
18         THE WITNESS:  It would.
19    Q.   (BY MR. WALSH)  When you looked at his inmate
20 file, did you ever see a response to a request where
21 it was written on there that inmate had refused
22 medications, but is being offered them, that comes to
23 mind as you sit here?
24    A.   I don't specifically recall.  I see a lot of
25 requests throughout the day.

### Page 76

1     Q.   And I -- and I appreciate that, but, I mean,
2  you've made the comment that if it happened twice you
3  should have been told.
4     A.   Correct.
5     Q.   And you think you were told and you gave me a
6  specific instance.  I'm just telling you that I don't
7  see that in the inmate file.
8     A.   And it may not be his specific one.  I mean,
9  I don't recall his whole file.
10    Q.   Okay.  Is there any type of a CQI program in
11 place at this facility?  And let's -- the time frame
12 would be back from 2013 to 2014.
13    A.   That would be their quarterly reviews.
14    Q.   That's the quarterly reviews that we've
15 talked about?
16    A.   And also the jail inspector, she will come
17 in.  They normally come in and if the jail inspector
18 gets a complaint, the jail inspector will come and act
19 on that complaint and pull the charts and also look at
20 others and also pull them during their yearly
21 inspection.
22    Q.   Okay.  Back during this time, 2013 to 2014,
23 it was the policy of Creek County Jail to provide
24 access to appropriate care for serious medical, dental
25 and mental health care needs, wasn't it?

77

1  A.  Yes.
2  Q.  Detainees could not be refused health care
3  due to inability to pay assessed copayments?
4  A.  Correct.
5  Q.  Was there a list of any medications that the
6  jail had, not -- not any formularies from ACH or any
7  other third party vendor of medications, that would
8  not be given to inmates?
9  A.  Narcotics would not be given in general,
10 unless there was a specific --
11     (Reporter asked for clarification.)
12     THE WITNESS:  -- a specific --
13     MS. GOOCH:  I'm sorry.
14     THE WITNESS:  I'm sorry.  Could you review
15 the question so I can --
16 Q.  (BY MR. WALSH)  Was there any document that
17 the jail had as to any medications that would not be
18 given to an inmate?
19 A.  Narcotics would not be given unless a
20 non-narcotic could be substituted.
21 Q.  What if it had been ordered by a physician?
22 A.  A physician previous to incarceration?
23 Q.  Or a physician at the jail.
24 A.  If a jail physician ordered it, yes.  Or if
25 they could obtain the inmate's medical records, they

78

1  would find a non-narcotic that they could be put on.
2  Q.  Okay.  Was deference given if an inmate had
3  been prescribed medications by a physician prior to
4  coming to the facility that these medications would be
5  continued?
6      MR. MCMILLIN:  Object to the form.
7      THE WITNESS:  If it met the formulary, they
8  would be given it.  If it did not meet the formulary,
9  they would find a substitute to substitute that
10 previous prescription and that prescription had to
11 been verified by their medical records.
12 Q.  (BY MR. WALSH)  What if there was not a
13 substitute that was available?
14 A.  If there was not a substitute need -- or
15 found and it was a needed medication, then they would
16 be given it.
17 Q.  I'm looking at a policy that is JD02C
18 medication services controlled drug policy.  When you
19 talk about controlled drug policy, that's referring to
20 narcotic medications, isn't it?
21 A.  I'm sorry.  Could you repeat that?
22 Q.  Yes.  Let me just show it to you; okay?  This
23 policy and it's Bates stamped 1793.  This is the
24 policy that is dealing with controlled drugs, which
25 would be narcotics; correct?

79

1      MS. GOOCH:  I have a copy here if you need
2  that to look at and he can look at mine.
3      MR. WALSH:  Okay.
4      THE WITNESS:  Okay.  I'm -- can you repeat
5  the question?  I'm -- I'm sorry.
6  Q.  (BY MR. WALSH)  The policy that you've just
7  looked at, controlled drug policy, that is dealing
8  with narcotic medications, isn't it?
9  A.  Correct.
10 Q.  And it says in here that the facility will
11 give those medications; correct?
12 A.  Correct.
13 Q.  It tells you how you're going to account for
14 it.  There will be two nurses.  There's got to be a
15 count given both before and after receipt of the
16 medications?
17 A.  Uh-huh.
18 Q.  Do you recall seeing that?
19 A.  Yes.
20 Q.  Certainly ACH would have been advised that it
21 was the policy of your procedure to give these
22 narcotic medications if prescribed by a physician and
23 necessary for that inmate?
24 A.  That is correct.
25 Q.  Okay.  I can kind of hear what you're saying

80

1  over there.  This is not the drug policy?
2      MS. GOOCH:  Oh.  Let's start on this at the
3  beginning of the tab.  Can we take one moment?
4      MR. WALSH:  Sure.
5      (Break taken from 10:40 a.m. to 10:48 a.m.)
6  Q.  (BY MR. WALSH)  There was a policy -- was the
7  correct policy or something that -- have you satisfied
8  yourself that the policy we were looking at that
9  talked about controlled drugs was, in fact, in force
10 and effect at your facility back in 2013 and 2014?
11 A.  There may have been some confusion on my
12 part.  This policy that we have here is authored by
13 ACH that we adapted to our policy.
14 Q.  Okay.
15 A.  So that -- that's where my confusion was.  I
16 didn't understand the numbering and how all that was.
17 That was --
18 Q.  Oh, okay.
19 A.  There's -- this is different from the
20 original Creek County Jail policy.  This was authored
21 by ACH for our site, if that makes sense.
22 Q.  And adopted by your facility as part of its
23 policies and procedures?
24 A.  Correct.
25 Q.  And these outlined the medical rights that

