### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MICHELLE ERNST, as Personal Representative of the Estate of David Michael Ernst, deceased,<br><br>Plaintiff,<br><br>v.<br><br>CREEK COUNTY PUBLIC FACILITIES AUTHORITY, ADVANCED CORRECTIONAL HEALTHCARE, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 14-CV-504-GKF-PJC<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**OPINION AND ORDER**

David Michael Ernst ("Mr. Ernst") had been jailed for nearly ten months at the Creek County Criminal Justice Center ("the Jail") when, tragically, he committed suicide on June 17, 2014. Michelle Ernst ("Ms. Ernst"), Mr. Ernst's daughter and personal representative of Mr. Ernst's estate, sued the Creek County Public Facilities Authority ("the Authority") under 42 U.S.C. § 1983, alleging that the Authority was deliberately indifferent to Mr. Ernst's serious medical needs in violation of his Eighth Amendment rights. Ms. Ernst also sued Advanced Correctional Healthcare, Inc. ("ACH"), a contractor that provided inmate medical care at the Jail, alleging that its improper policies and procedures, and its failure to provide prompt and adequate medical and psychiatric treatment and supervision, constitutes negligence under Oklahoma law. Ms. Ernst has since dismissed her claims against ACH with prejudice.

    **I.**     **Summary Judgment Standard**

Before the court is the Authority's Motion for Summary Judgment [Dkt. #72]. A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## II.     Material Facts

The court views the facts presented by the parties in the light most favorable to the plaintiff. Mr. Ernst was booked into the Jail on August 24, 2013, and "reported suicidality to staff upon intake." [Dkt. #73-1, p. 3]. Authority officers became concerned that day when he began to give his food away,[1] and placed him on suicide watch. Clinician Amanda Spriggs, LPC, released him from suicide watch on August 26, 2013, and gave the following reason for her

---

[1] Mr. Ernst also reported he had medical problems and had not been able to eat. [Dkt. #73-1, p.3].

decision: "Inmate denies suicidality, states reasons to live, and commits to a safety plan. Inmate will remain in booking on medical observation and food intake will be documented." *Id.* A medical history prepared on August 26, 2013 notes Mr. Ernst had been diagnosed with depression and had a history of mental health treatment, including treatment with gabapentin—an anticonvulsant used to treat nerve pain that Mr. Ernst took for depression; buspar and valium—antianxiety medications; and mirtazapine—an antidepressant sold under the trade name Remeron. [Dkt. #73-1, p. 7]. Mr. Ernst also reported having Crohn's disease. *Id.*

During his time at the Jail, Mr. Ernst had several disagreements with Authority staff and with ACH medical staff about his medication and treatment. Mr. Ernst requested Lortab, a narcotic pain medication, for Crohn's disease on several occasions, but ACH denied these requests. ACH told Mr. Ernst that the pain medications he requested were not available because they were narcotics and that "no narcotics are given at this facility." [*See* Dkt. #73-1, p. 13]. To the contrary, the Authority's formal policy authorized the administration of controlled medications. [*See* Dkt. #93-21, p. 1]. Jail Administrator Kelly Birch testified the Authority could provide non-narcotic substitutes, or, if a substitute was not found "and it was a needed medication," the inmate would be given the narcotic. [Dkt. #93-4, p. 11].

During the early months of Mr. Ernst's incarceration, ACH administered Remeron brought by Mr. Ernst's family. However, by January 23, 2014, ACH had stopped giving him Remeron. [*See* Dkt. #73-1, p. 22]. Mr. Ernst submitted a request to ACH for the Remeron, but ACH staff denied the request, stating "We can't give Remeron here anymore, and there isn't a substitute." [*Id.*]. In denying the request, ACH staff offered no further explanation as to why they could not administer Remeron. Jail Administrator Kelly Birch later testified that giving the Remeron medication was, in fact, an option. [Dkt. #72-32, p. 16].