**Page 81**

1  patients have in your facility?
2     A.  Correct.  That ACH has written.
3     Q.  So when we were talking about the controlled
4  drugs, this was a policy that was offered by ACH and
5  accepted by your facility?
6     A.  Correct.
7     Q.  And you expected ACH to follow that policy
8  and procedure as, once you adopted it, it became the
9  jail's policy and procedure; correct?
10    A.  That's correct.  Sorry for any confusion, but
11 I was --
12    Q.  No.  That's fine.  That's fine.
13    A.  The numbering system had me confused.  I was
14 like, that's not our number so...
15    Q.  And there is another policy and this is
16 J-E-05, mental health screening evaluations and
17 services and it -- once again, it says it is the
18 policy of Creek County Jail that mental health
19 services are available to all detainees who require
20 them?
21    A.  Correct.
22    Q.  The detainees who require acute care mental
23 health services beyond those available at the jail are
24 transferred to an appropriate facility as soon as the
25 need for such treatment is identified and arrangements

**Page 82**

1  can be made.  You were aware that that was the policy
2  that was ultimately adopted by the jail based on ACH
3  policies and procedures; correct?
4     A.  Correct.
5     Q.  And yet as you sit here right now, we've
6  talked about that one man that went out for three to
7  five months, as we sit here now, is that still the
8  only person you can think of that has been transferred
9  outside of the facility for mental health treatment?
10    A.  Yes.
11    Q.  During the time that you have been the jail
12 administrator, are you saying that from that point
13 until now that you have never seen an inmate that you
14 thought was in need of inpatient mental health
15 services?
16        MS. GOOCH:  Object to the form.
17        THE WITNESS:  There have been others.  Yes.
18    Q.  (BY MR. WALSH)  But they did not receive that
19 treatment?
20        MS. GOOCH:  Object to the form.
21        THE WITNESS:  No.  Well -- no.
22    Q.  (BY MR. WALSH)  That would be in violation of
23 this policy, wouldn't it?
24        MS. GOOCH:  Object to the form.
25        THE WITNESS:  That would be correct.  That

**Page 83**

1  would be my understanding that the medical company
2  would make the appropriate appointments or
3  arrangements for their treatment --
4     Q.  (BY MR. WALSH)  Okay.
5     A.  -- as per the contract.
6     Q.  Are you aware that ACH did not have any
7  contract with any psychologist or psychiatrist in the
8  area?
9     A.  No, I was not.
10    Q.  Did you ever see any psychiatrist or
11 psychologist ever come to your facility during the
12 time that ACH had this contract?
13        MR. MCMILLIN:  Object to the form.
14        THE WITNESS:  Not that I'm aware of.  No.
15    Q.  (BY MR. WALSH)  Were you ever told that a
16 psychiatrist or psychologist had came to your facility
17 during the time that ACH had this contract?
18    A.  No.  The only -- no.
19    Q.  In the same policy, the J-E-05, it says that
20 medical staff shall attempt to obtain past and current
21 medical and mental health history of a detainee to
22 assist in the treatment of detainee while
23 incarcerated.  This, once again, was something that
24 you expected the medical to do in fulfillment of their
25 responsibilities under the contract they had with the

**Page 84**

1  jail?
2     A.  That is correct.  We would have the inmate
3  sign a medical release and give that medical release
4  to them.
5     Q.  Have you ever seen the treatment protocols
6  that were utilized by ACH during the time that they
7  were under contract with your facility?
8     A.  I have seen them.  I haven't reviewed each
9  and every one of them but, yes, I have seen them.
10    Q.  Okay.  As the jail administrator responsible
11 ultimately for the well-being of the inmates at your
12 facility, should you have reviewed those medical
13 protocols?
14    A.  Yes.  I -- yes.
15    Q.  I mean, certainly both as in your role as the
16 jail administrator as well as just life in general, I
17 mean, you have encountered people that had anxiety
18 issues, haven't you?
19    A.  Yes, I have.
20    Q.  You have encountered people that have
21 depressive issues, haven't you?
22    A.  Yes.
23    Q.  You understand that those are conditions that
24 can be medically treated for individuals?
25    A.  Correct.

**Page 89**

1  Q.  Your policies and procedures require that
2  your guards be trained to recognize medical and mental
3  health issues?
4  A.  That is correct.
5  Q.  And, in fact, the policies and procedures
6  basically say that they are to work hand in hand with
7  medical to identify those issues; correct?
8  A.  Correct.
9  Q.  During the period of time that you have been
10 jail administrator, how many suicides have there been
11 at your facility?
12 A.  There has been two.
13 Q.  Mr. Ernst and Mr. Moss?
14 A.  That is correct.
15 Q.  Mr. Moss's suicide was one month after
16 Mr. Ernst, wasn't it?
17 A.  I believe it was a year and a month.  I don't
18 believe it was -- I don't recall.  It may have been.
19 I thought it was a year after but...
20 Q.  Well, Mr. Ernst died in June of 2014.  A year
21 and a month would mean that he died in July of 2015,
22 Mr. Moss, so that's been within the last three months?
23 A.  Maybe it was one month.  I don't recall the
24 exact date.
25 Q.  I know that there was an investigation that