3

Mr. Ernst requested an increased dosage of gabapentin. ACH denied this request initially and after review by a physician. [Dkt. #73-1, pp. 16-18].

Mr. Ernst also requested, and was denied, individual counseling due to nightmares of a motor vehicle accident that killed four people—the accident which resulted in Mr. Ernst's prosecution and eventual conviction for manslaughter. ACH told Mr. Ernst that the Authority "does not provide individual counseling to inmates" and that he would need to arrange for individual counseling when he left the Jail. [*See* Dkt. #73-1, p. 15]. Mr. Birch testified that it was possible to send an inmate to an off-site appointment for mental health counseling. [Dkt. #93-4, p. 19]. And Assistant Jail Administrator, Lieutenant Gina Hutchinson testified that inmates could be taken outside of the Jail for mental health treatment if "ACH, the doctor, says we need to take them[.]" [Dkt. #93-20, p. 5].

Nine months into his incarceration, Mr. Ernst's family contacted the Jail, stating that he "needed mental health treatment." [Dkt. #73-1, p. 24]. Clinician Spriggs conducted a "Mental Health Services Clinical Contact" with Mr. Ernst on May 19, 2014. According to Ms. Spriggs's notes on the clinical contact form, Mr. Ernst reported he was having trouble sleeping due to nightmares. Ms. Spriggs wrote that Mr. Ernst requested "individual therapy and medication for sleep," but that "neither . . . is provided at CCJ." [*Id.*]. Ms. Spriggs also noted Mr. Ernst reported no suicidal ideation. Based on the clinical contact, Ms. Spriggs planned to "continue to monitor" Mr. Ernst, and provided him with a "coping skills teaching guide." Ms. Spriggs also stated she would forward Mr. Ernst's information for review by a physician. The summary judgment record contains no evidence that a physician reviewed Ms. Spriggs's clinical contact notes.

On June 11, 2014—the day before Mr. Ernst was to be sentenced in his criminal case arising from the motor vehicle accident mentioned above—a fellow inmate's wife, Angela Holmes, called the Authority and reported Mr. Ernst was threatening suicide:

| | |
|---|---|
| **Authority Staff**: | Creek County Jail |
| **Mrs. Holmes**: | Hello. I just got off the phone with my husband, um, he's in I pod[2] and the man that fell asleep in Kellyville and killed the four people—he's in that pod too—I think his name is Dave Ernst or something like that.  Anyway, my husband said he's threatening suicide. He's asking questions about if he jumped off the top rung of the pod if they thought it would kill him, and they're having to stay awake and watch him and make sure he doesn't do anything stupid.  So, my husband asked to call and see if you guys could take him up front and put him on suicide watch until all this is over with. |
| **Authority Staff**: | Who's your husband? |
| **Mrs. Holmes**: | Jeremy Holmes.  I think the guy's name is Ernst or something like that. |
| **Authority Staff**: | OK, I will let my supervisor know. |

[Dkt. #72-24].

Jeremy Holmes called Angela Holmes the following day, June 12th.  Mrs. Holmes asked her husband, "Did they come get that guy last night?"  [Dkt. #72-25, p. 3].  Jeremy Holmes replied, "Yeah. They come and got him and took him out and asked him a few questions and s*** and brought him back."  [*Id.*].  The evidentiary materials before the court do not reveal the substance of the conversation between Authority staff and Mr. Ernst.  The Authority staff who interviewed Mr. Ernst did not place him on suicide watch, and the Authority and ACH did nothing else to investigate Mr. Ernst's suicide risk at that time.

On June 12, 2014, Mr. Ernst was sentenced to thirty-six years in prison for voluntary manslaughter.  [Dkt. #72-26].  The transport deputy who took Mr. Ernst back to the Jail—

---

[2] A "pod" is a section of inmate housing.

5

Deputy Adam Marshall—testified that, after the sentence was announced and the jury was dismissed, Mr. Ernst's wife took off her wedding ring and threw it at Mr. Ernst. [Dkt. #72-36, p. 4]. Deputy Marshall[3] also testified that, during the ride back, Mr. Ernst commented that a thirty-six year sentence might as well be a life sentence for him and that Marshall "should just hit him with the car, run him over or something like that . . . ." [*Id.* at 3].