**Page 90**

1  took place and I've looked at the investigation.  It
2  talks about finding Mr. Ernst and looking at videos
3  and seeing what he had been doing during that early
4  morning hours before the suicide.  You're familiar
5  with that investigation, aren't you?
6  A.  Yes.
7  Q.  Was there ever an investigation that took
8  place where the facility tried to determine what they
9  could do to help prevent suicides among their inmate
10 population?
11 A.  No.  There was not an investigation.
12 Q.  Was there any analysis performed by you or
13 anyone at the Creek County facility that dealt with
14 how do we keep this from happening in the future?
15 A.  No.
16 Q.  You're aware that there is a suicide
17 prevention program in the policies and procedures as
18 adopted by the jail and offered by ACH?
19 A.  As -- I don't know.  I'd have to -- if you
20 can --
21 Q.  Yeah.  It is --
22 A.  -- review that.
23 Q.  Policy J-G-05.  It's under Bates stamp 1824.
24 It's towards the end of those.  Are you looking at the
25 suicide prevention program?

**Page 91**

1  A.  Yes.
2  Q.  That is a policy that has been adopted by
3  Creek County Detention Center, isn't it?
4  A.  Yes.
5  Q.  And it states that the policy of the Creek
6  County Jail, the suicide recognition intervention
7  begins upon book in to the jail.
8  A.  That is correct.
9  Q.  And you want to inquire and get as much
10 information as you can about an inmate to determine
11 whether they're suffering from any type of mental
12 illness that might lead to any suicide attempts,
13 aren't you?
14 A.  That is correct.
15 Q.  The intake itself, is that done by jail staff
16 or by medical staff?
17 A.  The initial is done by jail staff.
18 Q.  Is there a follow-up that is then done by
19 medical staff?
20 A.  Yes.  The intake form is then handed over to
21 medical staff.
22 Q.  States that all jail and medical staff are
23 responsible for monitoring the mental status of every
24 detainee.  That is the policy, isn't it?
25 A.  Yes.  That's the policy statement.  Yes.

**Page 92**

1  Q.  That's the baseline that you are talking
2  about that this training gives to your guards at your
3  facility?
4  A.  Correct.
5  Q.  It says that a staff member who works with
6  detainees are trained to recognize verbal and
7  behavioral clues that indicate potential suicide.
8  What are those verbal clues that could recognize
9  suicidal ideations?
10 A.  If they're verbally expressing it to them.
11 Q.  Okay.  So if someone says I'm going to commit
12 suicide?
13 A.  Uh-huh.  Yes.
14 Q.  Or I want to die?
15 A.  Yes.
16 Q.  You understand that there are other verbal
17 clues that can be made that could indicate suicidal
18 ideation besides just the overt statement of suicide;
19 correct?
20 A.  There are some.  Yes.
21 Q.  Give me an example of some of those other
22 verbal clues.
23 A.  I don't want to be here.  My life is over.
24 Different things such as that.
25 Q.  And there are times that a -- an inmate in a

**Page 93**

1 jail facility is more prone to suicide than other
2 times, isn't there?
3   A.   Yes.
4        MS. GOOCH:  Object to the form.
5   Q.   (BY MR. WALSH) What are those times?
6   A.   If they're under the influence of alcohol or
7 drugs. If they're getting sentenced. If they know
8 they're going to prison or they may not be getting out
9 for sometime.
10  Q.   Okay. Well, one of the first is within the
11 first 24 hours, isn't it?
12       MS. GOOCH:  Object to the form.
13       THE WITNESS:  That's correct.
14  Q.   (BY MR. WALSH) And you have been taught and
15 you know from personal experience that that is a
16 higher risk of suicide of the individual during that
17 first time in prison?
18       MS. GOOCH:  Object to the form.
19       THE WITNESS:  Correct.
20  Q.   (BY MR. WALSH) Mr. Ernst was placed on
21 suicide prevention when he first came into your
22 facility, wasn't he?
23  A.   Yes.
24  Q.   Why was he placed there?
25  A.   Due to the nature of his crime.

**Page 94**

1   Q.   Was there something specific that occurred
2 that led him to be placed on suicide prevention?
3   A.   Due to the -- to the nature of his crime and
4 being under the influence as well.
5   Q.   He was under the influence of what when he
6 came into your facility?
7   A.   Well, he was suspected of being under the
8 influence of either alcohol or some sort of
9 prescription drug.
10  Q.   Well, you understand that Mr. Ernst was not
11 transferred to your facility directly from the site of
12 his accident, don't you?
13  A.   That is correct.
14  Q.   Where was he first taken?
15  A.   To the hospital.
16  Q.   How long did he remain in the hospital?
17  A.   I do not know how long he was there.
18  Q.   Well, the accident itself occurred on August
19 23rd of '13. I'll just tell you. I mean, this is the
20 dates that I have; okay?
21  A.   Okay.
22  Q.   And he was not brought to your facility until
23 August 24th, 2013.
24  A.   Okay.
25  Q.   I mean, statement that he was under the

**Page 95**

1 influence of alcohol, I mean, do you think that after
2 24 hours he's going to be under the influence of any
3 alcohol?
4        MS. GOOCH:  Object to the form.
5        THE WITNESS:  Well, if he was on any other
6 narcotics that could have been given to him at the
7 hospital as well.
8   Q.   (BY MR. WALSH) Okay. Were you aware that he
9 had attempted suicide in the hospital?
10  A.   No, I was not.
11  Q.   Was he under -- was he in custody at the time
12 that he was in the hospital?
13  A.   Not by the Creek County Sheriff's Office.
14  Q.   Who was he in the custody of during the time
15 that he was at the hospital?
16  A.   I do not know the answer to that.
17  Q.   Would you fully expect that if there had been
18 a suicide attempt that whoever transported him to your
19 facility would have told you of that fact?
20       MS. GOOCH:  Object to the form.
21       THE WITNESS:  I would have thought so.
22  Q.   (BY MR. WALSH) Are you aware now that he had
23 attempted suicide in the hospital?
24  A.   Now that you're telling me this and from the
25 previous depositions of his wife, after reading those.