      Upon return to the Jail, Deputy Marshall reported to his shift supervisor, Deputy Boomer Jones, to the chief of security, Deputy Lance Prout, and to Lieutenant Hutchinson, that Mr. Ernst should either be placed on suicide watch or be seen by medical staff. [*Id.* at 5-7]. Deputy Prout asked Pamela Hibbert, a licensed practical nurse from ACH's medical staff, to speak with Mr. Ernst before Ernst left the booking or intake area. [Dkt. #72-35, p. 11 (Ms. Hibbert testified "either the transport officer or . . . Officer Prout" asked her to look at Mr. Ernst); Dkt. #72-29, p. 2 (Deputy Jones reported "Deputy Prout had medical staff check on Inmate Ernst as well.")]. Ms. Hibbert testified that—when she spoke with Mr. Ernst—she was not aware of Deputy Marshall's opinion that Mr. Ernst should be placed on suicide watch nor was she aware of the wife's actions Deputy Marshall observed in court or the troubling conversation that occurred on the way back to the Jail. Ms. Hibbert testified that she was asked to evaluate Mr. Ernst simply because he had received a lengthy sentence. According to Ms. Hibbert's report and deposition testimony, Mr. Ernst denied he was suicidal, claimed he had been expecting a long sentence, and asked not to be placed on suicide watch, where he would be "away from [his] friends." [Dkt. #72-35, pp. 12, 14-15]. Ms. Hibbert testified Mr. Ernst "showed . . . no signs or symptoms of being depressed or . . . any indication that he was a harm to himself whatsoever." [*Id.*]. No one placed Mr. Ernst on suicide watch.

---

[3] The transport deputy testified he was employed by the Creek County Sheriff's Office. [Dkt. #72-36, p. 2].

Three days later, on June 15, 2016, Mr. Ernst called his wife, Regina Ernst ("Mrs. Ernst" or "Regina"), and suggested she was cheating on him, a charge Mrs. Ernst denied. [Dkt. #72-30].

| | | |
|---|---|---|
| **Regina**: | | Well, hello, stranger. |
| **David**: | | Golly, Reg. |
| **Regina**: | | Been camping. |
| **David**: | | With who? Some dude? |
| **Regina**: | | No. Camping with Fonda, baby. Don't start crying. Please don't. That's all I need right now. |
| **David**: | | How can you do me that way? |
| **Regina**: | | What did I—how did I do you? |
| **David**: | | Don't tell me what's going on and for a week I can't get ahold of you. |
| **Regina**: | | It's been five days, baby. I went camping. |
| **David**: | | It's been a week. Monday— |
| **Regina**: | | Daddy, I went camping. I went camping. I went camping. I didn't know to have to find me another payee. |
| **David**: | | Who are you in Arkansas with? |
| **Regina**: | | Myself. |
| **David**: | | Dude, I know that ain't true, Reg. |
| **Regina**: | | No. Believe it or not. |
| **David**: | | You're with that dude. |
| **Regina**: | | No, I'm not. |
| **David**: | | Yeah. |
| **Regina**: | | No. |
| **David**: | | Tell me the truth. |
| **Regina**: | | I am, and I'm not going to sit here and argue with you. I'm already upset. |
| **David**: | | You're upset? Why are you upset? |
| **Regina**: | | Because I can't get my money to take care of business. |
| **David**: | | I had a feeling you wouldn't get that lawyer anyway. You don't even ask— |
| **Regina**: | | Oh, I'm going to get him. I'm going to get him. |