**Page 96**

1   Q.   Okay. What other depositions have you read
2 before coming here today?
3   A.   Her specifically.
4   Q.   Any others?
5   A.   I've briefed over the others, but not word
6 for word.
7   Q.   Did you read the deposition of Amanda
8 Spriggs?
9   A.   I have read the majority of it. Yes.
10  Q.   Okay. Behavioral clues that indicate
11 potential suicide. What are those behavioral clues?
12  A.   It could be crying. It could be being
13 distant, not speaking, more of a -- just a down, head
14 shaking. There's many different ones.
15  Q.   Under G it says communication between health
16 care staff and correctional staff is critical.
17 Special occurrences are documented on an ancillary
18 report communicated to the medical staff. I mean, you
19 agree that it is critical for your staff to
20 communicate with medical concerning patient's medical
21 and mental health needs, isn't it?
22  A.   Correct.
23  Q.   You're aware that there was an event that
24 took place with Officer Marshall, the transport --
25  A.   Yes.

Page 97

```
 1   Q.   -- deputy?  When did you first learn that
 2 Officer Marshall had reported to his supervisors his
 3 concerns for Mr. Ernst?
 4   A.   It was sometime after he got sentenced.  I
 5 don't remember the exact date when I found that out.
 6   Q.   Okay.  What have you learned about what
 7 Officer Marshall reported?
 8   A.   I knew that his wife had took off her wedding
 9 ring and threw it at him at court during the
10 sentencing.
11   Q.   Uh-huh.
12   A.   And that whenever Marshall came back, he
13 notified either Gina Hutchinson -- Gina Hutchison or
14 Lance Prout about his -- about what had happened at
15 court, that he needed to be checked out.
16   Q.   Okay.  Have you now learned that he actually
17 reported that to three different individuals?
18        MS. GOOCH:  Object to the form.
19        THE WITNESS:  I don't recall exactly who he
20 reported it to.
21   Q.   (BY MR. WALSH)  Well, you read the
22 supplemental report that Officer Marshall prepared,
23 didn't you?
24   A.   I have at one time.  Yes.
25   Q.   Officer Marshall indicates in that report
```

Page 98

```
 1 he -- matter of fact, let's just look at that report.
 2        (Off-the-record discussion.)
 3   Q.   (BY MR. WALSH)  In the -- in the supplemental
 4 report that I have about Marshall, he talks about on
 5 June 11th of 2014, I, Deputy Adam Marshall, a
 6 certified deputy for Creek County Sheriff's Office,
 7 was assigned to the jury trial in Bristow, Oklahoma,
 8 located in Creek County.  During the trial, Mr.
 9 Ernst's wife approached him from a distance and tossed
10 her wedding ring at Ernst and stated he didn't need it
11 anymore.  On June 12th, at approximately 1300 hours,
12 Mr. Ernst was found guilty on four counts of
13 manslaughter in the first degree and sentenced to 38
14 years in the department of corrections.  I could tell
15 that Ernst was emotional and upset.  When Ernst and I
16 got back to the jail, I told shift supervisor,
17 Corporal Boomer Jones, that he should have Ernst
18 checked and watched.  Have you ever talked to Boomer
19 Jones about any conversation that he had with Adam
20 Marshall?
21   A.   No, I have not.
22   Q.   At the time that the transport officer
23 reported this to Corporal Boomer Jones, what should
24 Boomer Jones have done?
25   A.   Should have been referred to medical and
```

Page 99

```
 1 checked at medical before being returned to his
 2 housing unit.
 3   Q.   Was -- was that done?
 4   A.   To my knowledge that was done.
 5   Q.   Okay.  We're going to come back to that.  You
 6 think that was done on the same date, June 12th?
 7   A.   I believe it was.  I'm not a hundred percent
 8 on it, though.
 9   Q.   Okay.  Now, during the deposition of Mr.
10 Marshall, and you haven't had a chance to read that
11 yet.  We'll get a copy of that pretty quick.  He also
12 indicated that there was one point in time that
13 Mr. Ernst reported that he just wishes a car would run
14 over him.  Did Adam Marshall ever tell you that
15 Mr. Ernst had made that statement?
16   A.   No.  I do not recall that statement.
17   Q.   The record goes on to say that he informed
18 Deputy Prout and Lieutenant Hutchison that he should
19 have been placed on suicide watch or be checked by
20 medical.  When I talked to Adam Marshall, he indicated
21 that these were actually three separate conversations
22 that he had, that he went up the chain because of his
23 concerns about Mr. Ernst.  Did you ever talk to Deputy
24 Prout about any actions that he took when he was
25 informed by Adam Marshall of his concerns?
```