7

| | | |
|---|---|---|
| **David**: | | I called you today. I mean, you had to be driving to Arkansas. You wouldn't answer—that dude wouldn't let you— |
| **Regina**: | | I tried to answer your phone call. |
| **David**: | | You didn't sit nowhere. You went to Arkansas. |
| **Regina**: | | You called me at 10:00 this morning, David. That's the only time my phone's rang. That's the only time until now. |
| **David**: | | Man, Reg. Why don't you just let me know the truth. Why— |
| **Regina**: | | Just do whatever you want to do. Okay? |
| **David**: | | Seriously? |
| **Regina**: | | Yeah. Seriously . I'm just – [Inaudible 03:21] because I just can't handle it anymore. |
| **David**: | | Yeah. You and what's his name, huh? |
| **Regina**: | | No. I love you . I'm going to let you go. Bye. |
| **David**: | | You better not hang up on me ... |

No one reported this phone call to any Authority or ACH staff prior to Mr. Ernst's suicide two days later in the early morning of June 17, 2014, when Mr. Ernst used a blanket to hang himself in a shower stall.

In June of 2015, the Authority terminated ACH in a letter that expressed the Authority's dissatisfaction with, *inter alia*, ACH's failure to provide inmates appropriate medications. [Dkt. #93-4, p. 18].

### III.   Controlling Law

"In *Monell* [*v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)], the Supreme Court stated that 'Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 770 (10th Cir. 2013).  A municipality or other local governmental entity such as the Authority "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694.  "Instead, it is when execution of a [local] government's policy or custom . . . inflicts the injury that the government

as an entity is responsible under § 1983." *Id.* In order to establish municipal liability, Ms. Ernst must show that the Authority had an official policy or custom, that the challenged policy or practice was closely related to the violation of Mr. Ernst's constitutional rights, and that the Authority's action or inaction was taken with deliberate indifference as to its known or obvious consequences. *Schneider*, 717 F.3d at 769-70. A municipal policy or custom may take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010) (quoting in turn *City of St. Louis v. Praprotnick*, 485 U.S. 112, 127 (1988) and citing *City of Canton v. Harris*, 489 U.S. 378, 388-91 (1989); *Pembaur*, 475 U.S. at 480; and *Monell*, 436 U.S. at 690-91)).

"[C]laims based on a jail suicide are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015) (quoting *Barrie v. Grand Cty.*, 119 F.3d 862, 866 (10th Cir. 1997)). Such claims "must be judged against the deliberate indifference to serious medical needs test." *Cox*, 800 F.3d at 1248; *see also Estate of Hocker ex rel. Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994) (quoting *Martin v. Bd. of Cty Comm'rs*, 909 F.2d 402, 406 (10th Cir. 1990)). Although deliberate indifference does not require the intentional or malicious infliction of injury, it

requires more than negligence, or even gross negligence. *Barrie*, 119 F.3d at 869; *Berry v. City of Muskogee*, 900 F.2d 1489, 1495-96 (10th Cir. 1990) (citing *City of Canton*, 489 U.S. at 387-88 & n.7); *see also Daniels v. Glase*, 198 F.3d 257, *5 (10th Cir. 1999) (unpublished) ("A single instance of negligent, even grossly negligent, conduct does not evidence an unconstitutional policy nor establish the violation of a constitutional right.").

The test for deliberate indifference to serious medical needs has both objective and subjective components. The objective component focuses on whether the alleged harm is sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment, and—as the Authority recognizes—suicide is sufficiently serious. *See Cox*, 800 F.3d at 1240 n. 3.

The subjective component of the deliberate indifference test focuses on whether the municipality's conduct or adopted policy "disregards a known or obvious risk that is *very likely to result* in the violation of a prisoner's constitutional rights." *Barrie*, 119 F.3d at 869 (quoting *Berry*, 900 F.2d at 1496) (emphasis added). "Deliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County*, 768 F.2d 303, 308 (10th Cir. 1985) (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

There must be a "strong likelihood, rather than a mere possibility, that self-infliction of harm would result." *Lambert v. City of Dumas*, 187 F.3d 931, 937 (8th Cir. 1999) (internal quotations omitted) (quoting *Bell v. Stigers*, 937 F.2d 1340, 1343 (8th Cir. 1991)). The municipality must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw the inference." *Cox*, 800 F.3d at 1248

(quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  In a jail-suicide case, a plaintiff can only succeed by presenting facts suggesting that the Authority had knowledge of the specific risk of inmate suicide—*id.* at 1249-50—and "disregard[ed] that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.