Page 100

```
 1   A.   No.  And if I may go back to about the
 2 conversation with Boomer?
 3   Q.   Yes.
 4   A.   Just recently he told me that he had referred
 5 Ernst to medical and that's when Prout took over at
 6 that point.
 7   Q.   Okay.  So Boomer Jones was aware that Prout
 8 had been consulted?
 9   A.   It was my understanding from Boomer that he
10 had spoke to Prout about it.
11   Q.   Okay.
12   A.   Which would have been Boomer's next level
13 supervisor or next in chain of command.
14   Q.   What did Prout do about the conversation that
15 he had with Boomer Jones?
16   A.   From what Boomer Jones told me was that Prout
17 either -- I don't recall what exactly he said.  He
18 told me, but I don't remember the -- the wording of
19 it.  I don't want to get it misconstrued here.
20   Q.   Okay.
21   A.   I mean, Boomer said that either Prout either
22 took him to medical or said that he -- that he talked
23 to him and said he was okay.  I don't remember exactly
24 what was said.  Like I said, I don't know --
25   Q.   Okay.  Someone --
```

101

1   A.   -- the conversation between Prout and Boomer.
2   Q.   When a deputy has expressed concern that
3 someone should be placed on suicide watch or taken to
4 medical, I mean, would it be appropriate for that
5 officer to just talk to the inmate himself and make a
6 determination that no, nothing needs to be done here?
7   A.   No.  That's -- that should be addressed by
8 medical.
9   Q.   Uh-huh.
10  A.   If we recognize a concern, then it needs to
11 go to medical for a -- more of a professional medical
12 evaluation.
13  Q.   And you're uncertain at this point whether
14 Prout told you that he actually talked to Ernst?
15  A.   I have never talked to Prout about that.
16 Prout is no longer with us.  Hasn't been with us for
17 quite sometime.
18  Q.   Where is he now?
19  A.   I believe he -- the last I heard he's the
20 assistant chief in Chelsea.
21  Q.   Did he leave on good terms?
22  A.   He resigned and I believe -- I don't believe
23 he even gave any notice when he resigned.
24  Q.   Okay.  But, I mean, did he leave in good
25 standing with the department?

102

1   A.   Yes.
2   Q.   Okay.  And then he says he talked to Gina
3 Hutchison.  Did you ever talk to Gina about any
4 conversations that Officer Marshall had with her?
5   A.   Not until just recently.
6   Q.   What did you two talk about?
7   A.   This is when the conversation came up with
8 myself, Boomer and Gina Hutchison.
9   Q.   Okay.  Did Gina Hutchison tell you that she
10 did anything in response to that conversation?
11  A.   If I recall correctly, it was that Prout was
12 handling the situation or was supposed to handle the
13 situation.
14  Q.   Okay.  In this report, if there had been
15 another statement made by Mr. Ernst that I just wish
16 some car would run over me, should that information
17 have been documented and reported as well?
18  A.   Correct.
19  Q.   Now, there is a late entry.  Have you seen
20 the late entries that Pam Hibbert prepared in the
21 medical file?
22  A.   I remember seeing them briefly.  I don't
23 recall what they stated though.
24  Q.   Do you understand that Pam Hibbert is a
25 licensed practical nurse?

103

1   A.   I knew she was either a LPN or RN.  I didn't
2 know which.  I knew she was a nurse.  I didn't know
3 what status she held.
4   Q.   She would not be considered the mental health
5 professional for the Creek County facility, would she?
6        MS. GOOCH:  Object to the form.
7        THE WITNESS:  No.
8   Q.   (BY MR. WALSH)  I mean, with the report that
9 Officer Marshall is making, would it be your
10 expectation, as the jail administrator, that Mr. Ernst
11 would have been seen by the medical health care
12 professional as a result of those statements?
13  A.   It would be my expectation to be placed on
14 suicide watch until he had seen mental health.
15  Q.   That did not happen, did it?
16  A.   No.
17  Q.   Nurse Hibbert did talk to Mr. Ernst on the --
18 on June 12th.  Do you know where that conversation
19 took place?
20  A.   I do not.
21  Q.   Do you know if Mr. Ernst was ever taken to
22 medical?
23  A.   It was my understanding he was seen in
24 medical or in the booking area before he was returned
25 to his cell.

104

1   Q.   Is the booking area and medical the same?
2   A.   They're in the same area.  Yes.  It's -- the
3 medical office is in the intake area.
4   Q.   Okay.
5   A.   They have their own office just to the side
6 of the intake area.
7   Q.   Did you ever talk to Nurse Hibbert about her
8 conversation with Mr. Ernst?
9   A.   No, I did not.
10  Q.   If I told you that Pam Hibbert just simply
11 walked by and stood next to Mr. Ernst and talked to
12 him for a couple minutes, would that be the type of
13 assessment that you as the jail administrator would
14 have expected to take place?
15  A.   No.
16  Q.   Tell me the assessment that you would have
17 expected to take place based upon what Mr. Marshall
18 had reported.
19  A.   I would expect him to be placed on suicide
20 watch with the on duty medical staff talking to him
21 but not released from suicide watch until cleared by
22 mental health.
23  Q.   In fact, is it mental health that can release
24 a person from suicide watch or is it only the
25 physician that can do that?