### IV.  Analysis

A "plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013); *Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010).

In her response brief, Ms. Ernst raises a single proposition in which she identifies two customs she contends violated Mr. Ernst's rights: (1) "acquiescing to ACH's unconstitutional policy, practice and procedure of allowing nurses to evaluate suicidal inmates"; and (2) the Authority's "own practice policy and custom of failing to properly document and pass on information regarding suicidal inmates."  [Dkt. #93, p. 25].  In her conclusion, however, Ms. Ernst identifies *three* practices and customs: (1) "Facility had a practice and custom of not immediately placing inmate in suicide cell and instead just refer to medical"; (2) "Facility had a practice and custom of having an unqualified LPN decide whether or not inmate needed to be placed on suicide watch instead of immediately placing in suicide cell and having physician or psychiatrist evaluate prior to release"; and (3) "Facility knowingly had a practice and custom of guards failing to provide written reports to medical staff and/or supervisors documenting suicidal reports and ideations."  [*Id.* at 35].  The first and second practices and customs identified in the conclusion correspond to the first practice and custom in the proposition, and the third practice and custom identified in the conclusion corresponds to the second item in the proposition.

Although she does not list it as a custom or practice, Ms. Ernst identifies, at various points in her response, a custom and practice of refusing to provide counseling and medications that could and should have been provided. [*Id.* at 9, 21, and 29]. The court reads her response liberally as having identified that custom and practice for the purposes of this motion.

Ms. Ernst also argues that Mr. Birch, as a final policymaker for the Authority, ratified ACH's "policy and procedure of having LPNs evaluate Mr. Ernst." [Dkt. #93, pp. 26-27, 33-34].

Next, Ms. Ernst contends the Authority failed to adequately supervise ACH's provision of inmate health care. [*Id.* at 10, 35-36].

Finally, in an argument related to her contention that the Authority failed to properly document and pass on information regarding suicidal inmates, Ms. Ernst states the "Facility fail[ed] to train and supervise its officers and medical staff in reporting, documenting and responding to suicidal ideations." [*Id.* at 35].

### a. *Informal Custom Amounting to a Widespread Practice*

The Authority's formal policy does not require a nurse, or any medical staff for that matter, to evaluate an inmate before the inmate can be placed on suicide watch. Rather, *any* Authority or ACH staff member may place an inmate on suicide watch without further review or approval if the staff member considers the inmate to pose a risk of suicide. Ms. Ernst argues the Authority had a practice and custom of not immediately placing inmates on suicide watch but instead referred the decisions to an LPN.

"In order to establish a custom, the actions must be persistent and widespread . . . ." *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (quoting *Starett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989)). Ms. Ernst has presented no evidence that potentially suicidal inmates, other than Mr. Ernst, were not placed on suicide watch. Ms. Ernst also points to no

evidence of another instance in which Authority staff deferred a suicide watch decision to a nurse. Thus, there is no genuine issue of fact that the Authority had a "persistent and widespread" custom of not placing potentially suicidal inmates on suicide watch or of referring suicide watch decisions to nurses.[4]

Next, Ms. Ernst argues the Authority had a "practice[,] policy and custom of failing to properly document and pass on information regarding suicidal inmates." [Dkt. #93, p. 25]. Ms. Ernst elsewhere uses a different formulation, arguing the Authority "knowingly had a practice and custom of guards failing to provide written reports to medical staff and/or supervisors documenting suicidal reports and ideations." [*Id.* at 35].