105

1    A.    The mental health and/or physician.
2    Q.    You think a master's in social work could
3  make a determination as to whether or not someone was
4  over any suicidal ideations?
5          MR. MCMILLIN:  Object to the form.
6          THE WITNESS:  I'm not sure what her
7  qualifications exactly were.
8    Q.    (BY MR. WALSH)  I'm telling you that that's
9  what it is.
10   A.    In social work I would not think so.
11   Q.    I mean, if you really want to provide help
12 for the inmates, the inmates need to be seen by people
13 that are competent and trained in mental health
14 issues; correct?
15   A.    I agree.
16         MS. GOOCH:  Object to the form.
17         MR. MCMILLIN:  Object to the form.
18   Q.    (BY MR. WALSH)  You understand a psychiatrist
19 would be that type of individual, wouldn't he?
20   A.    Yes.
21   Q.    A psychologist would be that type of
22 individual, wouldn't he?
23   A.    I would think so.
24   Q.    Other than those two, can you think of
25 anybody else that would be trained and competent to

106

1  deal with mental health issues and suicidal ideations
2  of an inmate in a prison setting?
3    A.    Not to my knowledge.
4          MR. MCMILLIN:  Object to the form.
5    Q.    (BY MR. WALSH)  There is another late entry
6  that Nurse Hibbert does about a conversation on June
7  13th where she once again stands there and talks to
8  Mr. Ernst, asks him how he's doing, that he says he's
9  feeling -- I'm fine.  I had an okay night.  That he's
10 making good eye contact with staff, voices no
11 complaints or concerns.  Do you recall reading that
12 late entry at any time?
13   A.    I remember seeing it.  I don't recall what --
14 at what time I seen it but...
15   Q.    Okay.  My understanding is this was not even
16 prepared until after Mr. Ernst had committed suicide;
17 is that your understanding?
18   A.    Right.  Now -- I mean, I remember seeing it,
19 but it was after his death.
20   Q.    In the -- in the training that you have had
21 on prevention of suicide, have you ever been taught
22 that people that once they have formulated a plan for
23 suicide, that they can become at ease with what they
24 are going to do and not have outward signs or symptoms
25 of suicidal ideations?

107

1    A.    That's correct.
2    Q.    When we were talking about when people were
3  most susceptible, we talked about the first 24 hours.
4  You talked about when they get sentenced or a verdict
5  comes back against them.  You understand that there is
6  a heightened risk of suicides in inmates at that time;
7  correct?
8    A.    Correct.
9    Q.    You also understand when there are changes in
10 interpersonal relationships that inmates have that
11 that can lead to an increase in suicide risk, can't
12 it?
13   A.    I would think so.  Yes.
14   Q.    Mr. Ernst had just received what would amount
15 to a life in prison sentence as a result of his
16 offense, hadn't he?
17   A.    Yes.
18         MR. MCMILLIN:  Object to the form.
19   Q.    (BY MR. WALSH)  He had had a change in an
20 interpersonal relationship, hadn't he?
21   A.    Yes.
22   Q.    Mr. Ernst was at a heightened risk of
23 suicide, wasn't he?
24   A.    Could be said so.  Yes.
25   Q.    And as you sit here now, you know that no one

108

1  other than an LPN talked to him; correct?
2    A.    Correct.
3          MR. MCMILLIN:  Object to the form.
4    Q.    (BY MR. WALSH)  Mr. Ernst, when we were
5  talking about deliberate indifference, not doing what
6  you need -- know you need to do, that occurred with
7  Mr. Ernst in not being properly assessed and evaluated
8  based upon what had just occurred with him, didn't it?
9          MR. MCMILLIN:  Object to the form.
10         MS. GOOCH:  Object to the form.
11         THE WITNESS:  I think there is other things
12 that could have -- should have happened.
13   Q.    (BY MR. WALSH)  Well, we talked about not
14 doing the things you know you need to do; correct?
15   A.    The nurse should have put him on other
16 precautions.
17   Q.    He should have been put on suicide risk,
18 shouldn't he?
19   A.    Correct.
20   Q.    And he should have been put on suicide risk
21 until he was checked out by the physician, shouldn't
22 he?
23         MS. GOOCH:  Object to the form.
24         MR. MCMILLIN:  Object to the form.
25         THE WITNESS:  By the physician or mental

Page 109

1  health, which --
2  Q.  (BY MR. WALSH)  Only mental health could make
3  those determinations; correct?
4  A.  Correct.
5  Q.  And at this point, you don't know whether
6  mental health could make those determinations, do you?
7      MS. GOOCH:  Object to the form.
8      THE WITNESS:  No.
9  Q.  (BY MR. WALSH)  So the only person that was
10 at that facility that could have come close to making
11 that type of determination would have been the doctor?
12     MR. MCMILLIN:  Object to the form.
13 Q.  (BY MR. WALSH)  Fair statement?
14     MS. GOOCH:  Object to the form.
15     THE WITNESS:  From what I know, yes.
16 Q.  (BY MR. WALSH)  How often did you see the
17 doctor at the facility?
18 A.  I didn't see him very often.  He normally
19 came in later in the evening.
20 Q.  Didn't you learn from your staff that it was
21 rare that he would come by?
22 A.  I think he was there every -- every two to
23 three weeks.
24 Q.  Was he there or his PA there every two to
25 three weeks?