As noted above, the staff members who spoke with Mr. Ernst on June 11, 2016, after Mr. Ernst's fellow inmate's wife called to report that Mr. Ernst was suicidal, made no written report of their contact with Mr. Ernst or the other steps, if any, they took to investigate his risk of suicide. Nor did Deputy Marshall, Deputy Prout, Deputy Jones, or Lieutenant Hutchinson prepare contemporaneous written reports of Marshall's observation of Mr. Ernst's suicidal behavior on June 12, 2016. No written reports of Mr. Ernst's suicidal behavior were submitted to medical for review. And no one told Ms. Hibbert prior to her examination of Mr. Ernst on June 12, 2014, that Deputy Marshall thought Mr. Ernst should be placed on suicide watch, or that Mr. Ernst had exhibited suicidal behavior during the ride from the courthouse to the Jail. [Dkt. #72-35, pp. 13-14].

The Authority's written suicide prevention policy states, "All jail and medical staff are responsible for monitoring the mental status of every detainee. Abnormal and/or bizarre behavior is to be reported to the medical staff immediately." [Dkt. #93-14, p. 1]. Ms. Ernst

---

[4] Even if the Authority had a custom of deferring suicide watch decisions to nurses, it is hard to see how such a custom could demonstrate deliberate indifference to the risk of suicide.

argues the Authority's "policies and procedures indicate that each time staff becomes aware of the potential for any suicide, they are to provide a *written* report to medical[,]"—[Dkt. #93, p. 32 (emphasis added)]—but she points to no evidence to support this claim. The Authority's written policy describes documentation of observations of inmates on suicide watch, but does not require written documentation of interactions with inmates who have not been placed on suicide watch. Nevertheless, Authority staff violated the written suicide prevention policy by failing to report Mr. Ernst's abnormal and suicidal behavior to the medical staff on June 12, 2014.

Yet, as Ms. Ernst's counsel recognized during oral argument, the parties have not presented evidence showing staff members failed to document or report suicidal behavior on other occasions or that the failure to document and report suicidal behavior and ideations to the medical staff was a "persistent and widespread" custom or practice. Ms. Ernst has not, therefore, raised a genuine issue of fact that the Authority had a custom of failing to document or pass on information regarding suicidal inmates.

Finally, Ms. Ernst argues the Authority had a custom or practice of refusing to provide inmates medication and individual counseling that could and should have been provided. [Dkt. #93, pp. 9, 21, 29]. As noted above, Mr. Ernst requested individual counseling and the medications Lortab and Remeron. ACH denied these requests on the grounds that these treatments were unavailable at the Jail, but this explanation was not accurate. ACH also denied Mr. Ernst's request for an increased dosage of gabapentin. Lieutenant Hutchinson testified in a deposition that the Jail does not give narcotics and did not identify any exceptions to that practice. [Dkt. #93-20, p. 6]. Counsel for Ms. Ernst subsequently presented Hutchinson with a copy of ACH's policy authorizing the administration of controlled medications and asked whether it was "the policy and procedure that narcotic medications . . . can be given to inmates at

14

your facility." [*Id.*].  Hutchinson answered, "I guess so." [*Id.*].  As previously stated, the Authority terminated ACH in June 2015, and one of the sources of dissatisfaction was that inmates were not getting appropriate medications. [Dkt. #93-4, p. 18].  The letter expressing the Authority's dissatisfaction with ACH was written a year after Mr. Ernst's suicide.  Plaintiff offers no evidence that the Authority was aware, during the period of Mr. Ernst's incarceration, that ACH was denying inmates medications or individual counseling that should have been provided.  Thus, there is no genuine issue that the Authority had a custom or practice of refusing to provide such treatment.