Page 110

1  A.  I really can't answer.  I know if I was
2  there, I would see him occasionally.
3  Q.  Would you see the PA much more frequently?
4  A.  She was there more during the daytime.  Yes.
5  Q.  Was it a she or a he?
6  A.  I want to say it was a female, the one that
7  I'm aware of.
8  Q.  This was with ACH?
9  A.  Yes.
10 Q.  Now, we talked about the quarterly meetings
11 that you had where they would send down the regional
12 director, you would be there.  Was the doctor ever
13 there during these meetings?
14 A.  No.
15 Q.  Was the PA there ever present during these
16 meetings?
17 A.  Not that I recall.  No.
18 Q.  Was Amanda Spriggs present during any of
19 these meetings?
20 A.  I think she was on site occasionally, but not
21 directly involved, but there.
22 Q.  Okay.  So the regional director was there,
23 you were there for those quarterly meetings, who else
24 would be there each time for these quarterly meetings?
25 A.  At times the nurse would be there, the on

Page 111

1  duty nurse that was there or the head nurse would be
2  there.  Sometimes Gina Hutchison would be there as
3  well and sometimes it was just Gina Hutchison with
4  them versus me as well.
5  Q.  Okay.  And you said that you would spot check
6  about 10 of the charts and look at them?
7  A.  Roughly, yes.
8  Q.  How long would these meetings take?
9  A.  Maybe 45 minutes, maybe to an hour.
10 Q.  Did you ever express any concerns to the
11 regional director that the inmates were not getting
12 appropriate medications?
13 A.  Yes.
14 Q.  What medications were you concerned that they
15 were not getting?
16 A.  I don't recall specifically.  I just -- that
17 inmates would say they were not getting their meds or
18 -- and when I would ask, it would be, well, we're out.
19 They're on order.
20 Q.  Did you ever have any concerns of any
21 psychotropic medications that were not being given to
22 inmates that were in need of them?
23 A.  I don't understand.  Are you meaning that --
24 if they were out or they were just not giving them
25 period?

Page 112

1  Q.  Not giving them period.
2  A.  I'm not a -- I'm sorry.  Repeat it one more
3  time for me.
4  Q.  Okay.  Did you ever express any concerns to
5  the regional director that psychotropic medications
6  were not being given to inmates that were in need of
7  those medications?
8  A.  I don't remember specifically what
9  medications they were.
10 Q.  Okay.  You indicated that there was a letter
11 that was written concerning dissatisfaction that the
12 facility had with ACH.  When was that letter written?
13 A.  There was one letter written that their
14 services would no longer be needed.  That was, I want
15 to say, in June.
16 Q.  June of 2014?
17 A.  20' -- of 2015.
18 Q.  What was the reason given for why their
19 services would no longer be needed?
20 A.  Because we were putting it out for bid.  We
21 were dis -- dissatisfied with them.
22 Q.  Why were you dissatisfied?
23 A.  That they weren't doing intakes in a timely
24 manner.  That if they were out of meds, the staffing
25 issues.

```
                                                          121
 1  that the family has brought, that would mean that they
 2  had gone through all of those steps; correct?
 3      A.   Correct.
 4           MS. GOOCH:  Object to the form.
 5      Q.   (BY MR. WALSH)  Mr. Ernst continued to
 6  receive this medication through -- he started in
 7  September.  In September, October and November he
 8  received both the Remeron, as well as the Gabapentin,
 9  according to the MAR reports.  You have any -- I'm
10  just telling you that; okay?
11      A.   Right.  Okay.
12      Q.   Remeron was then stopped in December.  When
13  you reviewed his medical file, did you find any
14  notations as to why Remeron was stopped?
15      A.   I don't recall any.
16      Q.   This is ACH 51, request to staff.  This went
17  to medical.  The inmate reports that he's having
18  trouble sleeping because of nightmares, requests to be
19  able to take my Mirtazapine that my family brought to
20  help me sleep.  Request that I be given my prescribed
21  medication.  The disposition of this is, we can't give
22  Remeron here anymore and there isn't a substitute.
23  Did the facility ever tell ACH that they could not
24  give Remeron?
25      A.   No.
```

```
                                                          122
 1      Q.   You talked about they had their own policies
 2  as to medications that they would give.
 3      A.   There was a formulary.  Yes.
 4      Q.   In that formulary, you would expect it to
 5  conform with the policies and procedures of ACH,
 6  wouldn't you?
 7      A.   Yes, I would.
 8      Q.   And we already looked at the controlled
 9  policy and procedure for the giving of medications,
10  didn't we?
11      A.   Correct.
12      Q.   And there is no medication that is
13  specifically stated that you can't give in that policy
14  and procedure, is it?
15      A.   No.
16      Q.   In fact, it says that if it's ordered by a
17  doctor that you can give the narcotic medication,
18  can't you?
19      A.   Correct.
20      Q.   For them to make the statement that Remeron
21  is not given here anymore, where did they get that
22  information?
23           MS. GOOCH:  Object to the form.
24           THE WITNESS:  I don't know where.  Would have
25  to ask whoever signed that.
```

```
                                                          123
 1      Q.   (BY MR. WALSH)  It was signed by an LPN.  Do
 2  you know what authority an LPN would have to make the
 3  determination that a patient wasn't going to get
 4  medication that had been prescribed?
 5      A.   I do not.
 6      Q.   On January 10th of 2014, there was a request
 7  to staff.  Request to see psychiatrist.  The
 8  disposition is, we do not offer counseling.  Was that
 9  the policy and procedure of Creek County that they did
10  not offer counseling?
11      A.   No.
12      Q.   On January 16th, another request.  Have sent
13  several requests to staff to see psychiatrist.  Once
14  again, the disposition is, we do not offer counseling.
15  You said that if an inmate had made repeated requests,
16  and you gave me the number two, and they could not do
17  what the -- what the inmate indicated, that you would
18  expect to see those requests to staff; correct?
19      A.   I would expect to.  Yes.
20      Q.   Did you ever receive these requests to staff
21  that took place on January 10th and January 16th?
22      A.   Not that I recall.  No.
23      Q.   If you had seen those requests to staff, what
24  would you have done?
25      A.   We would try to get him an off-site
```

```
                                                          124
 1  appointment or figure out what we could do.
 2      Q.   An off-site appointment was an option, wasn't
 3  it?
 4      A.   Yes, it is.
 5      Q.   Giving the Remeron medication was an option,
 6  wasn't it?
 7      A.   Yes.
 8      Q.   As early as October 1st of 2013, he had
 9  requested to see a psychiatrist and once again the
10  disposition is Creek County does not provide
11  individual counseling to inmates.  Once again, that is
12  not a true statement, is it?
13      A.   No.
14           MS. GOOCH:  Object to the form.
15      Q.   (BY MR. WALSH)  We had talked about that
16  January 29th request to staff where he requested to go
17  to CREOKS Mental Health and the disposition didn't
18  address CREOKS, but it said no Remeron.  On January
19  23rd is when they made the comment that Remeron was
20  not available, was no longer given at this facility,
21  no substitute available.  So we now have two instances
22  where he's requested a specific medication.  Did you
23  ever get copies of these requests to staff?
24      A.   No.
25      Q.   There is a request form where he states they
```