Furthermore, even if the Authority had been aware that ACH was denying inmates certain medications and individual counseling prior to Mr. Ernst's suicide, Ms. Ernst must still show that the Authority acted with deliberate indifference in doing so.  A municipality that delegates the provision of medical care to a contractor is not considered to have demonstrated deliberate indifference to a prisoner's serious medical needs "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner . . . ." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).  "[A] mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).  A practice of denying inmates appropriate medications and individual counseling—while providing other treatments[5]—is indicative of substandard mental health care, but without more, ACH's practice cannot be said to have been "very likely to result"

---

[5] Although ACH did not give Mr. Ernst the specific treatments he requested, there is no dispute ACH gave Mr. Ernst some treatments.  For example, it gave him Tylenol instead of Lortab for his complaints of pain from Crohn's disease.  [*See* Dkt. #72, p. 13, ¶ 17 *and* Dkt. #93, p. 8, ¶ 17].  ACH also provided mental health treatment, including treatment with gabapentin for depression, and, upon request from Mr. Ernst's family, consultation with Ms. Spriggs that included the provision of a coping skills guide.

in inmate suicide. *Barrie*, 119 F.3d at 869. Thus, ACH's practice did not amount to a "conscious disregard" of the risk of inmate suicide. *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). The court concludes there is no genuine issue of material fact that the Authority, even if it had been aware that ACH denied inmates certain medications and individual counseling, showed deliberate indifference to a specific risk of inmate suicide.

### b. Ratification by Policymaker

Ms. Ernst argues Mr. Birch had final policymaking authority, such that the Authority is liable for any of his subordinates' decisions that Birch ratified. Ms. Ernst then argues Mr. Birch ratified ACH's decisions regarding Mr. Ernst. The court is not persuaded. Plaintiff has produced no evidence that Mr. Birch knew of, or participated in, any of the decisions regarding Mr. Ernst's health care, including the decision not to place Mr. Ernst on suicide watch. As Ms. Ernst points out in her response, Mr. Birch testified that, having later learned the facts, he disagreed with the decision not to place Mr. Ernst on suicide watch.

Ms. Ernst also argues the Authority has ratified ACH's actions by defending those actions in this lawsuit. This argument is also unpersuasive. Arguing to a court that the actions taken by ACH and the Authority did not amount to a constitutional violation does not manifest a ratification by a policymaker of the actions themselves.

### c. Failure to Adequately Train or Supervise

"[D]eliberately indifferent training or supervision" can be "an official policy or custom for § 1983 municipal-liability purposes . . . ." *Schneider*, 717 F.3d at 770 (citing Schwartz at § 7.06[A]). A municipality can fail to supervise a contractor employed to provide inmate medical care. *See Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) (the "contracting of services with an independent contractor does not immunize [the Authority] from liability for damages in failing to

provide a prisoner with [constitutionally adequate] treatment."). In addition to establishing that the failure to supervise amounted to a policy or custom, a plaintiff must show causation and deliberate indifference. *Schneider*, 717 F.3d at 769.

As set forth above, Ms. Ernst contends the Authority failed to adequately supervise ACH's provision of inmate health care. She argues that "Administrator Kelly Birch [admitted] he provided no oversight of ACH's medical and mental care to inmates through monthly meetings or any other means," and that Birch "did not know how ACH provided mental healthcare." [*Id.* at 35]. Ms. Ernst notes Authority policy required Mr. Birch to hold "regularly scheduled" oversight meetings to review ACH's provision of health care to inmates. Mr. Birch admitted he did not hold "regularly scheduled" medical administrative meetings as required by the policy, instead holding "quarterly reviews." [Dkt. #93-4, p. 9]. Ms. Ernst contends these quarterly reviews were less thorough in scope than the policy required because "they would only pull about 10 [inmate] medical charts" for review. [Dkt. #93, p. 17]. She suggests that, if Mr. Birch had followed the policy, he would have seen evidence that Mr. Ernst and others were receiving inadequate mental health care. Lieutenant Hutchinson admitted she had never reviewed ACH's policies related to mental health care and did not know that ACH could give narcotics to inmates. Ms. Ernst also argues the Authority "had no means for an inmate to appeal ACH's denial of medical [care] to Creek County staff or administration." [6] [*Id.* at 35-36].