125

1 no longer will give me medicine for my Crohn's. Were
2 you ever advised of that request?
3    A.   No.
4    Q.   There is a request made on September 5th of
5 2013. I have requested my pain meds. The disposition
6 is, no narcotics are given at this facility. Once
7 again, the deposition that no narcotics are given at
8 this facility was not a correct statement, was it?
9    A.   Correct.
10   Q.   If you had at any time taken a look at these
11 requests to staff and there are numerous requests to
12 staff that we had just gone through; correct?
13   A.   Yes.
14   Q.   And you had seen these repeated requests,
15 would you have gone and talked to the doctor about
16 this?
17   A.   I probably would not talk to the doctor. I
18 would have called the regional office -- or the main
19 off -- the corporate office.
20   Q.   What would you have told the corporate
21 office?
22   A.   I would have asked why he's not getting his
23 meds and why he's not getting his appointments.
24   Q.   If you had looked and seen that Remeron, in
25 fact, had been prescribed for a three-month period and

126

1 now they're suddenly saying that we don't give
2 narcotics and we don't give Remeron, what would you
3 have wanted to know in your questioning of them about
4 that?
5    A.   Who changed it? Why wasn't we notified and
6 why are we not trying to find a substitute? Why can't
7 he have it if that's what he's prescribed and that's
8 been verified?
9    Q.   And would you have also wanted to know who is
10 your outside psychiatrist or psychologist that we're
11 going to use to help treat these patients?
12   A.   Yes.
13   Q.   And I take it, those issues never came up at
14 any time with any inmate during the time that ACH had
15 that contract?
16   A.   Correct.
17   Q.   Who is the contract with now?
18   A.   Turn Key Medical.
19   Q.   Is it the same coverage with Turn Key?
20   A.   The hours are the same with the exception of
21 with ACH, they didn't work holidays. With Turn Key,
22 they do.
23   Q.   Do you know who the mental health
24 professional is that Turn Key uses?
25   A.   I do not know his name. No. I don't know.

127

1    Q.   Do you know what his qualifications are?
2    A.   I do not.
3    Q.   Are you going to go find out today?
4    A.   It's a good idea. Yes.
5         MR. WALSH: Let's take a break here for a
6 little bit. Okay?
7         (Break taken from 10:49 a.m. to 12 p.m.)
8    Q.   (BY MR. WALSH) How were you notified that
9 Mr. Ernst had committed suicide?
10   A.   By telephone.
11   Q.   Who told you?
12   A.   I believe it was the supervisor that called
13 me, the shift supervisor at night. I want to say it
14 was Kyle Masters, but I'm not a hundred percent sure
15 who it was.
16   Q.   Is Kyle Masters still working with you?
17   A.   Yes.
18   Q.   Did you respond in any way or go to the jail
19 and look at the scene?
20   A.   I went to the jail immediately.
21   Q.   Did you look at the video?
22   A.   Yes.
23   Q.   What was Mr. Ernst doing out of his cell at
24 this time?
25   A.   It was -- that he went to the shower area.

128

1    Q.   You understand he went to the shower area
2 sometime at three in the morning?
3    A.   Correct.
4    Q.   Why was he out at that time?
5    A.   If his -- those cell doors are locked down.
6 The housing unit that he is in is locked down at
7 eleven o'clock at night. If for some reason that
8 their door does not function properly, that door is
9 left unsecured for emergency reasons.
10   Q.   Was the door not working properly at --
11 during this time?
12   A.   Correct. That door was -- had a bent -- I
13 believe it had a bent hinge on it where it would not
14 properly secure.
15   Q.   Okay. Are they supposed to be out at this
16 time, the inmates?
17   A.   No.
18   Q.   Do you have any additional guards that you
19 post in that area knowing that you have a piece of
20 equipment that isn't working properly?
21   A.   No, because they're -- it's their cell door
22 and they're in a day room during the day anyway, so
23 they're not a security risk.
24   Q.   But they certainly could be a risk to
25 themselves if they have suicidal ideations, if they