These arguments are not persuasive. First, a failure to adhere to jail policies and administrative regulations does not, of itself, equate to a constitutional violation. *Hovater v. Robinson*, 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993) (citing *Davis v. Scherer*, 468 U.S. 183, 194

---

[6] Lieutenant Hutchinson testified inmates sent "Request to Staff" forms when they disagreed with ACH's treatment decisions. Mr. Ernst addressed some Request to Staff forms to "Gina-Birch," referring to Lieutenant Hutchinson and Mr. Birch. [Dkt. #73-1, pp. 16-17]. Thus, the lack of a formal policy authorizing inmate appeals did not prevent Mr. Ernst from doing so.

(1984)). Second, as noted above, it is not enough to say that if Authority supervisors had more thoroughly supervised ACH they *would have* had reason to believe, or actual knowledge, that ACH was mistreating or not treating inmates. *See Spruill*, 372 F.3d at 236. To show the Authority acted with deliberate indifference, Ms. Ernst must demonstrate the Authority *had* reason to believe, or actual knowledge, that ACH was mistreating or not treating inmates. Third, in order to establish a failure to supervise claim, Ms. Ernst "must show that the defendant was adequately put on notice of prior misbehavior." *McClelland v. Facteau*, 610 F.2d 693, 697 (10th Cir. 1979). In this case, plaintiff has not shown the Authority was placed on notice of prior misbehavior, and therefore has not made a requisite foundational showing for her claim of failure to adequately supervise ACH. Furthermore, as noted above, even if evidence had been adduced that the Authority had been aware before Ernst's suicide that ACH was denying inmates certain medications and individual counseling—while otherwise providing medical and mental care— the evidence would be insufficient to show that the Authority was deliberately indifferent to a specific risk of inmate suicide.

Plaintiff's final argument is that the Authority failed to "train and supervise its officers and medical staff in reporting, documenting and responding to suicidal ideations." [Dkt. #93, p. 35]. As noted above, plaintiff has not produced evidence that Authority or ACH staff failed to document and report suicidal behavior or failed to place a potentially suicidal inmate on suicide watch prior to Mr. Ernst. To establish a failure to train claim, a showing "that individual officers violated a person's constitutional rights on an isolated occasion is not sufficient to raise an issue of fact whether adequate training and procedures were provided." *McClelland*, 610 F.2d at 697. An isolated incident cannot demonstrate that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of [an inmate's] rights, that the

18

policymakers . . . can reasonably be said to have been deliberately indifferent to the need for additional training." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (quoting *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996)). The parties do not dispute that Mr. Ernst's suicide was the first at the Jail in the six years since Mr. Birch became Jail Administrator and the first since Mr. Birch and the Authority contracted with ACH in 2011 for inmate medical care. [Dkt. #72, p. 18; Dkt. #93, p. 12; Dkt. #93-4, pp. 2, 6]. The Tenth Circuit has considered the absence of previous suicide attempts or successful suicides when assessing and rejecting allegations of deliberate indifference. *See Daniels* at *5. The plaintiff's argument fails for the reasons set forth above.

## V.     Conclusion

Ms. Ernst has not shown a genuine issue of fact in support of her allegations that the Authority adopted a policy, practice, or custom that caused Mr. Ernst's constitutional rights to be violated, and that the Authority acted with deliberate indifference to the risk of suicide. The Authority is therefore entitled to summary judgment on plaintiff's claims.

However, the failure to place Mr. Ernst on suicide watch when he returned from sentencing was a serious error. The LPN for the medical care contractor testified that if she had been told the transport deputy thought Mr. Ernst should be placed on suicide watch, she would have kept him under observation. Referring the suicide watch decision to the LPN did not demonstrate deliberate indifference to the risk that Mr. Ernst would commit suicide. However, doing so without relaying the transport deputy's observations was at least negligent. Better communication would likely have prevented this tragic result.

WHEREFORE, the Creek County Public Facilities Authority's Motion for Summary Judgment [Dkt. #72] is granted.

IT IS SO ORDERED this 22nd day of August, 2016.

*[signature]*
GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

20